IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT LEE DeFOY )<br>)<br>Petitioner )<br>)<br>v. )<br>)<br>JOHN M. MCCULLOUGH, et al., )<br>)<br>Respondents. ) | C.A. No. 00-110 Erie |

**PETITIONER ROBERT LEE DeFOY'S MOTION FOR SUMMARY JUDGMENT**

AND NOW, comes the Petitioner, Robert Lee DeFoy, by his attorney, Thomas W. Patton, Assistant Federal Public Defender, and files this Motion for Summary Judgment. In support thereof Counsel states:

At the time the Parole Board denied Mr. DeFoy reparole in June 1997, he had been granted a new trial on the charges of involuntary deviate sexual intercourse (IDSI), statutory rape, and corruption of minors. Despite this fact, the Parole Board denied Mr. DeFoy reparole because he would not admit his guilt to these crimes. This violated Mr. DeFoy's right not to be compelled to be a witness against himself and requires this Court to issue a writ of habeas corpus.

Background

The full procedural history of Mr. DeFoy's case has been set forth in detail in Mr. DeFoy's Memorandum of Law in support of his amended petition. This filing will focus on the denial of Mr. DeFoy's reparole in June 1997. Accordingly, only the facts relevant to those decisions will be discussed.

On January 3, 1972, Mr. DeFoy was sentenced to ten to twenty years of imprisonment for

robbery and larceny. (Petitioner's Exhibit A)[1] The sentence was given an effect date of September 29, 1972. Id. This placed Mr. DeFoy's maximum release date at September 29, 1992. Id. On October 29, 1991, Mr. DeFoy was arrested on charges of involuntary deviate sexual intercourse (IDSI), statutory rape, and corruption of minors. (Petitioner's Exhibits D and H) Mr. DeFoy did not post bond on the new state charges. (Petitioner's Exhibit H) The Parole Board placed a detainer on Mr. DeFoy, and stayed any action on his case pending the disposition of the new charges. (Petitioner's Exhibit D) Following a three-day jury trial at which Mr. DeFoy testified, a jury convicted Mr. DeFoy of involuntary deviate sexual intercourse, statutory rape, and corruption of minors. (Petitioner's Exhibit E) He was sentenced on January 25, 1993 to six and one-half to 13 years of imprisonment. (Petitioner's Exhibit E)

On November 10, 1992, the Parole Board revoked Mr. DeFoy's parole on the robbery and larceny sentence. (Petitioner's Exhibit F) The Board ordered that Mr. DeFoy serve 40 months of backtime and participate in sex offender treatment. (Petitioner's Exhibit F) On November 5, 1993, the Board entered an order setting Mr. DeFoy's reparole date at March 25, 1993, upon the condition that there were no misconducts and that Mr. DeFoy remain involved in required programs. (Petitioner's Exhibit AA) That order, for the first time, recalculated Mr. DeFoy's maximum release date, setting the date as June 7, 2001. (Petitioner's Exhibit AA) This release date was calculated by taking away all of Mr. DeFoy's "street" time and adding it to the previous maximum date of September 29, 1992. On November 23, 1993 the Board entered an order correcting the obviously

---

[1] Citations to Petitioner's Exhibits A-N refer to the exhibits attached to Mr. DeFoy's original petition. Citations to Petitioner's Exhibits AA-GG refer to exhibits attached to the amended petition. Petitioner's Exhibits AAA - EEE refer to exhibits attached to this motion for summary judgment.

