# U.S. DISTRICT COURT

## FOR THE WESTERN DISTRICT OF

## PENNSYLVANIA

\* \* \* \* \* \* \* \*

ROBERT LEE DEFOY,      \*

    Petitioner      \* Case No.

    vs.      \* 00-110 Erie

Superintendent JOHN\* District Judge

M. MCCULLOUGH,      \* McLaughlin

Attorney General D.\* Magistrate Judge

MICHAEL FISHER,      \* Baxter

PENNSYLVANIA BOARD \*

OF PROBATION AND      \*

PAROLE,      \*

    Respondents      \*

               \*

\* \* \* \* \* \* \*

*ORIGINAL*

### DEPOSITION OF

### DEBORAH COOK

### August 11, 2006



RECEIVED
AUG 2 2 2006
FEDERAL PUBLIC DEFENDER
ERIE - N.W. PENNSYLVANIA

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

1

Sargent's Court Reporting Service, Inc.
(814) 536-8908

2

1                    D E P O S I T I O N

2                         O F

3    DEBORAH COOK, taken on behalf of the

4    Plaintiff herein, pursuant to the Rules

5    of Civil Procedure, taken before me,

6    the undersigned, Melissa Beam, a Court

7    Reporter and Notary Public in and for

8    the Commonwealth of Pennsylvania, at

9    the offices of SCI-Laurel Highlands,

10   5706 Glades Pike, Somerset,

11   Pennsylvania, on Friday, August 11,

12   2006, beginning at 7:59 a.m.

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    A P P E A R A N C E S

2

3    THOMAS W. PATTON, ESQUIRE

4    Assistant Federal Public Defender

5    1001 State Street, Suite 111

6    Erie, PA  16501

7        COUNSEL FOR PETITIONER

8

9    SCOTT A. BRADLEY, ESQUIRE

10   Office of Attorney General

11   Commonwealth of Pennsylvania

12   Litigation Section

13   6th Floor, Manor Complex

14   564 Forbes Avenue

15   Pittsburgh, PA  15219

16       COUNSEL FOR RESPONDENTS

17

18

19

20

21

22

23

24

25

4

1                        I N D E X

2

3    WITNESS:   DEBORAH COOK

4    EXAMINATION

5        By Attorney Patton              7 - 98

6    EXAMINATION

7        By Attorney Bradley           98 - 103

8    RE-EXAMINATION

9        By Attorney Patton          104 - 112

10   CERTIFICATE                          113

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                         EXHIBIT PAGE

2

3                                              PAGE

4       NUMBER      DESCRIPTION              IDENTIFIED

5       A           12/9/92  Green  Sheet        42

6       B           11/5/93  Green  Sheet        42

7       C           11/23/93  Green  Sheet       42

8       D           4/23/97  Green  Sheet        47

9       E           6/19/97  Parole  Decision

10                  Making  Guidelines           48

11      F           6/97  Summarization

12                  Report                        53

13      G           Psychological  Report         54

14      H           10/00  Parole  Decision

15                  Making  Guidelines            77

16      I           10/00  Summarization

17                  Report                        83

18      J           7/11/00  Letter               86

19      K           10/24/00  DC-13(A)  Form      86

20

21

22

23

24

25

6

1                    OBJECTION PAGE

2

3    ATTORNEY                                    PAGE

4

5                    NONE MADE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1                    P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3    DEBORAH COOK, HAVING FIRST BEEN DULY

4    SWORN, TESTIFIED AS FOLLOWS:

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6    EXAMINATION

7    BY ATTORNEY PATTON:

8    Q.      Mrs. Cook, my name's Tom Patton.

9    I'm an Assistant Federal Public

10   Defender, and I represent Mr. DeFoy, in

11   the case that we're here taking the

12   deposition on today.  I'm going to ask

13   you a series of questions, and if you

14   don't understand any questions, just

15   please say so and I'll try to ask it in

16   a more intelligible manner.  Can you

17   start off just by telling us your full

18   name?

19   A.      Deborah, D-E-B-O-R-A-H, Cook,

20   C-O-O-K.  Middle initial, R.

21   Q.      And how are you employed?

22   A.      I'm a Hearing Examiner with the

23   Pennsylvania Board of Probation and

24   Parole.

25   Q.      How long have you held that

8

1   position?

2   A.      I have been a Hearing Examiner

3   continuously since August of 1996.

4   Q.      Did you hold any positions with

5   the Parole Board before you became a

6   Hearing Examiner?

7   A.      Yes, yes.

8   Q.      What positions did you hold?

9   A.      I began as an agent in 1983, and

10  I became a supervisor, I don't recall

11  the date, but it was the late 1980s,

12  perhaps the first part of 1990.  That

13  was a supervisor in the field.

14  Q.      And you held that position until

15  August of '96, when you became an

16  Examiner?

17  A.      That's correct.

18  Q.      What are your duties, generally

19  speaking, as a Hearing Examiner?

20  A.      Hearing Examiners in

21  Pennsylvania for the Parole Board have

22  three general duties.  The first one is

23  to conduct interviews with an eye

24  towards a recommendation or a vote on

25  parole.  The second is to do due

9

1   process hearings that determine whether

2   an individual who has been on parole

3   has, in fact, violated their parole.

4   And if so, what sanctions should be

5   imposed.  The third thing is by Act 8

6   of 1995, Pennsylvania Parole Board

7   Hearing Examiners do conduct oral

8   testimonies for the Office of Victim

9   Advocate.  It's a sworn testimony given

10  by a victim, who has indicated that

11  they wish to have input into whether an

12  individual is paroled or not.  Those

13  are the three basic duties, and

14  everything that goes with them,

15  including some clerical duties.

16  Q.      I'd like to focus, if I could,

17  on the first duty that you laid out,

18  interviewing individuals for parole

19  determinations.

20  A.      Uh-huh (yes).

21  Q.      Could you explain for me how the

22  process works of how you get notified

23  that a particular individual needs to

24  be interviewed?  And then once you get

25  that notification, what steps you take

10

1    to do your interview, what type of

2    material you review, and then how you

3    convey your recommendation to a Board

4    member, and then what interaction you

5    have with the Board member for the

6    parole decision to be made.

7    A.    Okay.  I think we'll take that a

8    chunk at a time, if we may.

9    Q.    Sure.

10   A.    Okay.  Generally, what happens

11   is either three or four months before

12   an individual's minimum --- it was

13   three months for a long time.  It's now

14   four, and I don't remember when that

15   changed, but it's fairly recently,

16   within the last year or so.  Four

17   months before an individual's minimum,

18   they are put on a list in our state

19   institutions or with our county

20   institutions as well.  We have agents

21   who deal with that for county prisons

22   that have state prisoners in them.

23   They generate a list.  I do not know

24   ahead of time in the state institutions

25   who it is that I'm going to be seeing.

11

1           So when I arrive at a

2    state correctional institution, I am

3    given a list and files, the Board

4    files, as a general rule, which are the

5    official records.

6    Q.    Do you know who generates that

7    list?

8    A.    I can't really answer that, no.

9    It's kind of a long process that

10   involves both the Department of

11   Corrections --- and we have a full-time

12   staff at each one of the state

13   correctional institutions that deal

14   with that only. And they would more

15   specifically know than I do.

16   Q.    Okay.

17   A.    I arrive, I get the list.

18   Q.    Okay.

19   A.    My job is to make sure that my

20   area --- I have a number of

21   institutions that I regularly go to,

22   that I make available to them the days

23   that I can in order to interview the

24   people that are listed for each docket

25   for each month.

12

1  Q.       Okay.   Once you arrive at an

2  institution and are given the list of

3  the inmates that you need to interview

4  at that institution, I believe you said

5  that you would be provided with that

6  inmate's file?

7  A.       That's correct.

8  Q.       Are you referring to the Parole

9  Board's file for that individual?

10  A.       Yes, with the exception of video

11  conferencing, when I am given a portion

12  of the file, really, all of the

13  relevant information but not the entire

14  file.   And that's because in video

15  conference, the person who has the

16  entire file is a Board member who is

17  joining us by the video conference

18  technology.   And he or she has the

19  Board file.

20  Q.       If you are not doing a video

21  conferencing hearing, then you would

22  actually have the Board file?

23  A.       That's correct.

24  Q.       What do you do to prepare for

25  your hearings?

13

1    A.        Interviews.

2    Q.        Or your interviews, excuse me.

3    A.        Yes.  For the interviews, we're

4    required --- the Parole Board is

5    required by Section 19 of the Parole

6    Act to look at certain things as much

7    as they are capable of being known.

8    And that's one of the --- when I

9    approach a file, that is the very first

10   thing that I do.  I will look for

11   judge, sentencing judge, and

12   prosecuting district attorney input.

13   We solicit that input, again, by law.

14   It is the choice of the judge or the

15   district attorney whether they reply or

16   not.  So that's the first thing that I

17   look for.

18        And then Section 19 requires

19   that we look at the offense itself, the

20   criminal history, the person's general

21   character while they were in the

22   community as much as that can be

23   ascertained, what the individual has

24   done in prison that would help or hurt

25   their chances for parole, victim's

14

1    input.  Again, I had mentioned Act 8 of

2    1995.  There was a previous act from

3    1990, I believe, that first established

4    that.  That is part of what we're

5    required to look at.

6         So it's essentially looking at

7    the offender's entire history as much

8    as it can be ascertained, including any

9    Court documents that might be

10   forwarded.  We do request --- at the

11   same time that judges and district

12   attorneys are surveyed, if you will, I

13   believe we also send a letter to the

14   Clerk of Courts.  I cannot answer that

15   specifically, that is not my duty, but

16   I believe that's one of the things that

17   we do.

18   Q.    When you get the file, has the

19   institutional parole officer generally

20   completed some kind of form for your

21   review before conducting the interview?

22   A.    Actually, it's a report called a

23   summarization report.  It can be given

24   by different names depending on whether

25   it's the person's minimum interview or

15

1    a review or a reparole review, but yes,

2    we do.  We get an original one, which

3    covers basically what I've already told

4    you Act 19 covers with the exception of

5    victim's input.  The Act 8 requires

6    that the victim's input be kept

7    separately.  And, essentially, only

8    those people who vote or recommend

9    parole, and that would be Hearing

10   Examiners and Board members and the

11   Office of Victim Advocate have access

12   to that.  So our agents don't.

13          But the report that they

14   generate, the summarization report,

15   includes current offense, the official

16   version, the offender's version, prior

17   record, social history, parole

18   planning, which of course is another

19   major part of this, and what the

20   individual has done in the institution

21   in terms of what programs have been

22   prescribed and what programs have been

23   completed or not completed.  And

24   misconduct history.

25   Q.     So you have that when the file

16

1    is given to you for a particular inmate

2    that you need to interview, that

3    summarization report should be in that

4    file for you to review?

5    A.        Yes, that's correct.

6    Q.        Do you also receive any

7    paperwork from the Department of

8    Corrections with regards to what their

9    recommendation is ---

10   A.        Yes.

11   Q.        --- as to whether or not a

12   particular inmate should or should not

13   be paroled or reparoled?

14   A.        Yes, we do.

15   Q.        You get the actual report that

16   the Department of Corrections gets?

17   A.        Well, I don't know what all

18   reports the Department of Corrections

19   generates.  We generally have what is

20   called the DC-1, which is the initial

21   sentence summary report, and a DC-

22   16(E), which is the sentence status

23   report itself.  And that basically is

24   what the individual is doing, minimum

25   and maximum dates, whether there are

17

1  any detainers pending, that sort of

2  thing.  Then we usually get the

3  Department of Corrections vote sheet.

4  That may not come.  Sometimes if the

5  individual is coming to us very

6  rapidly, doing a very short sentence,

7  there may not be a complete Department

8  of Corrections, what we call DC-13(A).

9  We may not have that.  We may have a

10  memo form, again, because for example,

11  if we have an individual who's doing a

12  one to two-year sentence and he's

13  already done eight months in the county

14  prison before he is classified, he's

15  very close to his minimum.  And so the

16  Department of Corrections will give us

17  a memo form as opposed to a vote sheet.

18  Q.     So will you review the Parole

19  Board's file for an individual,

20  including the documents we've just

21  discussed prior to your interview of

22  the inmate?

23  A.     Yes, yes.

24  Q.     Prior to the interview, do you

25  complete the Parole decision-making

18

1  guidelines forms?

2  A.      I do not do those.   Those are

3  generated by the agents in the

4  institution, the parole agents in the

5  institution.

6  Q.      So would those parole decision-

7  making guidelines forms then be in the

8  Parole Board file that you would

9  receive for your review?

10 A.      Yes, yes.

11 Q.      Okay.  Do you review those forms

12 at all for accuracy, or do you just

13 look at the forms and see what the

14 recommendation is on those forms as far

15 as whether or not the guidelines are

16 recommending?

17 A.      Yes, I usually check the

18 guidelines.

19 Q.      After you check the guidelines

20 --- well, let me rephrase that.

21         After you review the inmate's

22 file, do you then do a personal

23 interview with the inmate?

24 A.      Yes.

25 Q.      And during those interviews,

19

1  what do you try and --- generally

2  speaking, try to discuss with the

3  inmate?

4  A.    Okay.  The offense itself, what

5  his or her attitude is towards the

6  offense, whether they accept

7  responsibility for the offense or not,

8  what their prior record is like.  And I

9  look for things like is the current

10  offense the first offense of this type

11  or is it one of several.  I talk about

12  I have your criminal record here, and

13  there is a gap from 1991 to '96.

14  You've been in trouble before then and

15  in trouble after then, but not during

16  that five years.  Why?  What was

17  different about that?  Any kind of

18  information that I think is important

19  for the Board to know before a decision

20  is made.  We discuss mental health

21  history, drug and alcohol history.

22        Another thing Section 19 of the

23  Parole Act, which I did not mention

24  before, requires that we do is to look

25  for any evidence of history of family

20

1   violence.  So if there is a family

2   violence or some kind of, for example,

3   molestation where the inmate himself or

4   herself has been molested, that is not

5   something normally that we would

6   discuss.

7   Q.      Okay.  If the person you are

8   interviewing is up for reparole rather

9   than an initial parole, are any

10  different steps used in the process?

11  A.      Well, yes, in that if you're

12  talking from my angle, we also talk ---

13  in addition to all of those things, we

14  also talk about why parole was not

15  successful for this individual.

16  Q.      Okay.  Generally speaking, how

17  long does your interview with the

18  inmate last?

19  A.      That varies.  We occasionally

20  have an inmate who does not want to be

21  paroled, and he will sign a paper

22  saying such.  He may come in and I may

23  say, okay, I understand you want to

24  max.  And do you know when your max is,

25  and if it's longer than a year, I

21

1   explain to him the parole application

2   procedures, and then he leaves.  And

3   that could be two minutes.  I've had

4   ones that have gone 45 minutes to an

5   hour.

6   Q.     Would 45 minutes to an hour tend

7   to be probably the longest?

8   A.     Yes, yes.

9   Q.     How many people do you generally

10  have to interview when you come to a

11  particular institution and you get your

12  list?

13  A.     We are set up for 15 a day, 15

14  interviews or 15 interviews and

15  hearings combined.

16  Q.     After you conduct your interview

17  of the inmate, what do you then do?

18  A.     I take notes.  Throughout the

19  interview, I generally take notes.

20  Occasionally, I will wait to take my

21  notes until the end, depending on how

22  intensive the individual is, whether my

23  writing will, in fact, distract them or

24  me.  But I take notes, and fairly

25  extensive notes, generally.  And part

22

1    of my note taking then is a description

2    of what I believe the person's risk is

3    to the community, what I believe should

4    happen, whether they need additional

5    programs.  Just generally, everything

6    that went into why I'm recommending the

7    way that I'm recommending.

8    Q.       After the interview and after

9    you've taken your notes, do you then

10   have to form an opinion as to whether

11   or not you are going to make a

12   recommendation that that particular

13   individual is going to be paroled or

14   not --- or should be paroled or should

15   not be paroled?

16   A.       Yes.  There are basically three

17   --- three alternatives that I have.

18   One is to recommend parole.  One is to

19   recommend refuse parole.  And there are

20   some sub-recommendations under that.

21   The third one is what we call a

22   continue, where I might see an

23   individual and, for example, they might

24   have an offense that was a violent

25   offense that we know nothing about in

23

1    the background.  And I may ask for a

2    continue, pending receipt of the

3    information, and that would be --- we

4    would try to send out a field agent if

5    it was in this state or through

6    intrastate, someone to get us the

7    paperwork for a particular crime.

8    Q.       How do you document your

9    recommendations for it to be passed on

10   to the Board member who is going to

11   review that case?

12   A.       In writing, as part of the

13   parole decision-making guidelines.

14   Q.       After you fill out the section

15   of the parole decision-making

16   guidelines form that calls for you to

17   make your recommendation, do you then

18   ever personally meet or speak with the

19   Board member who then is going to

20   review that file?

21   A.       Sometimes we actually do these

22   in panels.  We may personally both be

23   present at the time.  And when that's

24   the case, of course, we talk about it

25   after we're done with the interview.

24

1  Q.      If the Board member is actually

2  there and you are seeing an inmate,

3  both yourself and the Board member,

4  will the decision generally be made at

5  the conclusion of your interview and

6  your discussion with the Board member?

7  A.      Not necessarily.  If it's a

8  violent offense, it will take a

9  majority of the Board.  We currently

10 have eight Board members.  It will take

11 five out of eight of the Board members

12 to make that decision.  So, no, we

13 wouldn't necessarily say yes, in

14 particular.  Yeah.

15 Q.      Does a majority of the Board

16 have to agree to deny parole or

17 reparole?

18 A.      Generally, my understanding is

19 it takes two people.  Please understand

20 though that if I'm the first vote and

21 I'm the only one there, I don't know

22 what happens afterwards, because these

23 files leave my hands.

24 Q.      And is it accurate to say when

25 you're referring to your vote, is that

25

1    the recommendation that you put on the

2    parole decision-making guidelines form

3    as to whether or not you believe the

4    inmate should be paroled or reparoled

5    or denied parole or reparole?

6    A.      Yes.

7    Q.      And that counts as your vote

8    towards the ultimate outcome of ---?

9    A.      It is a recommendation in

10   violent cases because it takes a

11   majority of the Board.

12   Q.      And when you refer to violent

13   cases, are you referring to the offense

14   for which that inmate is currently

15   serving a sentence?

16   A.      That's correct, that's correct.

17   Q.      So in non-violent offenses, it's

18   an actual vote?

19   A.      Yes.

20   Q.      Okay.  What's the difference

21   between it being an actual vote and a

22   recommendation?

23   A.      Okay.  The vote comes about

24   because of the original offense, the

25   offense that the individual's in jail

26

1    for.  Violent offenses are essentially

2    your part one offenses that include the

3    homicides, robberies, crimes against

4    people, essentially and including arson

5    against people.  The other crimes are

6    the crimes that are more likely the

7    property offenders, drug offenders.