2

incorrect reparole date of March 25, 1993 to March 25, 1997, 40 months from November 25, 1993. (Petitioner's Exhibit BB)

On November 8, 1996, Mr. DeFoy received a class 1 misconduct for refusing to obey an order. (Petitioner's Exhibit J) As a result, on April 22, 1997, the Board entered an order temporarily rescinding Mr. DeFoy's reparole date, and listing his case for reinterview on the next available docket. (Petitioner's Exhibit DD)

The next available docket was August 1997. (Petitioner's Exhibit K) Prior to that date, on March 27, 1997, Judge Cassimatis granted Mr. DeFoy's post-conviction petition and ordered a new trial on the IDSI, statutory rape and corruption of a minor charges. (Petitioner's Exhibit I) On April 17, 1997, Judge Cassimatis entered an order finding Mr. DeFoy eligible for bail and setting bail at $25,000. (Petitioner's Exhibit EEE)

In August 1997, the Parole Board considered Mr. DeFoy for reparole. In preparation for Mr. DeFoy's reparole interview, Parole Agent Frederick L. Cutler completed the first two pages of a Parole Decision Making Guidelines form and a Summarization Report. (Cook Dep. p. 50, Cutler Dep. pp. 15, 21) The Parole Decision Making Guidelines are attached as Petitioner's Exhibit AAA and the Sumarization Report is attached as Petitioner's Exhibit BBB. The Parole Decision Making Guidelines are used by the Board to assist in making parole or reparole determinations. The Guidelines take into account a number of different factors believed by the Board to be relevant to the parole/reparole decision and, after their application, result in a recommendation of either parole/reparole or refuse parole/reparole. (Martinez Dep. pp. 7-8) The Board follows the Guidelines' recommendation in approximately 80% of its cases. (Martinez Dep. pp. 7-8) The Summarization Report, as the name suggests, provides a summary of the inmate's case, including

the Department of Corrections' recommendation as to parole/reparole, and the Parole Decision Making Guidelines' recommendation as to parole/reparole. For Mr. DeFoy's 1997 reparole consideration the Parole Decision Making Guidelines recommended he be reparoled and the Department of Corrections recommended that he be reparoled. (Petitioner's Exhibit AAA p. 2, Petitioner's Exhibit BBB p. 1)

      Hearing Officer Deborah Cook conducted Mr. DeFoy's reparole interview on June 19, 1997. (Cook Dep. p. 51, Petitioner's Exhibit AAA) Mrs. Cook has been employed by the Board as a Hearing Examiner since August 1996. Mrs. Cook started with the Board in 1983 as a Parole Agent, was promoted to a Supervisory Agent in the late 80's or early 90's and held that position until becoming a Hearing Examiner in August 1996. (Cook Dep. p. 8) One of Mrs. Cook's duties as a Hearing Officer is to conduct interviews of inmates eligible for parole or reparole and make recommendations to the Board as to whether the inmate should or should not be released. (Id.) Mrs. Cook conducts hearings at numerous institutions. (Id. at 11) When she arrives at the institution she receives a list of the inmates she will be interviewing and the Board's file for each inmate. (Id.) Included in the Board file is a Parole Decision Making Guideline form completed through page 2 by an institutional Parole Agent, (Id. at 50-51) and a Summarization Report also prepared by an institutional Parole Agent. (Id. at 14-18) The Board file will also contain a recommendation from the Superintendent or Warden of the facility in which the inmate is housed as to whether the Department of Corrections supports parole or reparole. (Cook Dep. pp. 16-17) After reviewing the file, Mrs. Cook will interview the inmate. The interview can last anywhere from a few minutes to an hour. (Id. at 21) The process is set up to allow Mrs. Cook to interview fifteen inmates a day. (Id.) After the interview, Mrs. Cook can either recommend release,

recommend against release, or continue the matter if she needs more time to look into an issue. (Id. at 22-23) Mrs. Cook's recommendation is then documented on the Parole Decision Making Guideline Form. (Id.)