8    Firearms offenses are, unless the

9    firearm is discharged and someone is

10   harmed and it becomes an assault, that

11   would not be a violent offense.  In

12   those cases, yes.  My vote is a vote.

13          In the violent offenses, my vote

14   is a recommendation, again, because it

15   takes five out of --- well, the

16   majority of the Board, however many

17   people there are at that time.

18   Q.      After you have filled out the

19   parole decision-making guideline forms

20   with your vote or recommendation, what

21   do you then do with the decision-making

22   guideline form?

23   A.      It is part of the Board file.

24   Once it leaves my hands, I don't know

25   the specific way that it makes its way

27

1    to the Board.  Our institutional parole

2    agents would be the ones who would know

3    that.

4    Q.      In the situation where a Board

5    member is not with you at the interview

6    of the inmate, are you ever contacted

7    by any of the Board members for them to

8    discuss with you your interview of a

9    particular inmate?

10   A.      It's possible.  I don't recall

11   any recently.

12   Q.      So it would be accurate to say

13   generally or most of the time once you

14   make your either recommendation or

15   vote, the file gets passed on to the

16   Board and you have no further input

17   into the decision?

18   A.      Generally, yes, with the

19   exception of continues.  And then that

20   information would be sent back to me

21   and then I would again review the file

22   and my notes and either make a

23   recommendation at that point or

24   schedule the person for another

25   interview if I felt there was something

28

1    that was important that needed to be

2    dealt with between the inmate and the

3    Board.

4    Q.    Now, is it accurate to say that

5    there are times when the Board, when

6    they are --- let's, for example, focus

7    on a situation where someone has had

8    their parole revoked, and the Board

9    issues an initial green sheet setting

10   the amount of back time that the

11   offender must serve.  And assume that

12   the Board states on the green sheet

13   that the inmate needs to participate in

14   certain programming prior to the

15   decision as to whether or not the

16   inmate will be reparoled.

17   A.    Okay.

18   Q.    Do you look at the green sheets

19   to see what the Board had told the

20   inmate they wanted him to do as to see

21   if that has, in fact, been done?

22   A.    Yes.

23   Q.    And I would assume that that was

24   done when you're reviewing the file,

25   you'll review the green sheet and see

29

1    what recommendations may have been

2    made; is that accurate?

3    A.    Yes.  Part of our reparole

4    summarization reports, however, include

5    a list of what the Board actions were

6    in this particular case, or for this

7    particular individual, I should say,

8    because they may have prior cases and

9    we may very well see Board actions that

10   predate the current sentence.

11   Q.    And if the inmate has not done

12   the programs that were listed by the

13   Board in his green sheet, is that taken

14   into consideration by you in making

15   your recommendation?

16   A.    Yes.

17   Q.    If the Board has, and their

18   green sheet has stated that an inmate

19   needs to participate in a specific

20   program, whatever that program may be,

21   if the inmate does not do that program,

22   how does that impact your decision?

23   A.    Okay.  Well, it depends.  It

24   depends on whether the inmate didn't do

25   it because he or she chose not to do

30

1    it, or they're on a waiting list, or

2    that particular program and this

3    particular SCI is not available.  There

4    are some factors that go into that.

5    Q.     What if the Defendant has

6    voluntarily or --- I should not say

7    voluntarily but has by their own

8    decision not participated in the

9    program?

10   A.     Well, generally, if it is a

11   program that is specific to their

12   crime, I'm going to recommend that they

13   not be reparoled.

14   Q.     And is that true of any program

15   that the Board may put on the green

16   sheet for the inmate?

17   A.     Yes, I think so.

18   Q.     Specifically, with regards to an

19   inmate --- and, again, referring to a

20   reparole situation.

21   A.     So an individual has been

22   paroled and has been returned for

23   violating their parole?

24   Q.     Correct.

25   A.     Okay.

31

1   Q.      And if the green sheet tells the

2   individual to be reparoled, you have to

3   participate in a sex offender

4   program ---

5   A.      Uh-huh (yes).

6   Q.      --- and if the inmate does not

7   participate in the sex offender program

8   because they have said they don't want

9   to participate in the sex offender

10  program, is it accurate to say that in

11  that situation you will enter a

12  recommendation or a vote that the

13  person not be reparoled?

14  A.      Generally, yes.

15  Q.      Have there ever been any

16  exception to that that you can recall?

17  A.      I cannot recall a specific

18  exception, no.

19  Q.      And would you generally vote not

20  to reparole even if the Department of

21  Corrections was actually recommending

22  that the individual be paroled?

23  A.      For a program --- for not

24  attending a program that's specific to

25  the individual's crime, I would

32

1    probably vote no.  Again, there's a lot
2    that goes into the decision, okay.  And
3    asking me for general things, I'm
4    trying to answer as completely as I
5    can.
6    Q.     Well, can you ever recall in
7    your experience having an individual
8    inmate who was ordered by the Parole
9    Board on their green sheet to
10   participate in sex offender programming
11   who has not participated in sex
12   offender programming who you have
13   either recommended or voted for
14   release?
15   A.     I don't recall, no.  I don't
16   remember any.
17   Q.     Now, is it accurate to say that
18   the Department of Corrections will
19   generally create a prescriptive
20   programming plan for an individual who
21   is put into their custody?
22   A.     Well, you're asking me a
23   question about the Department of
24   Corrections' policy that I would have
25   difficulty answering that.

33

1    Q.        Let me ask you this.  In the

2    forms you get from the Department of

3    Correction that you get in a parole

4    file that you're reviewing, would those

5    forms discuss whether or not an inmate

6    has participated in the prescribed

7    programming of the Department of

8    Corrections?

9    A.        Yes, yes.

10    Q.        And is that something that you

11    will take into consideration in making

12    your --- either your vote or your

13    recommendation?

14    A.        Yes.

15    Q.        Have there been instances where

16    an inmate may not have done all of the

17    programs that the Department of

18    Corrections may have recommended for

19    that inmate where you have still, after

20    your review of the file and your

21    interview of the inmate, made a vote or

22    recommendation for release?

23    A.        I'm sure there have been.

24    Q.        So then it's accurate to say

25    that there is a distinction between an

34

1    inmate not completing a program that

2    the Board themselves have indicated

3    they wanted the inmate to participate

4    in on the inmate's green sheet, versus

5    an inmate, perhaps, not completing a

6    program that the Department of

7    Corrections has recommended that that

8    inmate participate in?

9    A.    I think you need to ask that

10   question again.  I'm not sure I

11   understand it.

12   Q.    Okay.  When you're reviewing

13   your files and making your decision as

14   to what your vote or recommendation is

15   going to be, is it accurate to say that

16   there is a distinction between an

17   inmate not completing a program that

18   the Parole Board specifically stated on

19   a green sheet that they wanted that

20   inmate to complete versus the inmate

21   not completing a program that the

22   Department of Corrections may have

23   recommended that the inmate complete?

24   A.    I see.  To a certain extent,

25   there may be a difference, if you're

35

1  talking about reparole reviews.

2  Because the Board had jurisdiction of

3  this individual's case and this

4  individual during the time that they

5  were on parole there may be information

6  in the Board file about that parole

7  that would suggest to us that there is

8  a program that this individual really

9  should have before they're released on

10  parole in order for them to be

11  successful on parole.

12  Q.     Based on your experience working

13  with the Parole Board, and including

14  any training that you may have gotten,

15  are there any rules or guidelines that

16  you have to follow with regard to

17  whether or not an inmate has

18  participated in the sex offender

19  program, if they have been so directed

20  by the Parole Board, as to how you are

21  supposed to weigh that factor in making

22  your decision?

23  A.     Are you asking me are there any

24  written guidelines?  Is that what

25  you're asking me?

36

1   Q.      Well, we'll start with that.

2   Are there any written guidelines?

3   A.      The guidelines themselves, the

4   parole decision-making guidelines talk

5   about the type of crime and the

6   participation in the programs.

7   Q.      Okay.  Outside the parole

8   decision-making guidelines, are there

9   any --- whatever you want to call them,

10  rules or policies whether written or

11  unwritten regarding reparoling an

12  individual who has been recommended to

13  participate in sex offender programming

14  who has not participated?

15  A.      Specifically to reparole, I

16  don't recall of anything, but certainly

17  to parole, yes.  The Board has been

18  very serious about sex offenders

19  receiving sex offender treatment before

20  they're being considered for parole.

21  And that has been for many years.  It

22  predates my time as a hearing examiner,

23  in fact.

24  Q.      When you say that the Board has

25  been very strict on wanting a sex

37

offender to have a sex offender

treatment to be --- I forget the way

you said it, to be considered for

parole?

A.    They can be considered for

parole whether they've had the program

or not, but for the decision --- for

the person to be paroled, the Board has

been very serious about them having sex

offender treatment.

Q.    Okay.  In your years with the

Board, whether working as an agent or a

supervising agent or a hearing

examiner, can you ever recall an inmate

who has been ordered to take the sex

offender program who has not taken the

sex offender program being paroled or

reparoled?

A.    I cannot recall a single

specific instance that I have been

involved with.  The only thing I would

add to that is as I had indicated

before the proceeding began, we are

sitting in what is essentially a prison

hospital.  We have individuals here who

38

1    may not be mentally competent, and

2    perhaps would be going to South

3    Mountains as an example, which is a

4    Department of Public Welfare situation.

5    I could see where maybe the Board would

6    want to parole someone like that, but

7    that would be a major exception, I

8    would think.

9    Q.      So ---.

10   A.      And, again, I am speaking not of

11   a specific case because I do not recall

12   any specific cases.

13   Q.      Okay. But it is accurate to say

14   that --- well, I want to take this in

15   two steps. Generally, based on your

16   knowledge and experience working for

17   the Parole Board for a number of years,

18   is it accurate to say that you know

19   that it has been the Board's policy, as

20   you said, for a number of years even

21   predating your work with the Board that

22   if an inmate did not; does not,

23   participate in sex offender program, if

24   ordered to, that that inmate is not

25   going to be paroled or reparoled?

39

1  A.      Well, specifically, I said that

2  it was the sex offender program

3  expectations predated my time as a

4  hearing examiner, not as a ---

5  Q.      Okay.  I'm sorry.

6  A.      --- worker for the Parole Board,

7  but yes, it's been for sometime now.

8  Q.      Is it also accurate to say that

9  with regard to the time since you've

10  been either an agent or a supervising

11  agent or a hearing officer that you

12  cannot recall any specific case where

13  an inmate who was ordered to take the

14  sex offender program but who did not

15  take the program has been paroled or

16  reparoled?

17  A.      I cannot recall a specific case.

18  Q.      All right.  Can you remember any

19  specific case where, since you've been

20  a hearing examiner, where an individual

21  was directed to take the sex offender

22  program and who did not take the sex

23  offender program, where you have voted

24  or entered a recommendation that the

25  individual be either paroled or

40

1    reparoled?

2    A.        No.

3    Q.        So would it be accurate to say

4    that perhaps even if the parole

5    decision guidelines were saying that

6    the person would be an acceptable

7    parole or reparole candidate, and even

8    if the Department of Corrections was

9    recommending that the individual be

10   paroled, if that individual had been

11   ordered by the Board in a green sheet

12   to take the sex offender program, but

13   had not taken the sex offender program,

14   it would still be your recommendation

15   or vote that the person not be paroled

16   or reparoled because they did not

17   complete the sex offender program?

18   A.        Well, you're asking a question

19   of finality there, and what I would say

20   to you is that if the Department of

21   Corrections did not recommend an

22   individual for the sex offender

23   program, there would generally be a

24   reason for that, okay, that would be

25   part of the Department of Corrections'

41

1    information that we would normally get,

2    again, in that file review.  And in

3    that particular case, they would

4    explain generally why --- that they

5    have done an evaluation, because we

6    would --- they do evaluations on people

7    who have sex offenses whether it's a

8    current one or a previous one.

9         And at that point, that sex

10    offender evaluation would be one of the

11    things that I would read, and it would

12    explain why the individual who did the

13    assessment or evaluation believes that

14    sex offender treatment is not needed.

15    Q.    Assume that you're interviewing

16    an individual where the parole

17    decision-making guideline forms

18    recommend parole.

19    A.    Okay.

20    Q.    But the person's green sheet has

21    stated that they need to do the sex

22    offender program.  The Department of

23    Corrections has indicated that he needs

24    to do the sex offender program, but the

25    individual has not done the sex

42

1  offender program, but the Department of

2  Corrections nonetheless recommends that

3  the individual be paroled, would it

4  still be your practice to vote or

5  recommend that the individual not be

6  paroled or reparoled because they have

7  not participated in the sex offender

8  program?

9  A.      You're asking a general question

10  that's hard to answer for the simple

11  reason that each case is somewhat

12  unique, and there is information that

13  is weighed in each case, okay.  So to

14  give a blanket answer to that, I think,

15  is difficult.  Again, if I know of a

16  specific case, then I might be able to

17  explain why a particular thing would

18  happen in a particular way.  To give a

19  general answer to that, I don't know

20  that I can.

21  Q.      I want to show you what I'll

22  mark as Petitioner's Exhibit A.

23                  (Petitioner's Exhibits A,

24                  B and C marked for

25                  identification.)

43

1        ATTORNEY BRADLEY:

2            You can review that.

3    A.      Thank you.

4    BY ATTORNEY PATTON:

5    Q.      Take a second to look that over.

6    WITNESS COMPLIES

7    A.      Okay.  I've had a chance to look

8    that over.

9    BY ATTORNEY PATTON:

10   Q.      Okay.  I wanted you to look at

11   Petitioner's Exhibits B and C, which

12   are then subsequent green sheets in the

13   same case issued by the Board.

14   WITNESS COMPLIES

15   A.      Okay.

16   BY ATTORNEY PATTON:

17   Q.      Now, Exhibit A, does that appear

18   to be the green sheet for Robert DeFoy,

19   with a parole number of 1226J,

20   institution number AK1017?

21   A.      Yes.

22   Q.      Recommitting Mr. DeFoy as a

23   convicted parole violator to serve a

24   40-month --- to serve 40 months of back

25   time?

44

1    A.        Yes.

2    Q.        Okay.  And does the green sheet

3    also state that Mr. DeFoy should

4    participate in sex offender treatment?

5    A.        Yes, it does.

6    Q.        And Exhibit B, is that also a

7    green sheet for Mr. DeFoy setting a

8    reparole date for Mr. DeFoy on that 40-

9    month back time sentence or commitment,

10   I should say?

11   A.        Yes, to a state detainer

12   sentence, not to the street.

13   Q.        Correct.  And does that green

14   sheet also indicate that Mr. DeFoy

15   should participate in a sex offender

16   treatment program?

17   A.        It does not specifically say

18   that.  What it says is upon condition

19   that there are no misconducts and you

20   remain involved in required programs.

21   Q.        And is it accurate to say that

22   Exhibit B, the green sheet setting the

23   reparole date, refers back to

24   Petitioner's Exhibit A?

25   A.        Yes.

45

1    Q.        Okay.

2    A.        It seems to.

3    Q.        Which in Petitioner's Exhibit A

4    it does state that Mr. DeFoy is to

5    participate in sex offender treatment

6    program; is that correct?

7    A.        It does.

8    Q.        Okay.  Now, in your experience,

9    would the Petitioner's Exhibit B ---

10   well, let me clarify.

11            Does Petitioner's Exhibit C

12   indicate that it is adjusting the

13   reparole date that is listed on

14   Petitioner's Exhibit B to correct

15   basically an error from changing the

16   release date from March 20 --- I

17   believe it's ---

18   A.        25th, '93.

19   Q.        --- 25th, 1993 to March 25th of

20   1997?

21   A.        Yes.

22   Q.        Okay.  Have you seen green

23   sheets like that before, setting

24   reparole dates?

25   A.        Yes.  Uh-huh (yes).

46

Q.    When that green sheet sets the reparole date, does that mean that the person --- that the Board is at least conditionally ordering that the person be paroled on the date listed in that green sheet?

A.    In this particular case, yes. That's what it looks like.

Q.    Okay.  In that case, in Mr. DeFoy's situation then when you have this Petitioner's Exhibit B, which is setting him, giving him a reparole date in conjunction with Petitioner's Exhibit C of March 25th of 1997, would you generally then end up doing an interview of Mr. DeFoy prior to March 25th of 1997?

A.    On the surface with what we have here, I would say no, but that's difficult to answer in specific here because these three sheets of paper only represent a very small portion of what might have happened in this case.

Q.    Sure.  Given what are in those exhibits, short of some action taken by

47

1   the Board to change what's stated in

2   those exhibits, would Mr. DeFoy have

3   normally been paroled to his detainer

4   sentence on March 25th, 1997, meaning

5   if there was no intervening action by

6   the Board?

7   A.      I'm guessing that's what would

8   happen, but understand that is a guess.

9   This is a portion of how things are

10  done with the Board that I do not deal

11  with.

12  Q.      Okay.

13  A.      Okay?   There are some

14  administrative things here that I have

15  no knowledge of.

16  Q.      Okay.

17  A.      Okay?

18              (Petitioner's Exhibit D

19              marked for identification.)

20  BY ATTORNEY PATTON:

21  Q.      Let me show you Petitioner's

22  Exhibit D, which is a green sheet

23  rescinding the order of reparole and

24  setting Mr. DeFoy for the next parole

25  docket.

48

1  A.    Okay.

2  Q.    When it says setting him for the

3  next parole docket, is that --- when

4  they refer to that parole docket, is

5  that what we talked about a little bit

6  earlier about when you get the list of

7  people who are at their minimum, you

8  come to the institution, get that list,

9  and you get those folks' files and do

10  your interviews?

11  A.    Yes.  Again, that's something

12  that I don't deal with.  The mechanism

13  of setting up the next available

14  docket, et cetera, is something that I

15  do not do, so I don't know the ins and

16  outs of it.

17  Q.    Okay.

18  A.    I can't specifically answer

19  that.

20              ATTORNEY BRADLEY:

21              Can we set these aside?

22              ATTORNEY PATTON:

23              Sure.

24              (Petitioner's Exhibit E

25              marked for

49

1          identification.)

2    BY ATTORNEY PATTON:

3    Q.      Please take a minute to review

4    Petitioner's Exhibit E.

5    WITNESS COMPLIES

6                ATTORNEY PATTON:

7                I'm just going to try and

8          clarify the record in that

9          Petitioner's Exhibit A is a

10         green sheet dated 12/9 of '92.

11         Petitioner's Exhibit B is a

12         green sheet dated 11/5 of '93.

13         Petitioner's Exhibit C is a

14         green sheet dated 11/23/93, and

15         Petitioner's Exhibit D is a

16         green sheet dated April 23rd of

17         1997.

18   A.      This is cut off at the bottom.

19   BY ATTORNEY PATTON:

20   Q.      This copy might have a little

21   more.