With regard to Mr. DeFoy's reparole consideration in June 1997, Mrs. Cook acknowledged that the Parole Decision Making Guidelines recommended that Mr. DeFoy be reparoled. (Cook Dep. pp. 51-52) Mrs. Cook also acknowledged that John McCullough, the Superintendent of facility in which Mr. DeFoy was incarcerated, recommended reparole on behalf of the Department of Corrections. (Id. at 57) Following Mrs. Cook's interview of Mr. DeFoy, she recommended that the reparole decision be continued so she could check on the status of Mr. DeFoy's IDSI, statutory rape, and corruption of minors conviction. The Summarization report indicated that Mr. DeFoy had received a new trial on the charges and that bail had been set on the charges and posted by Mr. DeFoy (Petitioner's Exhibit BBB) and Mrs. Cook's notes indicate that she was informed that Mr.DeFoy had been granted a new trial on the IDSI, statutory rape, and corruption of minors conviction. (Petitoner's Exhibit AAA p. 4, Cook Dep. pp. 106-107)

On August 1, 1997, Mrs. Cook reviewed information received from York County which indicated that since the York County District Attorney's Office had appealed the order granting Mr. DeFoy a new trial, the IDSI, statutory rape, and corruptions of a minor convictions "stands until that matter is resolved." (Petitioner's Exhibit AAA p. 4, Cook Dep. pp. 106-107) Based upon this legal opinion, Mrs. Cook treated the IDSI, statutory rape, and corruptions of a minor convictions to be valid which, in turn, validated the requirement that Mr. DeFoy needed sex offender treatment. (Cook Dep. p.107) Since Mr. DeFoy had not completed sex offender treatment, however, Mrs. Cook would not recommend his reparole even though the Parole Decision Making Guidelines

recommended reparole. (Id. at 107-108) In fact, Mrs. Cook could not remember any case in her time with the Board in which a defendant who refused to participate in the Sex Offender Treatment was actually released. (Id. at 37) As Mrs. Cook put it, "[t]hey can be considered for parole whether they've had the program or not, but for the decision – – – for the person to be paroled, the Board has been very serious about them having sex offender treatment." (Id.)

Page three of the Parole Decision Making Guidelines form contains section IV of the form entitled "COUNTERVAILING FACTORS TO EXPLICIT POLICY OF PAROLE DECISION MAKING GUIDELINES." (Petitioner's Exhibit AAA) Part A of the section is entitled "Factors Countervailing a Guideline Recommendation to Refuse Parole" and part B of the section is entitled "Factors Countervailing a Guideline Recommendation to Parole." (Petitioner's Exhibit AAA) The countervailing factors are "risks outside of the parole guideline for which a parole refusal may be justified." Mrs. Cook identified four countervailing factors weighing against the Parole Decision Making Guidelines form's recommendation of reparole: 1) the client had a recent psychiatric/psychological report which causes concern; 2) there is an unfavorable recommendation from Board Staff; 3) Mr. DeFoy refused to participate in sex offender treatment; and 4) Mr. DeFoy had a negative attitude.

> **Instructions:** The countervailing factors to a guideline recommendation to refuse parole (A) or to parole (B) are for information to the decision makers only. Countervailing factors checked in (B) are **not** to be communicated in the Board action as such. The Board Member/Hearing Examiner will supply the appropriate reasons for refusal in his/her decisions in section VII of this guideline document.

(Petitioner's Exhibit AAA p. 3) (emphasis in original).

The psychological report referred to by Mrs. Cook was attached to the Summarization Report and is attached here as Petitioner's Exhibit CCC. The report states that Mr. DeFoy had "no

history of mental illness or psychiatric treatment." Despite this fact, the report concludes by stating: "In Summary, due to Mr. DeFoy's denial of his sex offense and lack of treatment, he is not appropriate for parole at this time. Mr. DeFoy needs to participate in Sex Offender treatment prior to any consideration for parole release." (Petitioner's Exhibit CCC)

The unfavorable recommendation from Board Staff came from Parole Agent Frederick Cutler, as documented in the Summarization Report. (Petitions Exhibit BBB) That recommendation, however, does not provide any explanation as to why reparole should not be granted in countervailence of the Parole Decision Making Guidelines and against the recommendation of the Department of Corrections.

The failure to participate in Sex Offender Treatment speaks for itself, and is the reason the present action has been filed.