22   A.      Well, I think I know what it

23   says, but --- no.  The one I have is

24   actually a little bit better.  Okay.

25   I'll go with what I believe this to

50

1  say.  I can't --- this is Exhibit E,

2  and we're looking at page four, I guess

3  it is.  The bottom is slightly cut off.

4  I believe I know what it says.  It says

5  an appeal of PCRA, the conviction

6  stands until that matter is resolved.

7  Q.      Petitioner's Exhibit E, is that

8  a parole decision-making guidelines for

9  reparole review for Mr. Robert DeFoy?

10  A.      It is.  It's a copy of such,

11  yes.

12  Q.      Okay.  Does it state that the

13  day of the interview was June 19th of

14  1997?

15  A.      It does.

16  Q.      Page one, two and three of that

17  document, who would have filled that

18  --- even if you don't know the specific

19  individual, would you have filled those

20  pages out, or would the institutional

21  parole officer have filled that out?

22  A.      Page one and two would have been

23  filled out by the institutional parole

24  agent.

25  Q.      And who would have filled out

51

1    page three, four?

2    A.    And that's completed by an

3    interviewer, either a Board member or a

4    hearing examiner.

5    Q.    Okay.  Pages three, four, five,

6    six and seven would have been filled

7    out by the interviewer?

8    A.    Not page seven.  Page seven

9    would have been done by the

10   institutional staff.

11   Q.    Okay.  Based on reviewing the

12   document, does it appear to you that

13   you were the hearing examiner that

14   filled out pages three, four, five and

15   six of this document?

16   A.    It does.

17   Q.    Okay.  Is it accurate to say

18   that based on pages one and two of the

19   document that the parole decision-

20   making guidelines made a policy

21   recommendation of parole on this case,

22   or what, in fact, would have actually

23   been reparole?

24   A.    The factor score is four, and

25   yes, that would be a parole.  Again, of

52

1    course, on page two, you note at the

2    top it says each unfavorable factor

3    listed below is a possible reason for

4    refusing parole as a matter of policy.

5    It's the first line there.

6    Q.      But, generally, the guideline

7    would recommend parole or reparole in

8    this particular case?

9    A.      Yes.

10   Q.      Now, on page three, subsection B

11   entitled Factors Countervailing a

12   Guideline Recommendation to Parole.

13   A.      Uh-huh (yes).

14   Q.      And in that, there is marked off

15   in the yes column for --- there's three

16   items that would countervail a

17   guideline recommendation of parole;

18   correct?

19   A.      Yes.

20   Q.      And the first one that is

21   checked indicates that the client had a

22   recent psychiatric/psychological report

23   which causes concern?

24   A.      Yes.

25   Q.      Would you have personally

53

1  reviewed the psychiatric or

2  psychological report that is referred

3  to there?

4  A.    I have no remembrance of that in

5  this particular case.  Again, this is

6  1997.

7  Q.    Sure.

8  A.    Okay.  This is the year 2006, so

9  it's nine years later.  I will say that

10 psychiatric and psychological reports

11 are very important, and as a general

12 rule, I always look at them, at what

13 ones are available, yes.

14 Q.    Okay.

15              (Petitioner's Exhibit F

16              marked for

17              identification.)

18 BY ATTORNEY PATTON:

19 Q.    Please take a look at

20 Petitioner's Exhibit F.

21 WITNESS COMPLIES

22 BY ATTORNEY PATTON:

23 Q.    Does that appear to be the

24 summarization report prepared by the

25 --- would it be the institutional

54

1  parole agent for Mr. DeFoy's

2  consideration for parole in June of

3  1997?

4  A.      That's what it looks like, yes.

5  Q.      Okay.  And does that

6  summarization report indicate that

7  there's additional information and the

8  box is checked off for psychological or

9  psychiatric/psychological?

10  A.     Yes.

11  Q.     Okay.  Would that normally

12  indicate that the psychological or

13  psychiatric report --- a psychological

14  or psychiatric report would be attached

15  or included with the summarization

16  report?

17  A.     Generally.

18  Q.     Okay.

19                  (Petitioner's Exhibit G

20                  marked for

21                  identification.)

22  BY ATTORNEY PATTON:

23  Q.     Please look at Petitioner's

24  Exhibit G, which the parties previously

25  agreed is the psychiatric or

55

1    psychological report referred to in

2    Section IV(B)(2) of the parole

3    decision-making guidelines used in the

4    June '97 review of Mr. DeFoy for

5    reparole.

6    WITNESS COMPLIES

7    A.     Yes.

8    BY ATTORNEY PATTON:

9    Q.     Okay.  So Petitioner's Exhibit G

10   would be the psychiatric or

11   psychological report that the parole

12   decision-guideline making form is

13   referring to when it lists the

14   countervailing --- factors

15   countervailing the guideline

16   recommendation of parole?

17   A.     That's certainly what it looks

18   like, yes, although there is no date on

19   page three of the guidelines of

20   6/19/97, Exhibit E.

21   Q.     There's no date given for the

22   psychiatric or psychological report?

23   A.     That's right, that's right.

24   Q.     There's also in the factors

25   countervailing the guideline

56

1    recommendation to parole, it indicates

2    that there's an unfavorable

3    recommendation from Board staff; is

4    that correct?

5    A.      Board staff is underlined.

6    Q.      You would have been the person

7    that --- well, let me back up.  In the

8    preprinted form as a countervailing

9    factor, it has listed there an

10   unfavorable recommendation from the

11   Department of Corrections or Board

12   staff; correct?

13   A.      Yes.

14   Q.      And then Board staff is

15   underlined?

16   A.      Yes.

17   Q.      And the yes box is checked next

18   to that countervailing factor?

19   A.      Yes.

20   Q.      Okay.  Which would indicate that

21   the Board staff had recommended that

22   Mr. DeFoy not be reparoled?

23   A.      That's what it appears to say,

24   yes.

25   Q.      Okay.

57

1    A.      Again, I have no specific

2    recollection of this case, it being

3    nine years ago.

4    Q.      For Petitioner's Exhibit F, the

5    summarization report, does that

6    indicate kind of in the middle of the

7    first page of that document that the

8    superintendent or warden who provides

9    the recommendation of the Department of

10   Corrections was recommending reparole?

11   A.      Yes.

12   Q.      Okay.  You also on the parole

13   decision-making guidelines form

14   indicate that the other countervailing

15   factor, you have number six, which is

16   there are other factors supporting a

17   parole refusal checked, and then have

18   handwritten in refuses --- I believe

19   that's SOT?

20   A.      Yes.

21   Q.      Which would stand for sex

22   offender treatment?

23   A.      I believe so, yes.

24   Q.      And a negative attitude; is that

25   correct?

58

1    A.        That's correct.

2    Q.        Is it accurate to say that this

3    section of the parole decision

4    guideline making forms is where you

5    would list things that would counsel,

6    perhaps, against recommending parole or

7    reparole, even though the guidelines

8    themselves are recommending parole or

9    reparole?

10    A.        Well, it does both that, but

11    countervailing can go the other way,

12    too, and the top part would be the

13    opposite.

14    Q.        Correct.  But Part B of it ---

15    A.        Yes.

16    Q.        --- is countervailing factors,

17    meaning it's countervailing the

18    guideline recommendation of parole ---?

19    A.        To parole, yes.

20    Q.        Okay.  Now, at the bottom of

21    page three, there's some preprinted

22    language that states instructions, the

23    countervailing factors to a guideline

24    recommendation to refuse parole (A) or

25    to parole (B) are for information to

59

1    the decision makers only.

2    Countervailing factors checked in (B)

3    are not to be communicated in the Board

4    action as such.  The Board

5    Member/Hearing Examiner will supply the

6    appropriate reasons for refusal in

7    his/her decisions in Section VII of

8    this guideline document.  What does

9    that mean?

10   A.      Well, going back to 1997, I'm

11   not sure I remember all of the ins and

12   outs, but what it appears to say to me

13   is that on page six of this document,

14   the interviewer or Board member would

15   be required to put in their reasons for

16   refusal.

17   Q.      And that any countervailing

18   factors should not be listed in that

19   section, meaning Section VII?

20   A.      I guess specific ones.  We're

21   being very specific on page three, and

22   page six then, the factors are listed,

23   and that's the section that would be

24   communicated as part of the Board

25   action, if I remember correctly.

60

1   Q.      Is it accurate to say that that

2   communication is basically the green

3   sheet that would be issued, in this

4   case, based on the guideline --- the

5   completed parole decision-making

6   guidelines form, the green sheet,

7   saying that parole would be or reparole

8   would be denied?  Then the green sheet

9   would then list the factors that are

10  listed in Section VII of the form?

11  A.      Yes.

12  Q.      Okay.  Now, in Section VII where

13  it's given reason for parole refusal,

14  it has checked off factor cited in

15  guideline section and then it refers to

16  Roman numeral III and IV and VII.  Now,

17  the Roman numeral III, is that

18  referring to Section III of the

19  decision --- the parole decision-making

20  guidelines form?

21  A.      Yes.

22  Q.      And Section Roman numeral III

23  --- Number IV is removed for CSC, which

24  would stand for ---?

25  A.      Community --- it's actually

61

1    community corrections center.  I can't

2    remember what we called it back then.

3    The CSC predated that, community

4    services center, or something like

5    that.  Essentially, it would be a

6    halfway house.

7    Q.    Okay.  And so that's one factor

8    that the guidelines took into account

9    in determining whether or not Mr. DeFoy

10   should be reparoled; correct?

11   A.    Yes.

12   Q.    And you received some points

13   under the guideline for having

14   previously been removed from a halfway

15   house; is that correct?

16   A.    Yes.

17   Q.    And Roman numeral III, number

18   seven is assault of instant offense;

19   correct?

20   A.    Yes.

21   Q.    Which Mr. DeFoy also had

22   received a point under the guidelines

23   for the fact that that was an assault,

24   it was an assault of instant offense;

25   correct?

62

1    A.       Yes.

2    Q.       But even having received those

3    points, Mr. DeFoy's total score under

4    the forms resulted in a guideline

5    policy recommendation of reparole?

6    A.       That's correct.

7    Q.       The other reason --- the next

8    reason given for refusal is failure to

9    participate in sex offender's

10   treatment; is that correct?

11   A.       Yes.

12   Q.       And then you have next checked

13   off under subsection seven, Section F,

14   which states other than blank, and then

15   written into the blank is misconduct;

16   is that right?

17   A.       Yes.

18   Q.       Okay. Referring back to Section

19   III of the guideline form, that section

20   of the form calls for points to be

21   added due to unfavorable factor score

22   based on misconducts; correct?

23   A.       Yes.  I would point out that

24   it's based on misconducts, but there

25   are specific ways that those scores are

63

1    generated, and it involves the number

2    of Class I or Class II misconducts.  So

3    you could have a misconduct ---

4    Q.      Correct.

5    A.      --- and still receive a zero.

6    Q.      Correct, because the form states

7    that you can have a misconduct, but

8    still end up getting zero points on the

9    form for misconducts?

10   A.      Yes.  Uh-huh (yes).  And, again,

11   you would have to read that particular

12   section on page two of the unfavorable

13   factors for institutional performance.

14   Q.      I'm sorry.  Can you repeat that?

15   A.      Sure.  In order to get, for

16   example, a score of one, you would need

17   to have three or more Class II

18   misconducts, or two Class I and one

19   Class I misconduct, or two or more

20   Class I conducts during the last 12

21   months or the last one-half of the

22   minimum sentence, whichever is longer.

23   So I do not know specifically in this

24   case, but it appears as though there

25   was at least one misconduct.  If there

64

1    was one misconduct, he would still get

2    a zero, but he still had a misconduct.

3    Q.      Correct.  And the information

4    about misconducts would be gained from

5    the Department of Corrections?

6    A.      Yes.  And would probably be

7    documented in one of the --- either the

8    Department of Corrections summarization

9    report or the Parole Board

10   summarization.  Some of these forms

11   have changed over the years, so you're

12   asking me to go back nine years.  It

13   makes remembering somewhat difficult.

14   Q.      And, in fact, the summarization

15   report, which is marked as Petitioner's

16   Exhibit F ---

17   A.      Uh-huh (yes).

18   Q.      --- in the second paragraph in

19   the analysis section states, the

20   second-to-last sentence of that

21   paragraph ---

22   A.      Yes.

23   Q.      --- that Mr. DeFoy had received

24   one Class I Misconduct on November 6th

25   of 1996 for refusing to obey an order?

65

A.        Yes.

Q.        Was sanctioned with 30-day cell restriction.  But under the parole decision-making guidelines forms having the one misconduct would not result in Mr. DeFoy not receiving any unfavorable factors?

A.        That's right.  Uh-huh (yes).

Q.        Because the guidelines --- when the guidelines were written, the decision was made that you would only receive a point if there were a certain number of these conducts ---

A.        That's right.  Uh-huh (yes).

Q.        --- that had been obtained?  Okay.

A.        Okay.  Can we take a break here for just a moment?

                    ATTORNEY PATTON:

                    Certainly.

A.        I need to step down the hall.

SHORT BREAK TAKEN

BY ATTORNEY PATTON:

Q.        While the parole decision guideline making form for 1997, which

66

1    is Petitioner's Exhibit E, while you

2    had originally marked the

3    recommendation for parole, that was

4    qualified by saying you wanted to get

5    some further clarification on the

6    status of Mr. DeFoy's July 16th, 1992

7    conviction for involuntary deviate

8    sexual intercourse and corruption of a

9    minor and statutory rape, once you got

10   clarification on that conviction ---?

11   A.     If I may stop you for a second?

12   Q.     Sure.

13   A.     You see that the Board decision

14   is actually continue.  The only reason

15   that the X is marked under parole is

16   for the continue.  The guideline

17   recommendation, you would put the check

18   --- if the guidelines say to parole, I

19   would put the check there.  If the

20   guidelines say refuse, I would have put

21   it there, okay.  So when you say that I

22   checked to parole, that's actually not

23   accurate.  What I checked was continue

24   pending receipt of information.

25   Q.     Okay.  Thank you.

67

1  A.       Okay.  So it was not a parole

2  decision.  It was a continue.

3  Q.       Continue.  Okay.

4  A.       Uh-huh (yes).

5  Q.       Because you wanted to get more

6  information on the status of Mr.

7  DeFoy's conviction?

8  A.       Yes.  Apparently so.  Uh-huh

9  (yes).

10  Q.       Once you got some clarification

11  on the status of that conviction, you

12  made a recommendation to refuse parole?

13  A.       That's correct.

14  Q.       Okay.

15  A.       According to what I have written

16  here.

17  Q.       Right.  Because Mr. DeFoy at

18  this point in time was serving a

19  sentence for a robbery, is it accurate

20  to say that in this particular case

21  then you would just be making a

22  recommendation, not a vote, because it

23  was a violent offense?

24  A.       That's a question I can't answer

25  because the Board policy has been

68

1  different over the years, and I do not

2  recall what it was at this particular

3  time.

4  Q.      Okay.  But whether it was a

5  recommendation or a vote, your position

6  was that Mr. DeFoy should not be

7  reparoled?

8  A.      That's correct.

9  Q.      Which was contrary to at least

10 the recommendation of the guideline

11 making form?

12 A.      That's correct.

13 Q.      Which was then agreed to by

14 Nicholas Muller, who's a Board member?

15 A.      Yes.  I believe was the chairman

16 at the time.

17 Q.      Now, you indicated before that

18 --- I believe, that there had to be a

19 majority of the Board to vote on these

20 violent offenses?

21 A.      At this time.

22 Q.      At this time, okay.  Could it be

23 that that may not have been what the

24 policy was back in '97?

25 A.      That's correct.  That's correct.

69

1    There was a change in the policy.  I
2    don't remember when it was, but yes.
3    Q.      Okay.  But according to this
4    form, at least on this form, there's
5    only one Board member - - -
6    A.      That's correct.
7    Q.      - - - that's signing off?
8    A.      Uh-huh (yes).
9    Q.      Mr. Muller, who agrees with your
10    recommendation?
11    A.      That's correct.
12    Q.      Okay.
13    A.      If I may clarify, there's a
14    historical situation here.  When you
15    first asked me about my duties, I
16    clarified for you at that time, my
17    duties as they stand now, and they are
18    still the duties that they've always
19    been.  The voting and recommending has
20    changed over the years, okay.  There
21    was a time when I became a hearing
22    examiner when my yes was not just a
23    recommendation but also a vote.  That
24    changed.  When I explained to you in
25    the beginning what we were going - - -

70

1    when you were asking me these questions

2    about voting and recommending, that is

3    specifically for how things are now and

4    have been for sometime, but I don't

5    remember when the cutoff date was.

6    Q.     Okay.

7    A.     So when I spoke initially when

8    you asked me about my duties and then

9    about voting and recommending, I'm

10   speaking as it is now.  It changed over

11   the years.  Obviously, we're talking

12   about nine years ago.  There were some

13   changes that happened with the Board

14   during that period of time.

15   Q.     Okay.  With regard to this

16   psychological report that was used in

17   making the decision in this case, which

18   is Petitioner's Exhibit G?

19   A.     G.  Uh-huh (yes).

20   Q.     That report, is it accurate to

21   state, says that in the opinion of the

22   writers of the report, Mr. DeFoy needed

23   to participate in sex offender program

24   before being paroled; correct?

25   A.     Yes.

71

Q.      And it actually indicates that
there was no history of mental illness?

A.      That's correct.

Q.      Okay.  So there were no mental
health problems as such, but it was the
opinion of the writers of that report
that Mr. DeFoy needed to participate in
sex offender treatment?

A.      Yes.

Q.      Okay.  Based upon your
experience as a hearing examiner, is
the result in this case consistent with
your statements earlier that if the
Board has ordered someone to take sex
offender treatment and the person does
not take the sex offender treatment
program, they are not --- they will not
be paroled or reparoled?

A.      It appears to be consistent.
Again, I don't have this entire file.
I have only what you've given me.

Q.      Okay.  The parole guidelines
recommend release, the Department of
Corrections recommended release, but
there was not a release; correct?

72

1    There was not a vote to parole?

2    A.        There was not a vote to release.

3    I don't know what happened after this.

4    Q.        Okay.  Well, there was a vote to

5    actually not release Mr. DeFoy?

6    A.        That's what it appears on page

7    six.

8    Q.        And that vote not to reparole

9    him was in countervailence to the

10   guideline recommendation to parole and

11   the Department of Corrections' support

12   of Mr. DeFoy's parole?

13   A.        The superintendent's

14   recommendation, yes, for the Department

15   of Corrections.

16   Q.        Correct.  But it's accurate to

17   say that generally the way the Parole

18   Board receives the recommendation of

19   the Department of Corrections is

20   through the warden or superintendent of

21   the particular institution at which

22   that inmate is housed; correct?