Finally, while "negative attitude" is listed as a factor weighing against reparole, nothing in Mrs. Cook's notes on page 4 of the Parole Decision Making Guidelines form indicates that Mr. DeFoy presented to her with a negative attitude. The psychological evaluation claimed that Mr. DeFoy stated that the Board "screwed everybody" and the Summarization Report noted that Mr. DeFoy threatened to sue Agent Cutler because Mr. DeFoy had been granted a new trial on the IDSI, statutory rape, and corruptions of a minor charges and had not been released. (Petitioner's Exhibits CCC, BBB).

Despite the recommendations of the Parole Decision Making Guidelines and the Department of Corrections, Mrs. Cook recommended that Mr. DeFoy not be reparoled. (Petitioner's Exhibit AAA, Cook Dep. p. 67) The official reasons given for not reparoling were listed as Mr. DeFoy's prior removal for cause from a half-way house, the offense for which Mr. DeFoy was on parole,

7

armed robbery, was an assaultive offense, failure to participate in Sex Offender Treatment, and the fact that Mr. DeFoy had received one misconduct. (Petitioner's Exhibit AAA, p. 6) Mr. DeFoy's prior removal from a half-way house, the fact that the offense was assaultive, and that he had received a misconduct were all factors taken into account by the Parole Decision Making Guidelines. (Petitioner's Exhibit AAA, Cook Dep. pp. 60-65, Mueller Dep. pp. 21-22)

Nicholas Muller, the Chairman of the Board at the time, reviewed Mrs. Cook's recommendation for denial of reparole and agreed with her recommendation. (Petitioner's Exhibit AAA) Mr. Muller acknowledged that all of the reasons listed for refusing reparole, other than Mr. DeFoy's refusal to participate in Sex Offender Treatment, had already been taken into consideration by the Parole Decision Making Guidelines. (Muller Dep. pp. 20-21) For Mr. Muller, "the big issue" and "primary consideration" in the denial of Mr. DeFoy's reparole was Mr. DeFoy's refusal to participate in Sex Offender Treatment. (Muller Dep. pp. 23, 27) This was the case despite Mr. Muller knowing that at the time of the reparole consideration Mr. DeFoy had been granted a new trial on the IDSI, statutory rape, and corruption of a minor charges. (Muller Dep. p. 29) The Board's denial of reparole was consistent with Mr. Muller's testimony that "it would be very unlikely" for an inmate to be paroled or reparoled if they refused to participate in Sex Offender Treatment. (Id. at p. 17)

Michael Ocilka, a Psychological Services Specialist with the Pennsylvania Department of Corrections who helps administer the Sex Offender Treatment program at SCI Houtzdale, explained the mechanics of the program. (Ocilka Dep. pp. 7-11) During the "core treatment" phase of the program, the inmate must admit to the official version of the offense and discuss the details of the offense in group counseling which consists of roughly 15 inmates. (Id. at 16-17) If the inmate will

not admit his guilt he will be removed from the program. (Id. at 16) In the seven and a half years Mr. Ocilka has worked as a Psychological Services Specialist he has never "known or learned" of an inmate who has refused Sex Offender Treatment being released on parole. (Id. at 30) Mr. Ocilka explained that it is understood at the institution by both the inmates and staff that an inmate who does not participate in Sex Offender Treatment is not going to be released on parole. (Id. at 30)

      This experience was present when Mr. DeFoy became eligible for for parole on the IDSI, statutory rape, and corruptions of a minor sentence in 2005. At that time, Mr. Ocilka interviewed Mr. DeFoy and generated a Psychological Evaluation for Parole for the Board's use in making its parole decision. (Id. at 18-27, Petitioner's Exhibit DDD) The evaluation indicated that Mr. DeFoy had a mental health stability rating of "A" which indicated no need for any mental health treatment (Id. at 25) and that Mr. DeFoy was not suffering from any significant psychopathology at the time of Mr. Ocikla's evaluation. The evaluation then indicated that Mr. DeFoy did not admit his guilt and refused to participate in Sex Offender Treatment and, therefore, "this writer believes that any additional information in the report regarding Mr. DeFoy would be superfluous." (Petitioner's Exhibit DDD p. 2, Ocilka Dep. p. 27) Mr. Ocilka explained that his statement in the report about additional information being superfluous was based on his experience that since Mr. DeFoy would not participate in Sex Offender Treatment he was not going to be paroled and so any other information just wouldn't matter. (Ocilka Dep. p. 29) As Mr. Ocilka explained, "[m]y remark there was based upon the fact that, yes, he was – – – my knowledge of how parole operates, they were not going to parole this man. And therefore, additional information was not necessary." (Id. at 36) When asked for further clarification on the point, Mr. Ocilka explained "[p]arole was not going to be granted to this individual based upon my knowledge of the system. And therefore, additional