23   A.        If I remember correctly, Section

24   19 of the Parole Act requires that we

25   ask the superintendent or warden for

73

1   their recommendation.  I have seen over

2   the years vote sheets listing each

3   individual staff member that voted that

4   may say no to a particular individual,

5   but the superintendent may, in fact,

6   say yes because it's his or her right

7   to do so.

8   Q.    Okay.

9   A.    Although there may be staff

10   input that is less than positive.

11   Q.    But, ultimately, the

12   recommendation that comes from the

13   Department of Corrections comes through

14   the warden or superintendent?

15   A.    That's correct, as far as I

16   know.  Yes.

17   Q.    And in this case, that input was

18   support for Mr. DeFoy's reparole to his

19   detainer sentence?

20   A.    It appears as though that's the

21   case, yes.

22   Q.    And in the reasons listed for

23   denying parole in Section VII of the

24   form, which appears on page six of the

25   form, the factors --- let me rephrase

74

1    that.    The facts listed for supporting

2    the denial of reparole was the fact

3    that Mr. DeFoy had been removed from a

4    halfway house for cause in the past;

5    correct?

6    A.      Yes.

7    Q.      Which is a factor that was

8    calculated into the guideline forms?

9    A.      Yes.

10   Q.      That the instant offense was

11   assaultive?

12   A.      Yes.

13   Q.      Which had also been taken into

14   account by the guideline forms;

15   correct?

16   A.      Yes, yes.

17   Q.      And he had received a

18   misconduct, which is also a factor that

19   was taken into account by the guideline

20   forms?

21   A.      Well, I guess it depends on how

22   you look at it.    The guideline forms,

23   obviously, assigned a zero, but that

24   doesn't take away from the fact that he

25   had a misconduct.    Yes.

75

1    Q.        Okay.  Understood that the
2    misconduct occurred?
3    A.        Uh-huh (yes).
4    Q.        But it is accurate to say that
5    the existence of the misconduct was
6    considered by the guideline forms?
7    It's just in this particular case there
8    were not a sufficient number of
9    misconducts for Mr. DeFoy to actually
10   receive any points that would have
11   negatively impacted his ---
12   A.        Yes, that's correct.
13   Q.        --- eligibility for or
14   recommendation for parole under the
15   guidelines?
16   A.        Yes.
17   Q.        And so the only factor that was
18   not taken into account --- already
19   taken into account by the guidelines
20   recommendation for reparole was the
21   fact that Mr. DeFoy did not participate
22   in the sex offender treatment program;
23   correct?
24   A.        It appears to be that way, yes,
25   sir.

76

1   Q.      Okay.

2   A.      I would note, however, that I

3   could very well have also listed on

4   page two, Section III, I could have

5   done a number 11 as well, and didn't.

6   And I'm not sure.  Again, I don't have

7   the entire file, so I can't speak

8   specifically about that.

9   Q.      But you did not list a number

10  11?

11  A.      I did not list it.  I can see

12  that.  I did not list it.

13  Q.      And so is it accurate to say

14  that the actual result of Mr. DeFoy not

15  being reparoled after or --- back that

16  up.

17          At least it's accurate to say

18  that your recommendation or vote that

19  Mr. DeFoy not to be reparoled is

20  consistent with the testimony you had

21  given earlier about the Board's

22  practice of taking the sex offender

23  treatment requirement seriously, and

24  that if someone had been ordered to

25  take the sex offender treatment program

77

1  by the Board but did not, in fact,

2  complete the treatment, would not be

3  reparoled?

4  A.    It appears to be consistent with

5  that, yes.

6  Q.    Okay.  I'm going to walk through

7  some of the same forms for when Mr.

8  DeFoy came up for a reparole hearing in

9  2000.

10  A.    Okay.

11            (Petitioner's Exhibit H

12            marked for

13            identification.)

14  BY ATTORNEY PATTON:

15  Q.    Take a look at Petitioner's

16  Exhibit H.

17  WITNESS COMPLIES

18  A.    All right.

19  BY ATTORNEY PATTON:

20  Q.    Does it appear that you were the

21  hearing examiner that would have

22  interviewed Mr. DeFoy and made a vote

23  or a recommendation in his case when

24  Mr. DeFoy was considered for reparole

25  in October of 2000?

78

A.     That is my name listed as a
panel member on page eight.  I would
point out that this is a slightly
different guideline.  And it appears to
me as though Mr. Muller and I both
signed on 10/24/2000, so it might very
well have been a panel interview.

Q.     Okay.

A.     And, in fact, it would almost
have had to be because these notes that
are on page three are not my writing.
It has been awhile since I've seen Mr.
Muller's writing, but it does appear to
have been his.

Q.     Okay.

A.     So I would think that he
probably conducted the interview and I
was present at the time that it was
done.

Q.     Okay.

A.     Again, nine years ago, it's hard
to remember.

Q.     Certainly.

A.     I don't remember.  But it does
appear that this is set up that way.

79

1    Q.        Okay.   The fact that your name

2    appears as signing as a panel member

3    would indicate that you were present at

4    the interview, would have reviewed the

5    - - -

6    A.        Yes.

7    Q.        - - - parole file and had had

8    input into the ultimate decision?

9    A.        Yes.

10   Q.        Okay.   Did the first two pages

11   of the parole decision-making guideline

12   form end up resulting in at least a

13   guideline policy recommendation for

14   reparole?

15   A.        Yes.

16   Q.        Does it appear that even though

17   the guidelines recommended reparole,

18   the ultimate determination made or

19   recommended by yourself and by Mr.

20   Muller was that Mr. DeFoy not be

21   reparoled?

22   A.        That's correct.

23   Q.        And that he be ordered to serve

24   the unexpired maximum sentence?

25   A.        That's what's checked on page

80

1    seven.

2    Q.      Now, is there a place on this

3    form that allows you to put on a reason

4    for --- the reasons for not agreeing

5    with the recommendation of the

6    guidelines?

7    A.      Again, these kinds of forms and

8    how the Board has handled Board actions

9    is something that is beyond the scope

10   for me to answer.  I'm not a policy

11   maker.  I carry out policies.  It

12   appears on page seven that the reason

13   for the Board decision is listed there.

14   Following an interview and review of

15   your file, the Pennsylvania Board of

16   Probation and Parole has determined

17   that the mandates to protect the safety

18   of the public and to assist in the fair

19   administration of justice cannot be

20   achieved through your release on

21   parole.  You're therefore refused

22   parole and ordered to serve your

23   unexpired maximum sentence.

24   Q.      Okay.

25   A.      How that happened, I really

81

1   can't --- I can't answer that. That's

2   a policy decision that I would not have

3   made or had been capable of making in

4   my particular position.

5   Q.    When you would have been doing

6   this reparole interview and considering

7   this release, would you have again

8   reviewed Mr. DeFoy's file, parole file,

9   prior to the interview?

10   A.    If Mr. Muller was conducting the

11   interview, I might be looking at parts

12   of the file while he was talking, yes.

13   Q.    Okay. Is there anything that is

14   in or written on or contained anywhere

15   within this parole decision-making

16   guideline form for this 2000, which is

17   Petitioner's Exhibit H, which would

18   indicate what led you and Mr. Muller to

19   conclude that although the parole

20   decision-making guidelines recommended

21   reparole that Mr. DeFoy not be

22   reparoled?

23   A.    Well, looking at page three,

24   just looking at this form as a form,

25   yeah, I don't remember this particular

82

1  individual, but I note a couple of

2  things.  Number one, the Department of

3  Corrections does not support, which is

4  on line three.

5  Q.      Uh-huh (yes).

6  A.      Then there's a line skipped, and

7  on line five it says no program

8  involvement and no SOT, meaning sex

9  offender treatment.  Looking up to the

10 second line, there was still the York

11 County detainer of six-and-a-half to 13

12 years, and that was for the IDSI,

13 statutory rape and corruption of morals

14 of minor.  So the no sex offender

15 treatment would seem to derive from

16 that.

17 Q.      Correct.  The fact that Mr.

18 DeFoy had this prior conviction, which

19 was actually the reason why his parole

20 was revoked?

21 A.      Actually, a subsequent

22 conviction, yes.

23 Q.      Correct.  Which was a sex

24 offense?

25 A.      Yes.

83

1   Q.      And the fact that he did not

2   participate in the sex offender

3   treatment program would have been a

4   reason not to follow the recommendation

5   of the guideline decision-making form?

6   A.      As best I can tell from this

7   form and without all of the other

8   information that would be available,

9   yes.   That's what it looks like.

10                  (Petitioner's Exhibit I

11                  marked for

12                  identification.)

13  BY ATTORNEY PATTON:

14  Q.      Petitioner's Exhibit I, which is

15  the review summarization report

16  completed in October 2000, that I

17  believe the parties have already agreed

18  is the summarization report that went

19  along with or was provided to the Board

20  for the October 2000 review.

21  A.      Okay.

22                  ATTORNEY PATTON:

23                  And I apologize, that was

24          not one of the things that we'd

25          agreed to, Scott, that that was

84

1          the summarization review for

2          2000.   It was in the documents

3          that you had provided.

4    BY ATTORNEY PATTON:

5    Q.      Based on your review of

6    Petitioner's Exhibit I, the review

7    summarization report, does it appear

8    that that summarization report would

9    dovetail with the parole decision-

10   making guideline forms which is

11   Petitioner's Exhibit H?

12   A.      Yes, yes.

13   Q.      Okay.

14   A.      It has my initials on it from

15   the same date.

16   Q.      Okay.  And that indicates that

17   the superintendent or warden was

18   recommending that there not be a

19   reparole; correct?

20   A.      That's correct.

21   Q.      And on the second page of that

22   under mental health evaluation ---

23   A.      Uh-huh (yes).

24   Q.      --- does that indicate that a

25   mental health evaluation was prepared

85

1  by the Department of Corrections on May

2  31st of 2000?

3  A.      It refers to it, yes.

4  Q.      Okay.  And did that evaluation

5  conclude that Mr. DeFoy's level of risk

6  to the community appears to be minimal?

7  A.      That line is written there, yes.

8  Q.      Okay.  But then after that, the

9  summarization report states that at

10  present, however, he refuses to

11  complete any treatment program for sex

12  offenders, which was the stipulation

13  established by the Board.

14  Subsequently, he is ineligible for

15  reparole?

16  A.      That's what it says, sir.  Yes.

17  Q.      Okay.  And as you said, your

18  initials actually appear on this

19  document?

20  A.      Uh-huh (yes).

21  Q.      On the same date that the parole

22  decision-making guidelines and

23  Petitioner's Exhibit H is dated?

24  A.      Uh-huh (yes).

25  Q.      So would that indicate that you

86

1    would have reviewed this form as part

2    of the process?

3    A.        Yes.   Again, it's a copy, but it

4    certainly looks like I did.   And that's

5    a copy of my initials as well.

6    Q.        Okay.

7                          (Petitioner's Exhibits J

8                          and K marked for

9                          identification.)

10   BY ATTORNEY PATTON:

11   Q.        Petitioner's Exhibit J.

12                         ATTORNEY PATTON:

13                         Scott, this came out of

14           the parole file.

15   A.        Okay.

16   BY ATTORNEY PATTON:

17   Q.        And Petitioner's Exhibit K,

18   which I believe was a DC-13A form that

19   also has your initials, or a copy of

20   that form with your initials on the

21   front page?

22   A.        Yes.

23   Q.        Also with the date of October

24   24th of 2000?

25   A.        Yes.

87

1    Q.      And I believe the DC-13A form is
2    a form that you had referred to earlier
3    as one of the forms that the Department
4    of Corrections forwards on to the
5    Parole Board containing information
6    about the inmate who is being
7    considered for reparole and containing
8    the recommendations of the Department
9    of Corrections?
10   A.      Yes.  And, of course, for those
11   who are being considered for parole as
12   well, yes.  It's not just for reparole.
13   Q.      Right.  Is it accurate to say
14   that both Petitioner's Exhibit ---
15   well, let me back up.
16           Is Petitioner's Exhibit J a
17   letter from John McCullough, who was at
18   the time the superintendent of SCI-
19   Houtzdale?
20   A.      That's correct.
21   Q.      Conveying his actual
22   recommendation for that Mr. DeFoy not
23   be reparoled when you were considering
24   his reparole on October 24th of 2000?
25   A.      Yes.  That's what it appears to

88

1  be, sir.

2  Q.    Is it accurate to say that both

3  Exhibit J and K indicate that the basis

4  for the Department of Corrections not

5  supporting Mr. DeFoy's parole is the

6  fact that he had not completed the sex

7  offender treatment program?

8  A.    Yes, but at least in reading

9  this, if you look at page two of K, it

10 says that he's earned very good housing

11 work reports and has consistently done

12 this since his transfer to Houtzdale.

13 However, there has been no program

14 involvement since his last review.

15 That's kind of vague.  The next page,

16 of course, speaks about his refusal to

17 participate in sex offender treatment.

18 And the superintendent's letter

19 specifically names the sex offender

20 treatment.  So I don't know --- it's

21 clear that there was no sex offender

22 treatment.  I'm not sure if there were

23 other programs he was supposed to do

24 that they didn't address.  That I can't

25 answer.

89

1            The report from Mr.

2    Kechison, who is the corrections

3    counselor, says there has been no

4    program involvement since his last

5    review.  So there could be other

6    programs, but I don't have enough

7    information to know that for sure.

8    Q.      Okay.  But in Warden --- excuse

9    me, Superintendent, I should say,

10   McCullough's letter, he specifically

11   references that it's the lack of

12   participation in sex offender treatment

13   programming that is causing the ---

14   A.      That's correct.

15   Q.      --- Department of Corrections to

16   recommend that Mr. DeFoy not be

17   reparoled?

18   A.      That's what the Exhibit J says.

19   Yes, sir.

20   Q.      And so the fact that in 2000,

21   when Mr. DeFoy was being considered for

22   reparole, the fact that even though the

23   parole decision guideline making forms

24   recommended parole or reparole, excuse

25   me, but that Mr. DeFoy was not

90

1   reparoled, does it appear that the

2   reason that he was not reparoled is

3   because he did not participate in the

4   sex offender treatment program?

5   A.      If I'm looking at Exhibit H ---?

6   Q.      Yes.

7   A.      Page seven, the reason for the

8   Board decision not does specifically

9   state that.  I don't have enough

10  information to answer this one

11  definitely.  I'm sure that that was a

12  factor in the decision not to parole

13  him.

14  Q.      Was there anything contained in

15  Petitioner's Exhibit H that would

16  indicate that there was some reason

17  other than Mr. DeFoy's failure to

18  participate in the sex offender

19  treatment program that would have

20  negatively impacted his opportunity to

21  be reparoled?

22  A.      Again, not perhaps specifically

23  in Exhibit H, except it does say the

24  DOC does not support, which of course

25  is the Department of Corrections.  And

91

1    then looking at K, recommendations

2    then, you look at the two of them and

3    there appears to be a parallel between

4    sex offender treatment and the

5    Department of Correction not

6    supporting. Again, I don't have all

7    the information, but there does appear

8    correlation.

9    Q.    And would that ultimate result

10   be then consistent with what we've

11   previously talked about, being that if

12   the Parole Board has recommended that

13   an individual participate in a sex

14   offender treatment program, but that

15   individual does not participate in a

16   sex offender treatment program, that

17   the Board will not parole or reparole

18   that individual?

19   A.    It appears to be consistent,

20   sir.  Yes.

21                  ATTORNEY PATTON:

22                  I just want to check a

23            couple things or two.

24                  ATTORNEY BRADLEY:

25                  Actually, this would

92

1          probably be a good time to take

2          a break?

3                    ATTORNEY PATTON:

4                    Okay.  Yeah, I think I'm

5          done, but I just want to ---.

6                    ATTORNEY BRADLEY:

7                    Okay.

8     A.     Sure.

9                    ATTORNEY PATTON:

10                   I'm probably going to

11         come back with a few questions.

12                   ATTORNEY BRADLEY:

13                   Okay.

14                   ATTORNEY PATTON:

15                   But let me take care of

16         this.

17    SHORT BREAK TAKEN

18    BY ATTORNEY PATTON:

19    Q.     I just have a few more

20    questions.

21    A.     Sure.

22    Q.     Is it the Department of

23    Corrections that calculates minimum and

24    maximum dates?

25    A.     Minimum and maximum dates, as I

93

1    understand it, initially are done by

2    the Department of Corrections.  When

3    there is a reparole, then the Board of

4    Probation and Parole has a piece in

5    that as well.  I can speak only in

6    general terms.  Again, that is an issue

7    or an area that I don't have expertise

8    in and do not have as part of my job

9    description, so I can only give you an

10   overview.

11   Q.     But for a reparole, if, for

12   example, if it's a convicted parole

13   violator who's going to be losing

14   street time, is it the Board that ---

15   somewhere in the Board, they'll

16   calculate the new minimum date based on

17   the amount of back time that's ordered

18   served, and then recalculate the

19   maximum date based on the loss of

20   street time?

21   A.     I think as a general rule that

22   would be correct, yes.  Again, the

23   specifics I can't speak to.

24   Q.     You had mentioned when you were

25   reviewing some of the exhibits that we

94

1  have been talking about that they're
2  older exhibits and things have changed
3  over the course of time, and some of
4  your duties have changed over the
5  course of time?
6  A.      Uh-huh (yes).
7  Q.      And that when you were giving
8  your general background, answers to my
9  questions about general background,
10  about what you did, that you were
11  speaking about the way you are
12  operating currently?
13  A.      That's correct.
14  Q.      With regard to the types of
15  information you would review and the
16  mechanics of getting the file,
17  interviewing a potential inmate, and
18  then making either a vote or a
19  recommendation, has that remained more
20  or less constant in your time with the
21  Board?
22  A.      Yes.  But there have been
23  changes to the Parole Act during the
24  time that I have been a hearing
25  examiner.  By and large, the things

95

1    that are in Section 19 of the Parole

2    Act, which again are the things that

3    we're required by law to look at before

4    making a decision, have not changed

5    substantially that I can recall.

6    Again, you know, we're going over a

7    nine or ten-year period of time, so

8    there have been a significant number of

9    changes in the parole law, starting at

10    about '94 and '95.  So there have been

11    changes all along.

12    Q.    Since December of 2000, for

13    offenses that have occurred after

14    December of 2000 that are sexual in

15    nature, an inmate's eligibility for

16    parole can depend upon whether or not

17    they participated in a sex offender

18    treatment program; is that correct?

19    A.    I believe so.  Yeah, I believe.

20    This is '97, I'm not sure, but I think

21    that's ---.

22    Q.    So that, for example, a person

23    who is convicted of committing a rape,

24    for a rape that occurred after December

25    of 2000, for that person to actually be

96

1    eligible for parole and even be

2    considered, they'd have to participate

3    in the sex offender program; is that

4    correct?

5    A.    You know, I can't answer that

6    specifically. I don't know. I don't

7    know.