9

information just was not necessary." (Id. at 37)

John McCullough was the Superintendent of SCI Houtzdale in 1997 and 2000 when Mr. DeFoy was considered for reparole. Mr. McCullough worked for the Department of Corrections from 1974 until 2004. (McCullough Dep. p. 8) Mr. McCullough was the Director of Treatment at SCI Rockview from 1974 through 1990. In 1990 he was promoted to deputy superintendent of SCI Camp Hill where he stayed for six or seven months, after which he returned to SCI Rockview as deputy superintendent for treatment where he stayed until being promoted to Superintendent of SCI Houtzdale in 1995. (McCullough Dep. p.9) Mr. McCullough was the Superintendent at Houtzdale until 2003 when he was promoted to Deputy Secretary of the Western Region where he stayed until his retirement in 2004. (Id.)

In his thirty years of experience Mr. McCullough found that if an inmate did not participate in Sex Offender Treatment as ordered either by the Board or the Department of Corrections, "it's understood by the Department of Corrections and by the Board" that the inmate would not be paroled. (Id. at 16) Based on this reality, Mr. McCullough would inform the inmates that if they did not participate in Sex Offender Treatment, they wouldn't be paroled. (Id. at 40) This was done to give the inmates fair warning about the consequences of their decisions because "the stability of your institution depends on how well you handle the parole situation, how fair you are." (Id. at 41) But, as Mr. McCullough further explained, "we told the inmates that [they wouldn't be released]. And that was accurate. Find that in writing, you won't."

Although there was never any written policy on the issue, Mr. McCullough explained that except in a few rare circumstances in which the Department of Corrections was able to convince the Board that Sex Offender Treatment was not warranted due to the specifics of the offense, he

10

could not ever recall an inmate who was paroled after refusing Sex Offender Treatment. (McCullough Dep. p. 45) Specifically, when asked what happens if the Board and the Department of Corrections agree that an inmate needs Sex Offender Treatment but the inmate refuses to complete the treatment, Mr. McCullough explained: "He isn't going home." (Id. at 46)

With regard to Mr. DeFoy, Mr. McCollough confirmed that when Mr. DeFoy came up for reparole in June 1997, Mr. McCollough, as Superintendent, recommended reparole. (Id. at 27)

### The Fifth Amendment Violation.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." "[O]ne of the Fifth Amendment's basic functions . . . is to protect *innocent* men . . . who otherwise might be ensnared by ambiguous circumstances." Ohio v. Reiner, 121 S.Ct. 1252, 1254 (2001) (internal quotations omitted) (citations omitted) (emphasis in original). The privilege "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." Lefkowitz v. Turley, 414 U.S. 70, 77 (1973). A criminal defendant who has been convicted retains the privilege after imprisonment as long as his testimony may be used against him in a future trial for a crime of which he has not yet been convicted. See, Mitchell v. United States, 526 U.S. 314, 325 (1999).

> This command of the Fifth Amendment . . . registers an important advance in the development of our liberty "one of the great landmarks in man's struggle to make himself civilized." Time has not shown that protection from the evils against which this safeguard was directed is needless or unwarranted. This constitutional protection must not be interpreted in a hostile or niggardly spirit. Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or

11

> commit perjury in claiming the privilege. Such a view does scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States.

Ullmann v. United States, 350 U.S. 422, 426-27 (1956) (footnotes omitted).