8    Q.    Well, when you're getting, for

9    example, with people you're

10   interviewing currently, if they have a

11   sex offense, if they're serving time on

12   a sex offense, is there any information

13   given to you with regard to whether or

14   not their offense occurred at such a

15   point in time that they are required to

16   do sex offender treatment program to be

17   eligible for parole, versus this is

18   somebody whose offense occurred at a

19   point in time where they're still

20   eligible?

21   A.    What happens is as a general

22   rule, we have a copy of the police

23   criminal complaint and Affidavit of

24   Probable Cause, hopefully both. And

25   that usually establishes the date of

97

1    the offense.

2    Q.      Okay.  So that's something you

3    as a hearing examiner will have to look

4    for in your review of the Board file in

5    preparing for your interview?

6    A.      That's correct.

7    Q.      And if you are reviewing a file

8    and see that the offense occurred after

9    December of 2000, and if you then look

10   and see, say this person hasn't

11   completed sex offender treatment, do

12   you even go ahead with an interview?

13   A.      Again, that would be the

14   determination that would be made before

15   it got to me.  Okay?

16   Q.      Okay.

17   A.      Because I believe the law, that

18   particular law, sets up certain people

19   for whom the law applies and certain

20   people for whom it doesn't.  And for

21   those for whom it applies, if they

22   don't have sex offender treatment,

23   they're actually not eligible for

24   parole.  We should not see them.

25   Q.      Okay.  So you should never have

98

1  to make that determination?

2  A.      I should not have to make that

3  determination.   That's correct.

4  Q.      Someone else should have done

5  that?

6  A.      Yes, yes.

7  Q.      Okay.

8                      ATTORNEY PATTON:

9                      Those are my questions.

10        Thank you.

11  A.      Sure.

12  EXAMINATION

13  BY ATTORNEY BRADLEY:

14  Q.      Just to follow up and be clear

15  on that, you wouldn't interview anybody

16  that's not eligible for parole?

17  A.      That's right.   Yes.

18  Q.      So if they're not eligible for

19  parole because of a failure to

20  participate in sex offender treatment

21  that's mandated by statute, then you

22  would never interview that person?

23  A.      That's the way it's supposed to

24  be, yes.

25  Q.      Okay.   I think you touched upon

99

1    it, but when you make these decisions,

2    these are individualized decisions; is

3    that correct?

4    A.    Yes.

5    Q.    You don't apply any blanket

6    rules or considerations when

7    approaching each specific case; do you?

8    A.    No.  Section 19 is the guiding

9    principle, if you will, the guiding

10   legislation, but each individual is

11   individually reviewed, and we attempt

12   to understand what goes into each

13   individual's makeup and their criminal

14   pattern.

15   Q.    And your decision with regard to

16   parole is made based on what you gain

17   from the file and what you gain from

18   the interview?

19   A.    That's correct.

20   Q.    And in consideration of those

21   factors mandated by statute, and

22   whatever administrative policies and

23   guidelines may apply?

24   A.    That's correct.

25   Q.    Now, you talked about that you

100

1  could not recall any instance where

2  somebody had refused to participate in

3  sex offender treatment and had then

4  been paroled.  Do you recall that?

5  A.      That's correct.  I do not recall

6  a single individual, cannot by name or

7  circumstance at this point.

8  Q.      But you didn't review any

9  records or documents in making that

10  recollection?

11  A.      No, that was a question asked of

12  me cold.  So I really can't speak to

13  it.  I can't say anything other than

14  what I have.

15  Q.      Has anybody ever told you from

16  the Board or the Department of

17  Corrections that under no circumstances

18  are you to ever parole an individual

19  who has refused to participate in sex

20  offender treatment?

21  A.      Not that I recall.

22  Q.      Now, with regard to your

23  function in recommending or voting for

24  parole, are you essentially making a

25  prediction about an inmate's future

101

1    behavior once released from custody?

2    A.    What I'm doing is assessing his

3    risk to the community.

4    Q.    And I guess at best that can

5    only be a prediction as to whether he

6    will not re-offend or he will re-

7    offend?  I don't know.  Do you

8    understand the question?

9    A.    You're asking me is what I'm

10   doing predicting what's going to happen

11   in the future?

12   Q.    Yes.

13   A.    Is that what you're asking?

14   Q.    That's what I'm trying to ask.

15   A.    I do not see my role so much as

16   a predictor as an evaluator or

17   assessor.  I see my role as important

18   in determining what is this

19   individual's likely risk to the

20   community.  And past record is one of

21   the serious things that we look at for

22   that assessment.

23   Q.    Within that function, and we can

24   talk generally then specifically, but

25   is generally the prescriptive

102

1  programming an inmate receives in the
2  institutional setting, is that an
3  important consideration in terms of
4  that evaluation or assessment?
5  A.      Yes.
6  Q.      Why is that?
7  A.      Well, the Department of
8  Corrections generally will have had an
9  individual for a period of months, and
10 often years.  So they've had a chance
11 to understand how this individual
12 functions on a day-to-day basis.  And
13 they've had a chance to look at many of
14 the same information sources that we
15 do.  For example, pre-sentence
16 investigations and that kind of thing.
17 So that they have to make an assessment
18 as well of what this individual's needs
19 are so that they can provide the
20 ability or at least the capacity for
21 rehabilitation if the individual is
22 willing to take that, that possibility
23 of rehabilitation.
24 Q.      And does that also apply more
25 specifically in the area of sex

103

1    offender treatment?

2    A.      Yes.  And alcohol and drug

3    treatment as well, yes.

4    Q.      So that because of that central

5    concern for rehabilitation and as

6    reflected in performance in

7    prescriptive programming, does it then

8    not surprise you that you cannot think

9    of any individual who has not been

10   paroled who has refused to participate

11   in sex offender treatment?

12   A.      No, it doesn't surprise me.

13   Q.      And I guess just finally to

14   clarify, and I think you touched upon

15   this, but this case involves Robert

16   DeFoy, and, apparently, you were

17   involved in several interviews and

18   parole reviews involving Mr. DeFoy.  As

19   we sit here today, do you have any

20   personal recollection of those events

21   back in 1997 and 2000?

22   A.      No, I don't.

23   Q.      Thanks.

24                   ATTORNEY BRADLEY:

25                   That's all I have.  He

104

1          may have some follow-up based on

2          those questions.

3     RE-EXAMINATION

4     BY ATTORNEY PATTON:

5     Q.      Mr. Bradley asked you some

6     questions about, you know, the

7     prescriptive programming plan.

8     A.      Uh-huh (yes).

9     Q.      And if an inmate's failure to

10    comply with the prescriptive

11    programming plan would have an impact

12    on the parole decision, your decision,

13    as to recommend parole or reparole.

14    When we were going through, for

15    example, Mr. DeFoy's case, the 1997

16    consideration for reparole, and we

17    determined that the Department of

18    Corrections through Superintendent

19    McCullough actually supported Mr.

20    DeFoy's parole; is that correct?

21    A.      I don't recall that I had Mr.

22    McCullough specifically in 1997.  It

23    may very well be, but I don't remember

24    - - - .

25    Q.      Whether it was Mr. McCullough or

105

1   not, the superintendent recommended

2   release?

3   A.      Yes.  Yes, that's correct.  I

4   don't see the individual's name, but

5   yes, that does appear to be correct.

6   Q.      But even though the parole

7   decision-making guidelines forms in

8   1997 supported reparole and the

9   Department of Corrections supported

10  reparole, ultimately Mr. DeFoy --- or

11  you recommended that Mr. DeFoy not be

12  reparoled based on the fact that he did

13  not complete the sex offender treatment

14  program; correct?

15  A.      That and misconduct, I believe.

16  Yeah.  And assault of instant offense,

17  the reasons were listed, yes.

18  Q.      The other things, okay.  With

19  regard to the sex offender treatment

20  program, even if the Department of

21  Corrections was recommending release

22  for an individual who the Board had

23  stated they wanted to have sex offender

24  treatment program, and if the person

25  hadn't done the sex offender treatment

106

1  program, it would be your experience
2  that that individual would not be
3  released, even though the Department of
4  Corrections may support such release?
5  A.      A difficult question again,
6  because if there was an obvious anomaly
7  between what the Department of
8  Corrections says and what the Parole
9  Board had placed in a green sheet, as a
10 decision maker, I would generally want
11 to have more information.  And, in
12 fact, that appears --- and, again, I
13 don't remember this case, but that
14 appears to be exactly what happened in
15 this case because I didn't immediately
16 say no.  I wanted clarification of
17 status of 7/16/92 conviction.  This is
18 Exhibit E, the 1997 guidelines.  And
19 below, there's a note, and this looks
20 like my writing.  Thankfully, not too
21 many people write like I do.
22      But 8/1/97, received attached
23 York County material, which I don't
24 have.  And legal opinion that since the
25 district attorney filed an appeal with

107

1  the PCRA, the conviction stands until

2  that matter is resolved. So I actually

3  didn't just blanket say no.  It

4  actually went another step and asked to

5  find out, was it, in fact, true because

6  if you read through my writing there,

7  he's been granted a new trial on the

8  IDSI, and he has posted bond.  So I

9  wanted to find out if indeed that

10  conviction was set aside.  Apparently,

11  it wasn't.  And at least from Exhibit

12  H, we had some written indication that

13  that, in fact, was still in effect, the

14  detainer sentence in 2000.

15  Q.     But once you concluded that the

16  sex offense conviction was still there,

17  that confirmed to you that sex offender

18  treatment program was needed as ordered

19  by the Board?

20  A.     Yes.

21  Q.     And, therefore, since that

22  treatment was not completed, ---

23  A.     Yes.

24  Q.     --- you would not recommend

25  reparole even though the guidelines

108

1    suggested it?

2    A.    That's what it appears to be.

3    Again, I don't have the entire file,

4    but that's what it appears to be.

5    Q.    Mr. Bradley asked you if you

6    reviewed any particular files in

7    preparing for today, and you had

8    answered that you did not?

9    A.    That's correct.

10    Q.    Would you know of any way you

11    could try and locate files in a manner

12    that would allow you to say I want to

13    do a comparison of seeing whether or

14    not anyone who had been ordered by the

15    Board to complete sex offender

16    treatment program, but who had not

17    completed the sex offender treatment

18    program were actually ever paroled or

19    reparoled?

20    A.    I don't know that I could

21    personally do that.  I mean, I can

22    request a file, a Board file, but that

23    would be unusual.  In fact, I've never

24    done that.

25    Q.    And based on your testimony,

109

1    based on your experience, the Board has

2    treated the sex offender treatment

3    program very seriously in the

4    requirement that an inmate do it, and

5    therefore, you cannot recall ever

6    having an inmate who did not complete

7    the program actually be paroled or

8    reparoled. Does it surprise you that

9    you can't recall of a single instance

10   where that actually occurred?

11   A.      Well, it doesn't surprise me

12   that I can't remember it in part

13   because of the volume of work I do, and

14   in part for the fact that I've been at

15   it for ten years.

16   Q.      Well, let me put it this way.

17   It would be an extremely rare situation

18   if it has ever occurred, that someone

19   who had been ordered to take a sex

20   offender treatment program but did not

21   were actually paroled or reparoled;

22   correct?

23   A.      I believe so.

24   Q.      And, therefore, would that be a

25   situation that would likely stick out

110

1   to you because it would be so out of
2   the ordinary?
3   A.      I'd like to say yes, but again,
4   the volume of work that I do makes it
5   difficult to remember specific cases.
6   The other part of that is I am
7   frequently the first person in the
8   whole process to make a vote or a
9   recommendation.  It looks like back in
10  '97, it was a vote.  Now, it's a
11  recommendation for yes.  There would be
12  people who would follow me.  And if
13  this was not a panel decision, if two
14  people or the entire panel are not
15  sitting here, I would not know what
16  happened afterwards, okay.  So when I
17  say that I believe it would be
18  extremely rare that's because in my
19  understanding, I've not seen it
20  happened.
21          That does not mean it could not
22  happen.  I don't have a way of knowing.
23  There's not a loop whereby everybody
24  says, oh, okay, you did these 15
25  people.  We want you to know this guy

111

1   was paroled, this one wasn't, da, da,

2   da, da. So I can't blanket say it

3   hasn't happen. To my knowledge, it

4   hasn't, but, again, my knowledge is

5   very narrowed. I am a worker, not a

6   policy maker. Okay?

7   Q.      Uh-huh (yes).

8   A.      And I'm not the person that

9   follows. That's the Board itself that

10  would look at those kinds of

11  statistics. I would have no reason or

12  truthfully ability to do it.

13  Q.      But you don't recall ever voting

14  yourself to recommend parole or

15  reparole for someone who hadn't done

16  sex offender treatment having been

17  previously ordered to do that by the

18  Board?

19  A.      I cannot give you a specific

20  name or a specific instance. Again, as

21  I had indicated, you're sitting in a

22  prison hospital. I could see a

23  possibility when it could happen, but I

24  cannot say that I have done that. I

25  cannot remember ever doing that. No,

112

1    sir.

2                    ATTORNEY PATTON:

3                    Thanks.

4                    ATTORNEY BRADLEY:

5                    Thank you.  Did you want

6            to review the transcript before

7            we certify it?

8    A.       I don't know.

9                    ATTORNEY BRADLEY:

10                   If you're confident that

11           the Court Reporter truthfully

12           and accurately took everything

13           down, then you can waive the

14           reading.

15    A.       I'll waive the reading.

16                * * * * * * * *

17       DEPOSITION CONCLUDED AT 10:27 A.M.

18                * * * * * * * *

19

20

21

22

23

24

25

COMMONWEALTH OF PENNSYLVANIA )

COUNTY OF CAMBRIA            )

C E R T I F I C A T E

I, Melissa Beam, a Notary Public in and for
the Commonwealth of Pennsylvania, do hereby
certify:

That the witness whose testimony appears in
the foregoing deposition, was duly sworn by me on
said date and that the transcribed deposition of
said witness is a true record of the testimony
given by said witness;

That the proceeding is herein recorded fully
and accurately;

That I am neither attorney nor counsel for,
nor related to any of the parties to the action in
which these depositions were taken, and further
that I am not a relative of any attorney or
counsel employed by the parties hereto, or
financially interested in this action.

*Melissa Beam, CCR*

Melissa Beam, Reporter

NOTARIAL SEAL
MELISSA BEAM, Notary Public
Johnstown, Cambria County, PA
My Commission Expires Nov. 14, 2007

· PITTSBURGH, PA          SARGENT'S          · PHILADELPHIA, PA
· CLEARFIELD, PA     · ERIE, PA    COURT REPORTING    · INDIANA, PA    · SOMERSET, PA
· STATE COLLEGE, PA    · OIL CITY, PA    SERVICE, INC.    · GREENSBURG, PA    · WILKES-BARRE, PA
· HOLLIDAYSBURG, PA    · HARRISBURG, PA    210 Main Street    · CHARLESTON, WV
Johnstown, PA 15901
(814) 536-8908

LAWYER'S NOTES

| Page | Line | |
|------|------|---|
| | | |



PITTSBURGH, PA
HARRISBURG, PA
GREENSBURG, PA
ERIE, PA
INDIANA, PA
HOLLIDAYSBURG, PA
STATE COLLEGE, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.

210 MAIN STREET
JOHNSTOWN, PA  15901
(814) 536-8908

PHILADELPHIA, PA
WILKES-BARRE, PA
OIL CITY, PA
SOMERSET, PA
CLEARFIELD, PA
*CHARLESTON, WV*

# COMMONWEALTH OF PENNSYLVANIA
## PENNA. BOARD OF PROBATION AND PAROLE

DATE:    120992

CLIENT NAME:    ROBERT DEFOY

PAROLE NO.:    1226J

INSTITUTION:    YORK COUNTY PRISON
SCI - HUNTINGDON CASE

INSTITUTION NO.:    AK1017

AS RECORDED ON    111092    THE BOARD OF PROBATION AND PAROLE RENDERED THE
FOLLOWING DECISION IN YOUR CASE:

RECOMMIT AS A CPV TO A STATE CORRECTIONAL INSTITUTION WHEN AVAILABLE TO SERVE
40 MONTHS BACKTIME.
   40 MONTHS FOR THE OFFENSES OF INVOLUNTARY DEVIATE SEXUAL INTERCOURSE,
STATUTORY RAPE AND CORRUPTION OF MINORS.    EVIDENCE RELIED UPON: PROOF OF
CONVICTIONS - COURT DOCUMENTS.    REASONS: MULTIPLE CONVICTIONS ESTABLISHED
IN A COURT OF RECORD.
WHILE CONFINED, YOU MUST COMPLY WITH THE INSTITUTION'S PRESCRIPTIVE PROGRAM
REQUIREMENTS AND HAVE NO MISCONDUCTS AND PARTICIPATE IN SEX OFFENDER TREATMENT.
(H.R. 10-6-92 CM)
   IF YOU WISH TO APPEAL THIS DECISION, YOU MUST FILE A REQUEST FOR ADMINISTRA-
TIVE RELIEF WITH THE BOARD WITHIN THIRTY DAYS OF THIS ORDER.    THIS REQUEST
SHALL SET FORTH SPECIFICALLY THE FACTUAL AND LEGAL BASIS FOR THE ALLEGA-
TIONS.    SEE 37 PA CODE SEC. 73.    YOU HAVE THE RIGHT TO AN ATTORNEY
IN THIS APPEAL AND IN ANY SUBSEQUENT APPEAL TO THE COMMONWEALTH COURT.
DATE MAILED:

DEC 10 1992

VIRTUE    LIBERTY AND    INDEPENDENCE

CC: PUBLIC DEFENDER
CC: SUB OFFICE - YORK
CC: SUPV

JAMES W. RIGGS
BOARD SECRETARY

CLIENT COPY
ROBERT DEFOY
YORK COUNTY PRISON
1155 WILLIAMS ROAD
YORK PA
17402-0000

AK1017

**PETITIONER'S
EXHIBIT
_A_**

F

# COMMONWEALTH OF PENNSYLVANIA
## PENNA. BOARD OF PROBATION AND PAROLE

DATE:    110593

ENT NAME:    ROBERT DEFOY

PAROLE NO:    1226J

NSTITUTION:    STATE CORRECTIONAL INSTITUTION CAMP HILL

INSTITUTION NO:    AK1017

AS RECORDED ON    110593    THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

REFER TO BOARD ACTION OF 11/10/92 TO RECOMMIT TO A STATE CORRECTIONAL INSTITUTION AS A CONVICTED PAROLE VIOLATOR TO SERVE 40 MONTHS ON BACKTIME.

REPAROLE 03/25/93 TO STATE DETAINER SENTENCE, UPON CONDITION THERE ARE NO MISCONDUCTS AND YOU REMAIN INVOLVED IN REQUIRED PROGRAMS.

MUST ABIDE BY THE RULES AND REGULATIONS OF THE INSTITUTION.  FAILURE TO DO SO MAY RESULT IN PAROLE REVOCATION.