"The constitutional privilege against self-incrimination has two primary interrelated facets: The Government may not use compulsion to elicit self-incriminating statements, and the Government may not permit the use in a criminal trial of self-incriminating statements elicited by compulsion." Murphy v. Waterfront Comm'n, 378 U.S. 52, 57 n.6 (1964) (citations omitted). Compulsion exists when some factor denies the individual the "free choice to admit, to deny, or to refuse to answer." Lisenba v. California, 314 U.S. 219, 241 (1941).

"Determining what constitutes unconstitutional compulsion involves a question of judgment: Courts must decide whether the consequences of an inmate's choice to remain silent are closer to the physical torture against which the Constitution clearly protects or the *de minimis* harms against which it does not." McKune v. Lile, 536 U.S. 24, 41, 122 S.Ct. 2017, 2028-29 (2002). The Supreme Court has found compulsion in a number of different contexts. In Garrity v. New Jersey, 385 U.S. 493 (1967), Gardner v. Broderick, 392 U.S. 273 (1968), and Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation of New York, 392 U.S. 280 (1968), the Supreme Court found that forcing police officers and city employees to chose between incriminating themselves or losing their jobs amounted to improper coercion of incriminating testimony. In Spevack Klien, 385 U.S. 511, 516 (1967), the Court held that an attorney's statements made at a disciplinary proceeding under threat of disbarment were coerced. In Lefkowitz v. Turley, 414 U.S. 70 (1973), the Court found a state statute which required that two architects who had refused to waive the privilege when summoned before a grand jury be stripped of their state contracts and prohibited from obtaining

state contracts for five years violated the Fifth Amendment as the statute was an attempt by the state to coerce incriminating testimony. Finally, in Lefkowitz v. Cunningham, 431 U.S. 801 (1977), the Court found a New York statute which automatically stripped an officer of a political party of his official position if the officer refused to waive his right against incrimination if called before a grand jury unconstitutional. In reaching this decision the Court reiterated that "a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." Id. at 805. "[G]overnment cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized." Id. at 806.

In McKune, the Supreme Court found that the Kansas sex offender treatment program did not violate the Fifth Amendment. Under the Kansas program, a refusal to participate in the program resulted in a transfer of the inmate to a higher security facility and a reduction in visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, and the loss of access to a personal television. McKune, 536 U.S. at 30-31, 122 S.Ct. 2023. A majority of the Court held that the loss of these privileges did not amount to unconstitutional compulsion, but a majority of the Court could not agree on a rationale to support this conclusion. A four-justice plurality employed the "atypical and significant hardship" test of Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293 (1995) to determine whether or not the penalties imposed by Kansas for failure to participate in its sex offender program amounted to unconstitutional compulsion. McKune, 536 U.S. at 41, 122 S.Ct. 2029. "A prison clinical rehabilitation program, which is acknowledged to bear a rational relation to a legitimate penological objective, does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are related to

13

the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life." Id. at 37-38, 2027. The plurality found that the denial of benefits at issue in the Kansas program did not constitute atypical and significant hardship in relations to the ordinary incidents of prison life, and, therefore, did not amount to unconstitutional compulsion. In reaching this conclusion, however, the plurality explicitly noted that the inmate's decision not to participate in the program "did not extend his term of incarceration. Nor did his decision affect his eligibility for good-time credits or parole." Id. at 38, 2027.

Justice O'Conner provided the fifth vote for the McKune majority. Id. at 48, 2032. Justice O'Conner disavowed the plurality's use of the Sandin "atypical and significant hardship" test to determine compulsion, finding that the Fifth Amendment compulsion standard broader than Sandin. Id. Justice O'Conner explained that the Court's "penalty cases," Uniformed Sanitation Men Ass'n, Inc v. Commissioner of Sanitation of City of New York, supra, Spevack v. Klein, supra, Lefkowitz v. Turley, supra, and Lefkowitz v. Cunningham, supra, established that the threatened loss of one's livelihood or the political influence or prestige of elected office were "grave" consequences that established unconstitutional compulsion. Justice O'Conner did not believe that "the consequences facing respondent in this case are serious enough to compel him to be a witness against himself." McKune, 536 U.S. at 50, 122 S.Ct. 2033-34. That having been said, Justice O'Conner made clear that threats of longer incarceration and execution "are far greater than those we have already held to constitute unconstitutional compulsion in the penalty cases." Id. at 52, 2034.