IF YOU WISH TO APPEAL THIS DECISION, YOU MUST FILE A REQUEST FOR ADMINISTRA-TIVE RELIEF WITH THE BOARD WITHIN THIRTY DAYS OF THIS ORDER.  THIS REQUEST SHALL SET FORTH SPECIFICALLY THE FACTUAL AND LEGAL BASIS FOR THE ALLEGA-TIONS.  SEE 37 PA CODE SEC. 73.  YOU HAVE THE RIGHT TO AN ATTORNEY IN THIS APPEAL AND IN ANY SUBSEQUENT APPEAL TO THE COMMONWEALTH COURT.

(CAM 11/05/93)

DATE MAILED: NOV 17 1993

PAROLE VIOLATION MAX DATE: 030701

ESQ.
CONTROL COPY

JAMES W. RIGGS
BOARD SECRETARY

FILE COPY



PETITIONER'S
EXHIBIT
B

15

# COMMONWEALTH OF PENNSYLVANIA

## PENNA. BOARD OF PROBATION AND PAROLE

DATE:   112393

CLIENT NAME:   ROBERT DEFOY          Hortydale          PAROLE NO:   1226J

INSTITUTION:   STATE CORRECTIONAL INSTITUTION HUNTINGDON          INSTITUTION NO:   AK1017

AS RECORDED ON      112393      THE BOARD OF PROBATION AND PAROLE RENDERED THE
FOLLOWING DECISION IN YOUR CASE:

MODIFY BOARD ACTION OF 11/05/93 BY CORRECTING REPAROLE DATE TO 03/25/97.

REST OF BOARD ACTION REMAINS THE SAME.

IF YOU WISH TO APPEAL THIS DECISION, YOU MUST FILE A REQUEST FOR ADMINISTRA-
TIVE RELIEF WITH THE BOARD WITHIN THIRTY DAYS OF THIS ORDER.  THIS REQUEST
SHALL SET FORTH SPECIFICALLY THE FACTUAL AND LEGAL BASIS FOR THE ALLEGA-
TIONS.  SEE 37 PA CODE SEC. 73.  YOU HAVE THE RIGHT TO AN ATTORNEY
IN THIS APPEAL AND IN ANY SUBSEQUENT APPEAL TO THE COMMONWEALTH COURT.

DATE MAILED: DEC 0 1 1993

(CAM 11/23/93)

PAROLE VIOLATION MAX DATE: 060701

ESQ.
CONTROL COPY

James W. Riggs

JAMES W. RIGGS
BOARD SECRETARY

FILE COPY

PETITIONER'S
EXHIBIT
C

16

# COMMONWEALTH OF PENNSYLVANIA
## PENNA. BOARD OF PROBATION AND PAROLE

DATE: 042397

LIENT NAME: ROBERT DEFOY

INSTITUTION: SCI - HOUTZDALE

PAROLE NO: 1226J

INSTITUTION NO: AK1017

AS RECORDED ON    042297    THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

ODIFY BOARD ACTION OF 11-23-93 AND 11-05-93 BY TEMPORARILY RESCINDING HE REPAROLE PORTION DUE TO MISCONDUCTS AND NOW:

LIST FOR REINTERVIEW ON NEXT AVAILABLE DOCKET.

[ MEMO 04-10-97    CG 4-23-97 ]



AROLE VIOLATION MAX DATE: 06J701

FILE COPY

PETITIONER'S
EXHIBIT
Q

W. CONWAY BUSHEY
BOARD SECRETARY

BPP-15 (6/96)

PBPP 361 (9-90)

# PENNSYLVANIA BOARD OF PROBATION AND PAROLE

CLIENT NAME _Robert De Foy_     PAROLE NUMBER _1226-V_

DATE OF INTERVIEW _6/19/97_     INSTITUTION _SCI-Mercer / AK-10_

# PAROLE DECISION MAKING GUIDELINES

_Reparole Review_

## I PAROLE PROGNOSIS ASSESSMENT

**INSTRUCTIONS:** Information on age-at-minimum-sentence, prior convictions, PPA offense code and prior probation or parole revocations should be provided in column 1. The appropriate risk classification score in column 2 should be placed in column 3 and subsequently added together in the total PPA score box. Based upon the total score number, the client may then be classified into a risk category according to the range of scores shown at the bottom of the instrument. Clients with multiple offenses should have each offense ranked in ascending score order according to the offense ranking at the bottom of the page. This process results in a risk assessment which is sensitive to potential future crime. Column 4 may be used to reassess a case if the interview suggests that the assessment information was incorrect.

| COLUMN 1<br><br>Variable _Review_ | COLUMN 2<br>Score Allocation for<br>Risk Assessment | COLUMN 3<br>Classification<br>Score | COLUMN 4<br><br>Reassessment |
|---|---|---|---|
| Age at Minimum: **30** yr. **45**<br>Minimum Sentence Date<br>_9/28/92_ | 0 if 40 years or older<br>21 if 26-39 years<br>38 if 25 years or younger | _21  0_ | ___ |
| Prior Convictions:<br>Number: _1_ | 0 if no prior convictions<br>9 if 1 or 2 convictions<br>26 if 3 or more convictions | _9  9_ | ___ |
| PPA Offense<br>(Ranked According to Index)<br>1. _Robbery w/ Acc_<br>2. _weapon offense_<br>3. _84 Violen_<br>4. _____<br>5. _____ | 0 if not elsewhere classified<br>20 if theft, fraud, burglary or robbery | _20 (20)_ | ___ |
| Probation Revocations _0_<br>Parole Revocations _1_<br>Total: _1_ | 0 if none<br>16 if 1 or more | _16 (16)_ | ___ |
| **TOTAL P.P.A. SCORE** | | _57  45_ | |

Parole Prognosis Assessment Score Category CHECK ONE: 71-100 High Risk ☐     45-70 Medium Risk ☒     0-44 Low Risk ☐

Instant Offense in descending recidivism rank order:   1) Theft/Fraud, 2) Burglary, 3) Robbery, 4) Aggravated Assault, 5) Drug Law Violation, 6) Arson & Miscellaneous, 7) Simple Assault & Kidnapping; 8) Sex Offenses, 9) Manslaughter, 10) Murder.

## II POTENTIAL ASSAULTIVENESS/DANGEROUSNESS SCREEN

Assaultivness is a course of conduct that presents, or is calculated to present, a danger or perceived danger to any person. An assaultive instant offense is defined as any single conviction offense for the current sentence of the following type: murder, manslaughter, rape, and other assaultive sex offenses, robbery, kidnapping, aggravated or simple assault, arson against persons, weapon law violations, or homicide by vehicle.

**Official versions or facts of crime are required for all offenses in the definition above prior to a final Board action.**

1. Does the client have an assaultive instant offense based upon the definition above, or based upon the official version of the offense in the case of a plea bargain? ☒ YES   ☐ NO
   If the answer to the above question is "yes", mark a score of (1) on p. 2, III(7), and answer the following question.
   If the answer to the above question is "no", stop here.

2. Does the client have a mental health problem which requires treatment in the form of either individual or group therapy/counseling and/or psychotropic medication? (Rape and all other assaultive sex offenses require a "yes" answer). ☒ YES   ☐ NO
   If the answer to the above question is "yes", mark the client as having a very high assault potential with a score of (3) on p. 2, III(8) and stop here.
   If the answer to #2 is "no", answer the following question.

3. Did the client have any institutional problems/misconducts which were assaultive in nature within the last 12 months or the last one-half of the minimum sentence, whichever is longer? ☐ YES   ☐ NO
   If the answer to the above question is "yes", mark th[e client as having a high] ssault potential with a score of (2) on p. 2, III(9).

PETITIONER'S
EXHIBIT
_E_

## III PAROLE CONSIDERATION FACTORS

Each unfavorable factor listed below is a possible reason for refusing parole as a matter of policy. Select the appropriate column from the PPA on p. 1. If the response to a specific unfavorable factor is in the affirmative, the appropriate score of 2 or 1 must be entered. If the response is in the negative, a 0 goes in the blank space provided. Enter the total score of unfavorable factors at the bottom of the appropriate column.

| REASONS FOR PAROLE REFUSAL | SCORE | PAROLE PROGNOSIS ASSESSMENT | | |
|---|---|---|---|---|
| | | High Risk | Medium Risk | Low Risk |
| **Unfavorable Factors from Institutional Performance:** | | | | |
| 1) Three or more Class II misconducts, or two Class II and one Class I misconducts, during the last twelve (12) months or the last one-half of the minimum sentence, whichever is longer. | 1 | _____ | 0 | 0 |
| 2) Two or more Class I misconducts during the last twelve (12) months, or the last one-half of the minimum sentence, whichever is longer. | 1 | _____ | 0 | |
| 3) Open charges* for new crimes, or new convictions, while serving this prison sentence. | 2 | _____ | 0 | |
| 4) Removed from CSC, work release or prerelease for cause. | 2 | _____ | 2 | |
| *(prima facie case was established.) | | | | |
| **Unfavorable Factors from Prior Record:** | | | | |
| 5) Substance Abuse | 2 | _____ | 0 | 0 |
| 6) Habitual Offender | 1 | _____ | 0 | |
| **Unfavorable Factors from Instant Offense:** | | | | |
| 7) Assaultive Instant Offense (from page 1, II (i)) | 1 | _____ | 1 | |
| 8) Very high assaultive behavior potential (from page 1, II (2)) | 3 | _____ | 0 | |
| 9) High assaultive behavior potential (from page 1, II (3)) | 2 | _____ | 0 | |
| 10) Victim Injury | 1 | _____ | 0 | |
| 11) Client had weapon in the commission of offense.  ☑ Firearm   ☐ Knife   ☐ Other | 1 | _____ | 1 | |
| **TOTAL UNFAVORABLE FACTOR SCORE** | | | 6 | |
| **Parole Policy Guideline Recommends Refuse if Total Score is:** | | 5 or more | 6 or more | 7 or more |

**Guideline Policy Recommendation:**    Parole ☑    Refuse ☐

## DEFINITIONS:

a) **Open Charges** - This refers to new criminal charges being filed while on pre-release or as a result of criminal conduct at a correctional facility. If open charges are to be accepted as a basis for parole refusal, a prima facie case must have been established.

b) **Substance Abuse** - There is a record of substance abuse which lead to police arrests and/or clinical determinations.

c) **Habitual Offender** - This refers to a person who has a total of three or more prior convictions for similar types of offenses in his criminal history. For example, they may be convictions for burglary and robbery, or for drug law violations. Also, a person is included who simply appears to have developed a criminal life style based upon four or more convictions which may be dissimilar. A corollary concept refers to a person in syndicated or organized crime.

d) **Victim Injury** - The official version of the offense must indicate physical injury to the victim of the crime, however slight. In cases of sexually assaultive behavior, psychological injury to the victim is also frequently the case; therefore, in all cases of sexual assault an unfavorable factor score of 1 is to be entered.

e) **Weapon** - The official version of the offense must place the client in actual or constructive possession of a weapon. The definition of weapon contained in Board regulations states: "Anything readily capable of causing harm to **or intimidating** another, possessed under circumstances not manifestly appropriate for any lawful use that the object may have". In a crime such as "homicide by vehicle", the vehicle would not be a weapon under the above definition unless: 1) there was a DUI involved, or; 2) there was a clear intent to harm the victim by using the vehicle as a weapon. Under both exceptions, the circumstances were not manifestly appropriate for any lawful use according to our definition.

# IV COUNTERVAILING FACTORS TO EXPLICIT POLICY OF PAROLE DECISION MAKING GUIDELINES

## A. Factors Countervailing a Guideline Recommendation to Refuse Parole:

**GENERAL POLICY:** Where factors of risk have been reduced by participation in available institutional programming, the quantity and quality of program participation should correspond to the level of risk involved to be a meaningful countervailance to a parole guideline recommendation to refuse. Where available prison programming could reduce the risk of parole failure, it will be prescribed by the Board as a necessary program to assure release.

|  | YES | NO |
|---|---|---|
| 1. Inventory of Institutional Programming |  |  |
| a. Was there positive response to prescriptive or other prison program plans? | ☐ | ☐ |

Program 1) _____     Benefit 1) _____

Program 2) _____     Benefit 2) _____

Program 3) _____     Benefit 3) _____

_____

_____

_____

|  | YES | NO |
|---|---|---|
| 2. Do other factors support a parole action? (For example, recommendations by the Department of Corrections, Board staff, strength of parole plan) _____ | ☐ | ☐ |

_____

_____

## B. Factors Countervailing a Guideline Recommendation to Parole:

**GENERAL POLICY:** The parole guidelines provide a uniform method for assessing parole suitability and risk. In some instances, guideline assessments may indicate medium or low risk; however, other risk factors may contravene and suggest that the likelihood of successful reintegration is low while the threat to the safety of the community is high. The factors listed represent risks outside of the parole guideline for which a parole refusal may be justified.

|  | YES | NO |
|---|---|---|
| 1. The client displayed psychotic or clearly dangerous behavioral characteristics during the parole interview. | ☐ | ☐ |
| 2. The client had a recent psychiatric/psychological report which causes concern. | ☒ | ☐ |
| 3. There were strong objections from the sentencing judge, the district attorney, or the victim of the crime. | ☐ | ☐ |
| 4. The client is a habitual offender for assaultive crimes. | ☐ | ☐ |
| 5. There is an unfavorable recommendation from the Department of Corrections or Board Staff. | ☒ | ☐ |
| 6. There are other factors supporting a parole refusal: *refuses S.O.T.* | ☒ | ☐ |

*negative attitude*

_____

_____

_____

**Instructions:** The countervailing factors to a guideline recommendation to refuse parole (A) or to parole (B) are for information to the decision makers only. Countervailing factors checked in (B) are **not** to be communicated in the Board action as such. The Board Member/ Hearing Examiner will supply the appropriate reasons for refusal in his/her decisions in section VII of this guideline document.

## V  FINAL DECISION MAKING ANALYSIS

Decision Outcome and Guideline Consistency: Use the appropriate guideline recommendation column to check off the interviewer decision.

*Instructions:* Inmates refused parole may be eligible for the Special Early Release Program. If eligible, indicate a parole action in item 2 below and check the box titled SERP. The initial and date space on this page is to be completed for a "continue" decision only. Final decisions are initialed on page 6 of this document when there is no "continue" action preceeding it. If the case has been continued, for whatever reason, the final decision can be initialed on this page with the appropriate completion of section VI or VII, whichever is appropriate to the decision.

| BOARD DECISION | Guideline Recommendation | |
|---|---|---|
| | Parole | Refuse |
| **1)  Continue:** | | |
| a)  to approved plan | ☐ | ☐ |
| b)  pending receipt of information (Specify) ☒ *CLARIFICATION OF STATUS OF 7/16/92 CONVICTION (1 DSI, CMM, STAT. RAPE)* | ☒ | ☐ |
| c)  pending successful adjustment to C.S.C., review in _____ | ☐ | ☐ |
| d)  pending disposition of criminal charges | ☐ | ☐ |
| **2)  Parole to Approved Plan**    ☐ SERP | ☐ | ☐ |
| **3)  Parole to in-patient program; approved home to be available** | ☐ | ☐ |
| **4)  Parole to Detainers:** ☐ To Board/backtime detainer sentence only; ☐ to State Sentence; approved home to be available prior to release to the community. ☐ while confined must participate in_____ | ☐ | ☐ |
| ☐ To other detainer sentence; approved home to be available. Check one: ☐ County    ☐ Sentence    ☐ Untried Case ☐ Other State (approved home necessary if untried case) ☐ Federal    ☐ Sentence    ☐ Untried Case ☐ Violation of Probation Parole ☐ Immigration and Naturalization ☐ When released to the community, special conditions as prescribed imposed. ☐ Other: _____ | ☐ | ☐ |
| **5)  Refuse Parole** | ☒ | ☐ |

Initial & Date
*JR Cook*
*6/19/97*

NOTES:  "It was just a regular shellup"

Aged 45; original sentence is 10-20yr for robbery; ret. as CPV for rape of step daughter (had 6½-13yr. sent. t serve); Bd. act of 11/23/93 was to reparole to 3/25/97; rec'd Class T misconduct (repairing an order) and has been granted new trial on the 1DSI, etc (he has posted bond); Bd. act of 4/22/97 relisted inmate for interview; previous CCC failure (drugs); also previously returned for possessing sword & loaded .22 in his home; since CPV return has completed Stress/Anger; refused S.O.P. (says not guilty, so won't take it); If paroled, live w/wife look for work (P.P. approved 5/15/97). inmate says he "thinks" he has posted bond — via property bond — but he is not "sure" the D.A. (?) effected the bond. Note: 8/1/97: Rec'd attacked York Co. motion and legal opinion that since DA filed an appeal of PCRA, the conviction stands until that matter is resolved.

# VI SPECIAL CONDITIONS OF PAROLE

|  | YES | NO |
|---|---|---|
| 1. Are special conditions of parole necessary? | ☐ | ☐ |
| 2. Did the inmate raise objections to any special condition? | ☐ | ☐ |

3. What is the presenting problem to adjustment, or danger to the community? _____

_____

4. **Complete if special conditions of parole are necessary:**

____ Prior to release to an in-patient program, you will be required to sign the appropriate release form for confidential information.

____ Removal or termination from the in-patient program for any reason other than successful completion is a violation of your parole.

**WHEN PAROLED OR AFTER SUCCESSFUL COMPLETION OF THE IN-PATIENT PROGRAM, YOU MUST COMPLY WITH THE FOLLOWING SPECIAL CONDITIONS OF PAROLE:**

____ ____ You must abide by all of the supervision requirements in the Special Early Release Program

____ ____ Out-patient (drug/alcohol/sex offender/mental health/other: _____) treatment [circle] is a special condition of your parole supervision until the treatment source and/or parole supervision staff determine it is no longer necessary. You will be required to sign the appropriate release form for confidential information.

____ ____ You must cooperate with TASC-SCI and follow all treatment recommendations.

____ ____ Upon your release on parole, you will be evaluated to determine your need for (drug/alcohol/mental health/other: _____) treatment [circle]. Prior to the evaluation being conducted, you will be required to sign the appropriate release form for confidential information. If the evaluation reveals that treatment is indicated, this special condition of parole will be amended to include other appropriate special conditions imposed by your parole agent.

____ ____ You must submit to (urinalysis testing/mandatory urinalysis testing) [circle]

____ ____ You must achieve negative results in screening tests ramdomly applied for the detection of the presence of controlled substances or designer drugs and you must pay for the costs of the tests. (Act 97 - _____)

____ ____ You must not consume alcohol under any conditions or for any reason

____ ____ You must not enter establishments that sell or dispense alcohol

____ ____ You must not contact or associate with persons who sell drugs, or with drug users, outside of a treatment setting.