> I believe the proper theory should recognize that it is generally acceptable to impose the risk of punishment, however great, so long as the actual imposition of such punishment is accomplished through a fair criminal process. See, e.g., McGautha v. California, [402 U.S. 183, 213, 91 S.Ct. 1454 (1971)] ("The criminal process, like the rest of the legal system, is replete with situations requiring the

14

>making of difficult judgments as to which course to follow.  Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." (Citation and internal quotation marks omitted.)) Forcing defendants to accept such consequences seems to me very different from imposing penalties for the refusal to incriminate oneself that go beyond the criminal process and appear, starkly, as government attempts to compel testimony; in the latter context, any penalty that is capable of compelling a person to be a witness against himself is illegitimate.

Id. at 53, 2035.

Justice Stevens wrote for the four dissenting Justices.  Id. at 54, 2035.  Justice Stevens had no problem concluding that the transfer of the respondent to a higher security facility and the concomitant loss in privileges punished the inmate for invoking his Fifth Amendment right not to incriminate himself.  Id. at 56, 2036.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993 (1977) (internal quotation marks omitted).  As Justice O'Conner's concurrence provides a narrower basis for reversing the judgment in McKune, her opinion constitutes the holding of the case.  Ainsworth v. Stanley, 317 F.3d 1, 4 (1st Cir. 2002); Searcy v. Simmons, 299 F.3d 1220, 1225 (10th Cir. 2002); United States v. Antelope, 395 F.3d 1128, 1133 n.1 (9th Cir. 2005).

Justice O'Conner's opinion, while not setting forth a completely comprehensive theory of the Fifth Amendment, indicates that if an inmate has been convicted of a sex offense through a fair criminal process, the inmate must accept the consequences of that conviction, even if the consequences include potentially longer sentences if the inmate will not participate in treatment.

15

In this view, sex offender treatment is part of the criminal process, and any penalty or denied benefit due to a failure to participate in sex offender treatment is acceptable as the imposition of the original punishment imposed through a fair criminal process. The Fifth Amendment is violated, however, if an inmate is penalized not as part of the criminal process but rather as part of a government attempt to compel testimony. In this context, any penalty that is capable of compelling a person to be a witness against himself is illegitimate. As explained by the Ninth Circuit, "[a]lthough it may be acceptable for the state to impose harsh penalties on defendants when it has legitimate reasons for doing so consistent with their conviction of their crimes of incarceration, it is a different thing to impose 'penalties for the refusal to incriminate oneself that go beyond the criminal process and appear, starkly, as government attempts to compel testimony.'" Antelope, 395 F.3d at 1137 (quoting McKune, 536 U.S. at 53, 122 S.Ct. 2017, O'Conner, J., concurring).

      In this case, when the Board considered Mr. DeFoy for reparole in June 1997, through a fair criminal process, his convictions and sentence for the IDSI, statutory rape, and corruption of a minor had been vacated and a new trial ordered. And, at the time of his interview with Mrs. Cook, Mr. DeFoy had been granted bail on the pending charges. Refusing reparole on the armed robbery sentence at this point due to Mr. DeFoy's refusal to admit his guilt to the IDSI, statutory rape, and corruptions of a minor charges went well beyond the criminal process into a stark attempt by the Commonwealth to compel testimony. In essence, the Commonwealth demanded that Mr. DeFoy admit his guilt to a pending charge as a condition of being paroled on an unrelated charge. That is the quintessential government attempt to compel testimony. Antelope, 395 F.3d at 1137-38 (revoking supervised release because defendant convicted of possessing child pornography would not admit to committing other crimes violated Fifth Amendment).