____ ____ You must take psychotropic medication if prescribed by your doctor

____ ____ You must support your dependents

____ ____ You must not contact or associate with _____ for any reason

____ ____ You must maintain (employment/vocational training/educational training/other/ _____) [circle] as approved by parole supervision staff.

____ ____ You must engage in an active job search during any period of unemployment, and provide verification as directed by parole supervision staff.

____ ____ Other: _____

## SPECIAL INSTRUCTIONS TO PAROLE SUPERVISION STAFF

_____

_____

## VII REASON FOR PAROLE REFUSAL AND REVIEW DATE

**1) Reasons for refusal:**

_____ ☒ a) factors cited in guidelines section(s) _III_, _4_, _7_, ___, ___, ___

_____ b) negative interest in parole

_____ c) your need for: (check the appropriate need)

    ☐ counseling            ☐ education
    ☐ treatment           ☐ vocational training

_____ ☒ d) failure to participate in and benefit from a treatment program for:

    ☒ sex offenders        ☐ mental health problems
    ☐ substance abuse    ☐ other: _____

_____ e) unfavorable recommendation from the:

    ☐ district attorney     ☐ warden of county prison
    ☐ sentencing judge     ☐ Department of Corrections

__X__ f) other: _MISCONDUCT_

**2) Review date and conditions for release consideration:**

__X__ a) review in _JUNE 1998_ for tentative _____ release
                  Mo./Yr.                   Mo./Yr.

__☒__ b) must participate in _P.P.P. INCLUDING S.O.T._

__☒__ c) you must ~~earn an~~ MAINTAIN institutional recommendation for parole. (and maintain a clear conduct record)

_____ d) review in _____, or earlier, if recommended by the Department of Corrections because of demonstrable benefit from participation in an appropriate treatment program for:

    ☐ sex offenders      ☐ mental health problems
    ☐ substance abuse    ☐ other: _____

_____ e) serve your unexpired maximum sentence ___/___/___

_____ f) parole to an approved plan upon condition that there are no misconducts, effective _____ and subject to the following special conditions (see page 5)

## VIII PANEL MEMBER CONCURRENCE

1) Interviewing Panel Member _DR Cook_ Date _8_, _1_, _97_
                       _Deborah R Cook_           _AUGUST 1, 1997_

                                                **Agree**  **Disagree**

2) Board/Panel Member _____ Date _8_, _12_, _97_  ☑   ☐

   Explain Disagreement: _____

   _____

3) Board/Panel Member _____ Date ___/___/___  ☐   ☐

   Explain Disagreement: _____

**Instruction: Agreement or Disagreement references position relative to the preceding response.**

6

## IX SPECIAL CONDITIONS OF PAROLE AND THE PAROLE PLAN

*GENERAL POLICY:*  The parole plan is a contract which provides the public some assurance that their community will be protected while the means to reintegrate the offender are implemented. The plan is judged therefore in context of the client's P.P.A. and unfavorable factors which suggest risk to the community. The higher risk client requires more stringent criteria when the plan is viewed as a countervailance to risk. Discretion for approval of a parole plan is a field staff prerogative unless the Board has specific cause to intervene. Where an approved plan is not available, specific approval criteria commensurate with assessed risk will be set by the Board as special conditions of parole.

### A.  PAROLE PLAN CHECK LIST

|   |   | YES | NO |
|---|---|:---:|:---:|
| 1. | Does the client have a detainer sentence? | ✔ | ☐ |

Type: ☐ State ☐ Board ☐ County ☐ Federal ☑ Untried Case ☐ Immigration and Naturalization
☐ Violation of Probation or Parole ☐ Other

|   |   | YES | NO |
|---|---|:---:|:---:|
| 2. | The client made some effort to prepare a parole plan. | ✔ | ☐ |
| 3. | The client submitted a completed parole plan to the IPR: Date ____/____/____ | ☐ | ☐ |
| 4. | The IPR sent the parole plan for a field investigation: Date __4__/__12__/__97__ | ✔ | ☐ |
| 5. | There were field investigation responses received for: | | |
|   | a) Residence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ✔ | ☐ |
|   | b) Employment/Education/Training . . . . . . . . . . . . . . | ☐ | ☐ |
| 6. | Was a parole plan accepted as adequate by field staff: Date __5__/__19__/__97__ | ✔ | ☐ |

7

PBPP-382 (4/87)

## SUMMARIZATION REPORT

Inst/Docket No. __SCI-HD #56__

Name __Robert DeFoy__ Inst and No. __SCI-Houtzdale, AK-1017__ Parole No. __1226-J__

            Minimum                  **Review** ☒
                                       **(Reparole)**

**OFFICIAL VERSION** (See Attached)    **PBPP 139**

DC-1B      PBPP-30      PSI      **Others (Indicate)** ☒      None available

**RESIDENT'S VERSION**    DC-1B      PBPP-130      PSI      Subject Interview

**PRIOR ADULT RECORD** Number of:    Source __PSP Rap Sheet__

**Convictions 1**    **Confinements 1**    **Probation Revocations 0**    **Parole Revocations 1**

**ADDITIONAL INFORMATION** (See attached report)

Psychiatric    **Psychological** ☒      Medical      **Misconducts** ☒ 11/6/96

Source __6/16/97__          Fines, Costs, Restitution      __Unlisted__
                                                                     Amount

**PROBLEM AREAS**

**Assaultive** ☒                  **Sexual** ☒      Vocational      Alcohol

**Psychiatric/Psychological** ☒      Drugs      Educational      **Others(Indicate)** ☒
                                                                          **Juvenile Record**

## Superintendent - Warden RECOMMENDATION

Parole      **Reparole** ☒      Refuse                  Others (Indicate)

## ANALYSIS

Board Action recorded 11/5/93 refers to Board Action of 11/10/92 to Recommit to a SCI as a CPV to serve 40 months backtime . . .Reparole 3/25/97 to State Detainer Sentence. Board Action recorded 11/23/93 modifies Board Action of 11/5/93 by correcting Reparole date to 3/25/97. Board Action recorded 4/22/97 was to modify Board Action of 11/23/93 and 11/5/93 by temporarily rescinding the Reparole portion due to misconducts and now list for reinterview on the next available docket. Subject was added to the June docket.

Currently, the subject is a 45 year old married male recommitted by the Board for a new conviction - rape of his stepdaughter. He is originally serving a 10 to 20 year sentence for armed robbery. Official Version reports he used a 45 caliber handgun in this robbery. Subject was received at SCI HD 5/8/96 from SCI Dallas. His Prescriptive Program Plan included No Misconducts, Good Housing and Work Reports, D/A Education, Stress/Anger, Sex Offender Programming. He received 1 Class I Misconduct 11/6/96 for Refusing To Obey An Order and was sanctioned with 30 days cell restriction. He Earns Above Average Housing and Work Reports (assigned to Culinary Department). He is presently assigned as Blockworker.

Psychological evaluation conducted 6/16/97 notes:
Subject denies any substance abuse history. During his interview with the evaluator, he responded with a sarcastic manner stating that coming up for parole was 'bullshit' and 'the Parole Board screws everybody". The subject was extremely angry. The evaluator noted that due to his denial of his sex offense and lack of treatment, he is not appropriate for parole at this time. The evaluator recommended he needs to participate in Sex Offender Treatment prior to any consideration for parole release.

PETITIONER'S
EXHIBIT
F

## ANALYSIS CONTINUED:

On 4/9/97 the Records Office notified this writer subject may receive a new trial on this matter. On 4/11/97, this writer spoke with the subject. The subject threatened to sue this writer for him not being released. In a letter dated 5/22/97 from York County reports the subject was granted a new trial regarding his detainer sentence. Bail was granted in the amount of $20,000 which has been posted.

Subject Has Secured Institutional Support for Reparole.

## PAROLE GUIDELINES

He is viewed as an Acceptable Parole Candidate under the Guidelines.

## DETAINERS

None listed.

## PLAN

Parole Plan approved 5/19/97 by the York SO.

## PAROLE STAFF RECOMMENDATION INCLUDING SPECIAL CONDITIONS:

Parole          Reparole          Continue          Refuse ☒

Frederick L. Cutler, Parole Agent II                    6/18/97
                                                        Date

D 7 6
I / S
6-18-97

CONFIDENTIAL PSYCHOLOGICAL ' 'UATION - Parole                      June 16, 1997
Re: Robert DeFoy, AK-1017

---

*The following is a confidential psychological evaluation. This information may be reviewed by;*
*health care, corrections counseling staff, inmate program manager, deputy superintendents,*
*superintendent and the treatment team. All others shall not be permitted to review or share*
*this information with persons who are not members of the treatment team.*

---

Mr. DeFoy was interviewed on June 17, 1997 to provide updated information for his parole
evaluation. Mr. DeFoy is serving backtime on his original sentence of 10-20 years for Armed
Robbery. He violated the conditions of his parole by being charged with Involuntary Deviate Sexual
intercourse, Statutory Rape and Corruption of a Minor. Mr. DeFoy received an additional 6 1/2 - 13
year sentence.

Mr. DeFoy is a 45 year old White male. He is the fifth of twelve children growing up in a single
parent household. His parents divorced when he was quite young. His mother paid little attention
to Mr. DeFoy and his brothers. He stated that she paid more attention to the girls. Mr. DeFoy
denies any substance abuse history.

In the interview setting, Mr. DeFoy responded in a sarcastic manner stating that coming up for
parole is "bullshit" and the parole board "screws everybody." Mr. DeFoy was extremely angry. He
impressed as being within the Below Average range of intelligence. There is no history of mental
illness or psychiatric treatment.

In Summary, due to Mr. DeFoy's denial of his sex offense and lack of treatment, he is not
appropriate for parole at this time. Mr. DeFoy needs to participate in Sex Offender treatment
prior to any consideration for parole release.

Submitted by,                          Reviewed by,

*Lori Ford*                             *Carrie A. Fromm*
Lori Ford, Psychology Intern            Carrie Fromm, Licensed Psychology Mgr.
                                        License #PS007121L

LF/CAF:cjh
c:   Medical Records (orig.)
     Records
     ~~Counselor~~
     Parole
     File

PETITIONER'S
EXHIBIT
6

# PA BOARD OF PROBATION AND PAROLE

PBPP-361 (4/98)

OFFENDER NAME **Robert Defoy**    PAROLE NUMBER **1226·J**

DATE OF INTERVIEW **10/24/00** INSTITUTION **Houtzdale AK-1017**

TYPE OF INTERVIEW:    ☐ Minimum    ☐ Review    ☒ Reparole Review    ☐ Application

# PAROLE DECISION MAKING GUIDELINES

## I    PAROLE PROGNOSIS ASSESSMENT

**INSTRUCTIONS:** Information on age-at-interview, total convictions, PPA offense code, and total probation, parole, or intermediate punishment revocations should be provided in Column 1. Technical parole violations and convicted parole violations are to be counted separately. The appropriate risk classification score in Column 2 should be placed in Column 3 and subsequently added together in the total PPA score box. Based upon the total score number, the offender may then be classified into a risk category according to the range of scores shown at the bottom of the instrument. Offenders with multiple offenses should have each offense ranked in ascending score order according to the offense ranking at the bottom of the page. This process results in a risk assessment which is sensitive to potential future crime. Column 4 may be used to reassess a case if the interview suggests that the assessment information was incorrect.

| COLUMN 1<br><br>Variable | COLUMN 2<br>Score Allocation for<br>Risk Assessment | COLUMN 3<br>Initial Classification<br>Score | COLUMN 4<br>Current Classification<br>Reassessment Score |
|---|---|---|---|
| Age at Interview: **48** yr.<br>Minimum Sentence Date<br>**9 / 29 / 82** | 0 if 40 years of older<br>21 if 26-39 years<br>38 if 26 years or younger | | **0** |
| Total Criminal History Record<br>of Convictions:<br>Number: **3** | 0 if no convictions<br>9 if 1 or 2 convictions<br>26 if 3 or more convictions | | **26** |
| PPA Offense<br>(Ranked According to Index)<br>1. **Robbery**<br>2. _____<br>3. _____<br>4. _____<br>5. _____ | 0 if not elsewhere classified<br>20 if theft, fraud, burglary, or<br>robbery | | **20** |
| Probation Revocations **0**<br>Parole Revocations **1**<br>Intermediate Punishment **0**<br>Revocations<br>Total: **1** | 0 if none<br>16 if 1 or more | | **16** |
| **TOTAL P.P.A. SCORE** | | | **62** |

Parole Prognosis Assessment Score Based on Recidivism **Check One**  71-100 High Risk ☐    45-70 Medium Risk ☒    0-44 Low Risk ☐

Instant Offense in descending recidivism order:  1) Theft/Fraud, 2) Burglary, 3) Robbery, 4) Aggravated Assault, 5) Drug Law Violation, 6) Arson & Miscellaneous, 7) Simple Assault & Kidnapping, 8) Sex Offenses, 9) Manslaughter, 10) Murder.

## II    POTENTIAL ASSAULTIVENESS/DANGEROUSNESS SCREEN

Assaultiveness is a course of conduct that presents, or is calculated to present, a danger or perceived danger to any person. An Assaultive instant offense is defined as any single conviction offense for the current sentence of the following type: murder, manslaughter, voluntary manslaughter, rape, all sex offenses, robbery, kidnapping, aggravated or simple assault, assault by prisoner, assault by life prisoner, extortion accompanied by threats of violence, arson, burglary (residential), weapon law violations, or homicide by vehicle.

**Official Versions of facts of crime are required for all offenses in the definition above prior to final Board Action.**

1.    Does the offender have an assaultive instant offense based upon the definition above, or based upon the official version of the offense in the case of a plea bargain?  Yes ☒    No ☐
    If the answer to the above question is "yes", mark a score of 1 on p. 2, III (7), and answer the following question.
    If the answer to the above question is "no", stop here.

2.    Does the offender have a documented mental health problem requiring treatment in the form of either individual or group therapy/counseling and/or psychotropic medication? (Rape and all other assaultive sex offenses require a "yes" answer.) Yes ☐  No ☒
    If the answer to the above question is "yes", mark the offender as having a very high assault potential with a score of (3) on p. 2, III(8) and stop here.
    If the answer to #2 is "no", answer the following question.

3.    Did the offender have any institutional problems/misconducts which were assaultive in nature within the last 12 months or the last one-half of the time served to date, whichever is longer?  Yes ☐    No ☒
    If the answer to the above question is "yes", mark [...] high assaultive potential with a score of (2) on p. 2, III(9).

PETITIONER'S
EXHIBIT
H

1

Each unfavorable factor listed below is a possible reason for refusing parole/reparole as a matter of policy. Select the appropriate column from the PPA on p. 1. If the response to a specific unfavorable factor is in the affirmative, the appropriate score must be entered. If the response is in the negative, a 0 goes in the blank space provided. Enter the total score of unfavorable factors at the bottom of the appropriate column.

| REASON FOR PAROLE REFUSAL | SCORE | PAROLE PROGNOSIS ASSESSMENT | | |
|---|---|---|---|---|
| | | HIGH RISK | MEDIUM RISK | LOW RISK |
| **Unfavorable Factors from Institutional Performance:** | | | | |
| 1) Three or more Class II misconducts, or two Class II and one Class I misconduct, during the last 12 months or the last one-half of the minimum sentence, whichever is longer. | 1 | _____ | | _____ |
| 2) Two or more Class I misconducts during the last 12 months, or the last one-half of the minimum sentence, whichever is longer. | 1 | _____ | | _____ |
| 3) Open charges (prima facie case established) for new crime; or new conviction while serving this prison sentence. | 2 | _____ | | _____ |
| 4) Removed from CCC, Boot Camp, work release or prerelease for cause. | 2 | _____ | | _____ |
| **Unfavorable Factors from Criminal History Record:** | | | | |
| 5) History of prior substance abuse or sales of illegal drugs | 2 | _____ | 0 | _____ |
| 6) Habitual Offender | 1 | _____ | 0 | _____ |
| **Unfavorable Factors from Instant Offense:** | | | | |
| 7) Assaultive Instant Offense (from page 1, II (I)) | 1 | _____ | 1 | _____ |
| 8) Very high assaultive behavior potential (from page 1, II (2)) | 3 | _____ | 0 | _____ |
| 9) High assaultive behavior potential (from page 1, II (3)) | 2 | _____ | 0 | _____ |
| 10) Victim Injury | | | 0 | |
| 11) Weapon involved in the commission of offense (specify) | 2 | _____ | | _____ |
| Firearm        Knife        Other | 1 | _____ | 1 | _____ |
| **TOTAL UNFAVORABLE FACTOR SCORE** | | | 2 | |
| PAROLE POLICY GUIDELINE RECOMMENDS REFUSE IF TOTAL SCORE IS: | | 5 or more | 6 or more | 7 or more |

Guideline Policy Recommendation:        Parole/Reparole ⊠        Refuse ☐

**DEFINITIONS:**
a) **Open Charges** – This refers to new criminal charges being filed while on pre-release or as a result of criminal conduct at a correctional facility. If open charges are to be accepted as a basis for parole refusal, a prima facie case must have been established.
b) **Substance Abuse** - There is a record of substance abuse, or sale of a controlled substance, which lead to police arrests and/or clinical determinations.
c) **Habitual Offender** - This refers to a person who has a total of three or more convictions for similar types of offenses in his criminal history. For example, they may be convictions for burglary or robbery, or for drug violations. Also, a person is included who simply appears to have developed a criminal life style based upon four or more convictions which may be dissimilar. A corollary concept refers to a person in syndicated or organized crime.
d) **Victim Injury** – The official version of the offense must indicate physical injury to the victim of the crime, however slight. In cases of sexually assaultive behavior, psychological injury to the victim is also frequently the case; therefore, in all cases of sexual assault, an unfavorable factor score of 2 is to be entered.
e) **Weapon** – The official version of the offense must place the defendant or codefendant(s) in actual or constructive possession of a weapon. The definition of weapon contained in Board regulations states: "Anything capable of causing harm to or intimidating another, possessed under circumstances not manifestly appropriate for any lawful use that the object may have." In a crime such as "homicide by vehicle," the vehicle would not be a weapon under the above definition unless: 1) there was a DUI involved; or 2) there was a clear intent to harm the victim by using the vehicle as a weapon. Under both exceptions, the circumstances were not manifestly appropriate for any lawful use according to our definition.

Last BA  7/21/98                                    Max : 6/7/01

York Co detainer (6½-13 yrs) IDS1, Stat Repre, CMM

Doc does not support                              Cust Level 3


No program involvement. No SOT.


Robbery committed in the 70's.

Last on parole in 1985.

New charge in 91. Thinks he has two years credit toward detainer.


Sex offense is on appeal. This is in federal court in Scranton,
he thinks.


Expects to max this on and turn over to new one.

3

Decision Outcome and Guideline Consistency:  the Guideline Recommendation (from Page 2) is:
Parole/Reparole ☐          Refuse ☐

**Instructions:**  The initial and date space on this page is to be completed for a "continue" decision only. Final decisions are checked on the last page of this document If the case has been continued, for whatever reason, the final decision can be initiated on this page with the appropriate block checked in Section VIII.