It cannot be seriously disputed that the testimony sought from Mr. DeFoy would be incriminating. The Sex Offender Treatment program required Mr. DeFoy to admit to the official version of the offense which meant he would have had to admit to the official version of the IDSI, statutory rape, and corruption of a minor offenses which admission could have then been used against him at his new trial rendering the new trial meaningless. That the testimony was compelled is also beyond dispute. The only basis for refusing Mr. DeFoy reparole in 1997 was his refusal to participate in Sex Offender Treatment. The Parole Decision Making Guidelines form recommended release, the Department of Corrections recommended release, and the only factors listed as countervailing the guidelines was a negative psychiatric report, which stated Mr. DeFoy had no history of mental illness or treatment but needed to participate in Sex Offender Treatment, an unexplained, unfavorable recommendation from Board staff, the refusal to participate in Sex Offender Treatment, and a negative attitude. (Petitioner's Exhibit AAA p. 3) To put it mildly, a person may have a negative attitude when he is being told he won't be paroled because he won't admit he's guilty of offenses for which he has been granted a new trial.

When a situation involves an attempt by the government to compel testimony, "any penalty that is capable of compelling a person to be a witness against himself is illegitimate." McKune, 536 U.S. at 53, 122 S.Ct. 2017. Justice O'Conner's opinion and Justice Steven's opinion make clear that increased incarceration, or the threat thereof, is a penalty that is capable of compelling a person to be a witness against himself. Incarceration is the harshest sanction our society uses to punish citizens. Indeed, all the Court need look at in this context is the manner used to compel recalcitrant witnesses to testify. When witnesses refuse to testify, they are held in contempt and incarceration is used to convince the witness to change their minds. In re Grand Jury Investigation, 600 F.2d 420

17

(3rd Cir. 1979).

      Justice O'Conner's insistence that an inmate accept the consequences of a conviction resulting from a fair criminal process applies equally to the Commonwealth. Mr. DeFoy obtained an order vacating his convictions and granting a new trial through a fair criminal process created by the Commonwealth. The Commonwealth, through the Board, was not free to ignore the results of this fair criminal process at its whim. At the time the Board considered Mr. DeFoy for reparole in July 1997, the Board knew that Mr. DeFoy had been granted a new trial on the IDSI, statutory rape, and corruption of a minor charges and yet it refused to reparole Mr. DeFoy, in contradiction to its own guidelines, because Mr. DeFoy would not admit he was guilty of the very offenses for which he had been granted a new trial. These actions went well beyond the criminal process, indeed ignored the criminal process, and appear, starkly, as a government attempt to compel Mr. DeFoy to be a witness against himself.

      The Board can not punish Mr. DeFoy for legitimately invoking his Fifth Amendment privilege to not be a witness against himself. The evidence in this case makes clear that had the Board not considered Mr. DeFoy's invocation of the Fifth Amendment he would have been paroled following the June 1997 reparole consideration. The Parole Decision Making Guidelines form recommended release, the Department of Corrections recommended release, and the only reasons given to countervail the guidelines was Mr. DeFoy's failure to participate in Sex Offender Treatment. The proper remedy for the Board's violation of Mr. DeFoy's Fifth Amendment rights is to enter an order reparoling Mr. DeFoy effective August 12, 1997, the date the Board issued its ruling on Mr. DeFoy's reparole consideration. <u>Mickens-Thomas v. Vaughn</u>, 355 F.3d 294, 309 (3rd Cir. 2004).

WHEREFORE, petitioner, Robert Lee DeFoy, respectfully requests that this Honorable Court issue a writ of habeas corpus ordering the Pennsylvania Department of Corrections to release Mr. DeFoy from imprisonment on his armed robbery and larceny sentence effective August 12, 1997.

    Respectfully submitted,
/s/ Thomas W. Patton
Thomas W. Patton
Assistant Federal Public Defender
P.A. I.D. No. 88653