**Victim Information Needed**

(Confidential. . . Do not list on Board Decision.)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

☐ 1) **Continue:**
   ☐ a)  pending receipt of an approved home plan
   ☐ b)  pending receipt of information (Specify Non-Victim Info.)

**Initial and Date**

_____

_____

   ☐ c)  pending successful adjustments to Community
       Corrections Center, review in _____
   ☐ d)  pending disposition of criminal charges
   ☐ e)  pending disposition of detainer(s)

**Reason for Board Decision:**
Following an interview and review of your file, the Pennsylvania Board of Probation and Parole has determined that the mandates to protect the safety of the public and to assist in the fair administration of justice can be achieved through your release on parole. You are therefore:

☐ 2)  **Paroled to Approved Plan**

☐ 3)  **Paroled to a Community Corrections Center for a minimum of _____ months. Must have a job/home prior to release from the Center.**

☐ 4)  **Paroled to in-patient_____ treatment program; approved home to be available** (must sign appropriate release form for confidential information.)

☐ 5)  **Paroled to an approved plan, on or after _____ , upon condition that there are no misconducts and subject to the following special conditions.**

☐ 6)  **Parole to Detainers:**
   ☐  To Board/backtime detainer sentence only;
   ☐  To State Sentence;
       ☐  while confined must participate in_____

   ☐  To other detainer sentence; approved home to be available
       Check one:
          ☐ County      ☐ Sentence      ☐ Untried Case
          ☐ Other State (approved home necessary if untried Case)
          ☐ Federal      ☐ Sentence      ☐ Untried Case
          ☐ Violation of Probation/Parole
          ☐ Immigration and Naturalization
          ☐ When released to the community, special conditions as
            prescribed imposed.
          ☐ Other: _____

## VI  SPECIAL CONDITIONS OF PAROLE

**WHEN PAROLED OR AFTER SUCCESSFUL COMPLETION OF THE IN-PATIENT PROGRAM, YOU MUST COMPLY WITH THE FOLLOWING SPECIAL CONDITIONS OF PAROLE:**

| Imposed | Mandatory (Board Only) | |
|---------|------------------------|---|
| _____ | _____ | Out-patient (drug/alcohol/sex offender/mental health/other _____) treatment [circle] is a special condition of your parole supervision until the treatment source and/or parole supervision staff determine it is no longer necessary. You shall be required to sign the appropriate release form for confidential information. |
| | | You shall participate in TASC and follow all treatment recommendations. |
| _____ | _____ | |
| _____ | _____ | Upon your release on parole, you shall be evaluated to determine your need for (drug/alcohol mental health/other: _____) treatment [circle]. Prior to the evaluation being conducted, you shall be required to sign the appropriate release form for confidential information. If the evaluation reveals that treatment is indicated, this special condition of parole shall be amended to include other appropriate special conditions imposed by your parole agent. |
| _____ | _____ | You shall submit to urinalysis testing. |
| _____ | _____ | You must achieve negative results in screening tests randomly applied for the detection of the presence of controlled substances or designer drugs and you must pay the cost of the tests (Act 97-_____ ). |
| _____ | _____ | You shall not consume or possess alcohol under any conditions or for any reason. |
| _____ | _____ | You shall not enter establishments that sell or dispense alcohol (except as approved by the supervision staff.) |
| _____ | _____ | You shall not directly or indirectly contact or associate with persons who sell or use drugs outside a treatment setting. |
| _____ | _____ | You shall take psychotropic medication if prescribed by your doctor. |
| _____ | _____ | You shall support your dependents, if any. |
| _____ | _____ | You shall not contact or associate with_____ , and/or the co-defendant(s) for any reason. |
| _____ | _____ | You shall maintain (employment/vocational training/educational training/other: _____ ) [circle] as approved by parole supervision staff. |
| _____ | _____ | You shall engage in an active job search during any period of unemployment, and provide verification as directed by parole supervision staff. |
| _____ | _____ | You shall not travel or reside in_____ (county, city, town) for any reason. |
| _____ | _____ | You shall develop and provide proof of establishment of a restitution repayment plan within 72 hours of release and comply with the restitution repayment plan. |
| _____ | _____ | You shall not have contact with victim(s), including correspondence, telephone contact, or communication through third parties. |
| _____ | _____ | You shall be placed on electronic monitoring for _____ days and during periods of unemployment. |
| _____ | _____ | You shall be placed on curfew restrictions for _____ days and during period of unemployment. |
| _____ | _____ | You shall attend a community support group program (i.e., Twelve Steps, Alcoholics Anonymous, Narcotics Anonymous) for _____ . |
| _____ | _____ | You shall abide by the conditions established for sex offender treatment. |

5

_____  _____  You shall not open, maintain, or have physical control of any checking, savings, or credit account in your or another's name, unless approved in advance and in writing by parole supervision staff.

_____  _____  Removal or termination from the in-patient program, community corrections center, or contract facility for any reason is a violation of your parole.

_____  _____  Other: _____

_____

_____

_____

**SPECIAL INSTRUCTIONS TO PAROLE SUPERVISION STAFF:**

_____

_____

_____

_____

_____

_____

_____

6

Decision Outcome and Guideline Consistency: the Guideline Recommendation (from Page 2) is:

Parole/Reparole ☐                    Refuse ☐

**Reason for Board Decision:**

Following an interview and review of your file the Pennsylvania Board of Probation and Parole has determined that the mandates to protect the safety of the public and to assist in the fair administration of justice cannot be achieved through your release on parole. You are therefore refused parole and order to:

_____ serve your unexpired maximum sentence.

_____ serve your unexpired maximum sentence, due to your negative interest in parole.

_____ be reviewed in _____ .

_____ be review in _____ , or earlier, if recommended by the Department of Corrections/County Prison staff because of demonstrable benefit from participation in an appropriate treatment program(s).

At your next interview, the Board will review your file and consider:

_____ a)  whether you have successfully completed a treatment program for:

☐ sex offenders                    ☐ mental health problems
☐ substance abuse                  ☐ impaired adjustment
☐ other: _____

_____ b)  whether you have received a favorable recommendation for parole from the:

☐ prosecuting attorney             ☐ warden of county prison
☐ sentencing judge                 ☐ Department of Corrections

_____ c)  whether you have maintained a clear conduct record and completed the Department of Corrections prescriptive program(s).

_____ d)  other: _____

_____ e)  _____ to be available at time of review.

7

VIII  PANEL MEMBER CONCURRENCE

| | | Parole/ Reparole | Refuse | Reaffirm |
|---|---|---|---|---|
| 1. | Interviewer _____ Date 10/24/00 | ☐ | ☑ | ☐ |
| 2. | Board Member _____ Date 10/24/00 | ☐ | ☑ | ☐ |

*Last RedFile info is from 1982 on onion skin.*

Remarks: _____

3.  Board Member _____ Date _____   ☐   ☐   ☐

Remarks: _____

4.  Board Member _____ Date _____   ☐   ☐   ☐

Remarks: _____

5.  Board Member _____ Date _____   ☐   ☐   ☐

Remarks: _____

8

**ADDITIONAL NOTES**

1

PBPP-382 (7/97)
Robert DeFoy, AK-1017

# REVIEW SUMMARIZATION REPORT

Month
of
Interview  October 2000
SCIHD/Docket #  30

NAME_____ Robert DeFoy ____ **INST. & NO.** __ SCI Houtzdale/AK-1017 ___ **PAROLE NO.** 1226-J _____
☐ Minimum          ☐ Review          ☒ Reparole/Review          ☐ Parole Application

**Fines, Costs, Restitution:** ☒ None Listed    Costs:_____    Fines:_____    Restitution:_____

**Source**_____ DC-16D _____

**PROBLEM AREAS**
☒ Assaultive                ☒ Sexual            ☐ Vocational          ☐ Alcohol
☒ Psychiatric/Psychological  ☐ Drugs            ☐ Educational         ☒ Others: Juvenile

**SUPERINTENDENT - WARDEN RECOMMENDATION**
☐ Parole          ☐ Reparole          ☒ Refuse          ☐ Others

**GUIDELINE RECOMMENDATION:** ☒ Re-Parole    ☐ Refuse

**ACT 97:** ☐ 97-O    ☐ 97-1    ☐ 97-2    ☐ 97-3    ☒ N/A

*[signature] 10/24/00*

**CRIME VICTIMS COMPENSATION PAYMENT:**    $30.00 Payment Verified    ☐ Yes    ☒ No

**DNA REGISTRATION REQUIRED:**          ☒ Yes    ☐ No    if yes, has it been completed:    ☐ Yes    ☐ No

**MEGAN'S LAW REGISTRATION REQUIRED:**                    ☒ Yes    ☐ No

## ANALYSIS

### Current Sentence

Subject, age 48, is serving 40 months backtime as a Convicted Parole Violator on an original 20-year sentence for Robbery from the Courts of Erie County.  The PV max has been established as 6-7-01.

### Last Board Action

Board Action of 7-21-98 refused parole and established an October 2000 review date.

**Board Stipulations**
1.  Prescriptive Program Plan
2.  Maintain Clear Conduct Record
3.  Participate in a treatment program for Sex Offenders

**Was Stipulation Completed**
☐ Yes  ☒ No  ☐ Other
☐ Yes  ☒ No  ☐ Other
☐ Yes  ☒ No  ☐ Other

### Institutional Adjustment

Since his last parole interview, he has earned very good housing and work reports and has consistently done this since his reception at SCI-Houtzdale; however, there has been no program involvement since the last Review. Subject refuses to participate in Sex Offender treatment.  Based upon his refusal, the Institution does not support parole at this time.

PETITIONER'S
EXHIBIT
7

2

PBPP-382 (7/97)
Robert DeFoy, AK-1017

## Mental Health Evaluation

A Mental Health Evaluation was prepared by the Department of Corrections on 5-31-00 and reports that there are no indications of significant psychopathology which will require intervention at this time. His self-concept appears to involve a generally stable and positive self-evaluation. He is somewhat distant in personal relationships and is unconcerned about opinions of others. He appears to exhibit control over his impulses and behaviors as demonstrated by his positive adjustment. His level of risk to the community appears to be minimal. At present, however, he refuses to complete any treatment programming for Sex Offenders, which was the stipulation established by the Board. Subsequently, he is ineligible for Reparole.

## Parole Alternatives

Detainers:   1-25-93   York County   6 years, 6 months - 13 years for IDSI, Statutory Rape, and Corruption of Minors

If paroled, Guidelines:
- ☒ Must abide by all of the requirements of a Community Corrections Center
- ☒ Out-patient treatment ☒ Drug ☒ Alcohol ☒ Sex Offender ☐ MH ☐ Other
  is a special condition of parole supervision until treatment source and/or parole supervision staff determine it is no longer necessary. Required to sign appropriate confidential info release forms
- ☒ Upon release, be evaluated to determine need for ☒ Drug ☒ Alcohol ☒ Sex Offender
  Prior to eval, required to sign confidential info release forms. If eval reveals treatment is indicated, this special condition of parole will be amended to include other appropriate special conditions imposed by PA.
- ☒ Must submit to ☒ Urinalysis ☐ Mandatory Urinalysis testing ☐ Pay for as per Act 97-0
- ☒ Must not consume alcohol under any conditions for any reason
- ☒ Must not enter establishments that sell or dispense alcohol
- ☒ Must not contact or associate w/persons selling drugs, drug users outside of a treatment setting
- ☒ Must take psychotropic medication if prescribed by your doctor
- ☒ Must support your dependents
- ☒ Must not contact or associate w/victim or victim's family for any reason
- ☒ Must maintain Employment, Vocational Training, or Educational Training as approved by parole supv staff
- ☒ Must engage in active job search during any period of unemployment and provide verification as directed by parole supv staff

If refused, Guidelines:
- ☒ Must participate in Prescribed Programming, to include Substance Abuse Treatment, and Sex Offender Treatment
- ☒ Maintain Clear Conduct Record
- ☒ Earn Institutional Recommendation for Parole

## Parole Planning

A parole plan was approved by the York Sub Office on 9-18-00. Residing address will be with his wife in Stewardstown, PA, who has offered to support him.

## Attachments

- ☒ Minimum Summarization Packet/Report
- ☒ Mental Health Evaluation
- ☒ DC-13A Reclassification Summary
- ☐ Misconducts

Date   10-19-00

_____
Parole Agent, Thomas J. Janocko

_Barbara L. Kline_   10/23/00
Parole Supervisor, Barbara L. Kline



**Martin F. Horn**
Commissioner

**William E. Speck**
Deputy Superintendent for
Facilities Management

**Pennsylvania Department of Corrections**
**State Correctional Institution at Houtzdale**
P.O. Box 1000
Houtzdale, PA 16698-1000

**John M. McCullough**
Superintendent

Phone: (814) 378-1000    FAX: (814) 378-1030

**J. Barry Johnson**
Deputy Superintendent for
Centralized Services

July 11, 2000

The Honorable William Ward, Chairman
Pennsylvania Board of Probation and Parole
P.O. Box 1661
Harrisburg, PA 17105

RE:    DeFoy, Robert, AK1017

Dear Chairman Ward:

Mr. DeFoy is an addition to the August Parole Docket due to material from the PBPP Central Office in Harrisburg not being available for his originally scheduled interview, therefore this update is being submitted in letter form.

Mr. DeFoy, age 48, is currently a convicted parole violator serving backtime on an original 10 to 20 year sentence for Robbery. The minimum and maximum expiration dates are 9-29-82 and 6-7-01. He currently has a 6 ½ to 3 year re-entry detainer for Statutory Rape, IDSI and COMM. Since the original 13A dated 4-25-00, Mr. DeFoy has continued to earn above average housing/work reports. However, he continues to refuse to participate in sex offender treatment, therefore Staff continues to not support parole.

RECEIVED
SCI-Houtzdale
JUL 1 3 2000
Pa. Board of Probation
& Parole

Sincerely,

John McCullough

John M. McCullough
Superintendent

JMM/MMI/sjh

c:    DC-14
      DC-15
      file

PETITIONER'S
EXHIBIT
J

**DC-13A**  **CONFIDENTIAL**

## RECLASSIFICATION SUMMARY

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| CHECK TOPIC | ☒ PAROLE SUMMARY  ☐ OTHER _____ | ☐ REPAROLE SUMMARY |
|---|---|---|

| PREPARED AT | SCI-Houtzdale | 4-25-00 |
|---|---|---|
| | | DATE |

| SID NUMBER | DC NUMBER | PBP NUMBER | NAME | | AGE |
|---|---|---|---|---|---|
| 9268847 | AK-1017 | | DeFOY, Robert | | 48 |

| EXPIRATION MINIMUM | EXPIRATION MAXIMUM | EFFECTIVE DATE | TIME SERVED TO DATE | EXPIRATION OF ½ MINIMUM | EFFECTIVE DATE OF PV RETURN | CLASS STATUS | MEDICAL PROFILE P U L H E S T |
|---|---|---|---|---|---|---|---|
| 9-29-72 | 9-29-82 | 9-29-92 | | | | 3 | |

| PBP DOCKET STATUS | ☐ FIRST HEARING  ☐ REVIEW HEARING | TOTAL ARRESTS | JUVENILE ARRESTS | JUVENILE COMMITMENTS | ADULT ARRESTS | CONVICTIONS | COMMITMENTS | PROBATION VIOLATIONS | PAROLE VIOLATIONS |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

ACCOMPLICE(S) AND KNOWN DISPOSITION(S)

None Listed

SENTENCE STATUS CHANGE AND/OR DETAINER(S) STATUS
CP#:3623;91 – 1-25-93, York County – 6 ½ to 13 years CS for IDSI, Stat. Rape, Corrupt Minors

**MISCONDUCTS:**
See attached DC-17.

Steve Kechisen
Corrections Counselor II

RECEIVED
SCI-Houtzdale
MAY 1 6 2000
Pa. Board of Probation & Parole

**EDUCATIONAL/VOCATIONAL:** WRAT scores dated 3-84 revealed:
READING, 6.9; SPELLING, 5.7; ARITHMETIC, 5.3

Mr. DeFoy resides on C Unit.

Melissa Miller
Education Department

**VOCATIONAL:**

Mr. DeFoy arrived at SCI-Houtzdale on 5-7-96 and was assigned to Culinary PM and Blockworker.

Susan McQuillen
Corr. Emp./Voc. Coordinator

**MEDICAL:**  **Medical History:** +PPD, History WPW
**On-Going Treatment:** Chronic Clinic
**Medications:** NTG
**Vision:** Last Exam 2-95  **Dental:** Last Exam 3-96
**Physical Limitations:** No heavy lifting

Medical Department

PETITIONER'S
EXHIBIT
K

CONFIDENTIAL

**MENTAL HEALTH EVALUATION:**  A Mental Health Evaluation will be forwarded to the Institution Parole Office as requested by the Parole Office Supervisor.

> Steve Kechisen
> Corrections Counselor II

**SEX OFFENDER TREATMENT:**  Sex offender programming has been recommended.  Mr. DeFoy denies guilt and refuses to participate.

> Steve Kechisen
> Corrections Counselor II

**DNA ACT NOTIFICATION:**  A DNA sample material will be required when he turns over to his detainer sentence.

> Steve Kechisen
> Corrections Counselor II

**PRE-RELEASE:**  Mr. DeFoy has not participated in any form of pre-release programming since his arrival at SCI-Houtzdale.

> Steve Kechisen
> Corrections Counselor II

**COUNSELOR'S EVALUATION:**  Mr. DeFoy, age 48, is a convicted parole violator serving backtime (4o months) on an original 10 to 20 year sentence for Robbery.  He currently has a 6 ½ to 3 year detainer sentence for IDSI, Statutory Rape and Corrupting the Morals of a Minor.  Mr. DeFoy was refused reparole at his last review and as recorded on 7-21-98 will be reviewed in June 2000.

Mr. DeFoy was received at Houtzdale 5-8-96 from SCI-Dallas.  Since his last parole interview, he has earned very good housing/work reports and has consistently done this since his transfer to Houtzdale.  However there has been no program involvement since his last review.

> Steve Kechisen
> Corrections Counselor II

Case 1:00-cv-00110-SJM-SPB    Document 48-8    Filed 01/03/2007    Page 144 of 144

**STAFF RECOMMENDATIONS:**

Mr. DeFoy, age 48, is currently serving backtime on an original 10 to 20 year sentence for the offense of Robbery With Accomplice. He has a 6 ½ to 13 year detainer sentence for the offenses of IDSI, Statutory Rape and Corruption Morals of Minor. He refuses to participate in sex offender treatment. Based upon his refusal to participate in sex offender treatment, Staff does not support parole. He was informed of this decision and all aspects of Act 159.

/John M. McCullough, Superintendent

5/11/0w
_____
Date

JMM:SK:sjh