IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

ROBERT LEE DEFOY,                *

    Petitioner            * C.A. No.

    vs.                   * 00-110 ERIE

Superintendent JOHN M.* District Judge

MCCULLOUGH, Att.           * McLaughlin

General D. MICHAEL         *

FISHER, PENNSYLVANIA   * Magistrate

BOARD OF PROBATION AND* Judge Baxter

PAROLE,                    *

    Respondents           *

* * * * * * * *

COPY

DEPOSITION OF

JOHN MCCULLOUGH

August 16, 2006

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

1              DEPOSITION

2                  OF

3    JOHN M. MCCULLOUGH, taken on behalf

4    of the Petitioner herein, pursuant to

5    the Rules of Civil Procedure, taken

6    before me, the undersigned, Lori A.

7    Behe, a Court Reporter and Notary

8    Public in and for the Commonwealth of

9    Pennsylvania, at the offices of

10   Keystone Building, Office of Attorney

11   General, 444 East College Avenue,

12   Suite 440, State College,

13   Pennsylvania, on Wednesday, August

14   16, 2006 beginning at 9:01 a.m.

15

16

17

18

19

20

21

22

23

24

25

3

1           A P P E A R A N C E S

2

3    THOMAS  W.  PATTON,  ESQUIRE

4    Assistant  Federal  Public  Defender

5    1001  State  Street

6    Erie,  PA   16501

7        COUNSEL  FOR  PETITIONER

8

9    SCOTT  A.  BRADLEY,  ESQUIRE

10   Office  of  Attorney  General

11   564  Forbes  Avenue

12   6th  Floor,  Manor  Complex

13   Pittsburgh,  PA   15219

14       COUNSEL  FOR  RESPONDENTS

15

16

17

18

19

20

21

22

23

24

25

4

1                          I N D E X

2

3    WITNESS:   JOHN M. MCCULLOUGH

4    EXAMINATION

5        by Attorney Patton              7 - 53

6    EXAMINATION

7        by Attorney Bradley            53 - 59

8    RE-EXAMINATION

9        by Attorney Patton            60 - 64

10   CERTIFICATE                            65

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                        EXHIBIT PAGE

2

3                                           PAGE

4      NUMBER    DESCRIPTION              IDENTIFIED

5      A         DC-13A

6                Reclassification

7                Summary of

8                05/07/97                    24

9      B         DC-13A

10               Reclassification

11               Summary of

12               05/18/98                    28

13     C         Letter Dated

14               July 11, 2000 to

15               Chairman Ward               29

16

17

18

19

20

21

22

23

24

25

6

1          OBJECTION PAGE

2

3   ATTORNEY                                    PAGE

4                    NONE MADE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1         P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3    JOHN M. MCCULLOUGH, HAVING FIRST BEEN

4    DULY SWORN, TESTIFIED AS FOLLOWS:

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6    EXAMINATION

7    BY ATTORNEY PATTON:

8    Q.      Mr. McCullough, my name is Tom

9    Patton.  I work for the Federal

10   Public Defenders office and I

11   represent Mr. Defoy, who's the

12   Petitioner in this case.

13          I'm just going to ask you some

14   questions.  Some just to get some

15   general background of how the

16   Department of Corrections works,

17   specifically with the Department's

18   role in preparing for parole hearings

19   for inmates that are housed with the

20   Departments, and then ask you some

21   more specific questions about Mr.

22   Defoy's case.

23   A.      Certainly.

24   Q.      Right now, how are you

25   employed?

8

1    A.        I retired in 2004 from the

2    Department of Corrections.  I am a

3    part-time instructor at Penn State

4    and at the Department of Corrections

5    training academy.

6    Q.        How long did you work for the

7    Department of Corrections?

8    A.        From 1974 until 2004.

9    Q.        Could you give me a run down

10   of the positions you held with the

11   Department, maybe starting

12   chronologically from when you started

13   with the Department of Corrections on

14   until your retirement.

15   Q.        I was the Director of

16   Treatment at Rockview from '74 until

17   '90.  Director of Treatment with

18   what's now called the CCPM position

19   the classification program manager or

20   something like that.  In '90 I was

21   promoted to the deputy superintendent

22   of Camp Hill following the riots.  I

23   was there six or seven months, came

24   back to Rockview as a deputy

25   superintendent for treatment,

9

1    promoted to Houtzdale in '95 as a

2    superintendent, was the

3    superintendent there until 2003.

4    From 2002 to 2003 I was the

5    superintendent of Houtzdale, but I

6    was also the supervising

7    superintendent over

8    Huntingdon/Smithfield in Cresson.   In

9    2003 I was promoted deputy secretary

10   for the western region and then I

11   retired after that year.

12   Q.     Okay.  With your work when you

13   started off the program, I forget the

14   title you had ---.

15   A.     It was Director of Treatment

16   it was called.

17   Q.     Director of Treatment, in that

18   position were you involved with

19   helping to establish the prescriptive

20   programming plans for inmates that

21   would come into the institution?

22   A.     Back then --- even back then

23   it wasn't centralized.  Generally,

24   the counselors did the prescription

25   program plans.  At that position, I

10

1   supervised the counselors and the

2   psychologists.

3   Q.      Could you just tell me

4   generally how the counselors would go

5   about creating --- well, first, I

6   guess we ought to --- can you tell me

7   what a prescriptive program plan.

8   A.      Prescriptive programming is

9   when the inmate first comes in he's

10  given a plan. And this has changed

11  over the years, but the concept

12  hasn't changed, but the paperwork

13  has. And the plan, basically,

14  outlines for him what he needs to do.

15  All in the way they get parole or

16  commutation or to get lower security

17  status or whatever. Prescription

18  program plan is going to include his

19  security level, job and housing

20  assignment and any other programs

21  that he might have to go to,

22  education, vocation or counseling

23  program.

24  Q.      Okay. So when an inmate comes

25  into an individual institution ---

11

1   A.       Uh-huh (yes).

2   Q.       --- that they're going to,

3   designated to be housed at, ---

4   A.       Right.

5   Q.       --- is that institution in

6   charge of creating the prescriptive

7   programming plan?

8   A.       Yes.

9   Q.       Is that handled by the --- at

10  the counselor level?

11  A.       Yeah, it's handled at the

12  counselor level now.  It would be

13  handled by the counselor, but the

14  unit manager might also have a part

15  in it.

16  Q.       Okay.  What's the difference

17  between a counselor and a unit

18  manager?

19  A.       A unit manager is the head of

20  a cell block.  It's a manager of a

21  cell block.  Could be an ex ---

22  former counselor, could be a former

23  officer.  For instance, at Houtzdale,

24  which is the institution in question,

25  unit manager would have a unit of

12

1    about 270, 265 inmates, two pods,

2    there's a counselor on either side

3    and a clerk to supervise the

4    counselor and the clerk and all the

5    officers in that block.

6    Q.        Okay.

7    A.        And some unit managers choose

8    in the prescription program to have

9    the blocks where the unit manager and

10    the counselor do it.  But it's the

11    counselor that sits down with the

12    inmate and does whatever he needs to

13    do.

14    Q.        Okay.  For an inmate that is

15    coming in on a revocation of parole,

16    will the counselor take into

17    consideration in creating the

18    prescriptive programming plans any

19    programs that the Board may recommend

20    in a green sheet revoking the

21    person's parole?

22    A.        That's a sore spot between the

23    Department of Corrections and the

24    Board of Parole.  I've always thought

25    that it's our responsibility because

13

1  we know the inmate better to make - - -

2  to decide what the guy should go

3  through.  The Board will make

4  recommendations.  If the

5  recommendations are reasonable to us

6  we will follow them.

7  Q.    But if you find them not to be

8  reasonable you won't necessarily

9  follow them?

10  A.    Right.  And we might write the

11  Board and say, look, this isn't

12  right.  He doesn't need this or we

13  don't have this program or we think

14  he needs whatever.  But this can be

15  an ongoing sore point between the

16  two.  Most of the time, however, the

17  Board leaves it up to us.

18  Q.    Okay.  So would it be accurate

19  to say that if an inmate comes in to

20  serve some parole revocation time and

21  the Board has stated in the green

22  sheet that they want the inmate to

23  participate in anger management or

24  sex offender treatment that the

25  Department of Corrections does not

14

1   feel that they are 100 percent bound

2   to include those programs in the

3   inmate prescriptive programming plan?

4   A.      That's correct.  It's up to us

5   to make the assessment.  Now, the

6   problem here is this, is when they

7   say something in their green sheet if

8   you want to get the guy paroled, you

9   know, I mean, that's --- and say you

10  have to gauge what matters and what

11  doesn't matter, if they come through

12  and say go to Alcohol Anonymous,

13  well, okay, go.  But if it's

14  something that we would think to be

15  unfair or unnecessary then we would

16  challenge them.

17  Q.      Okay.  So your answer seems to

18  indicate that there's a realization

19  in the Department of Corrections with

20  the counselors and everybody involved

21  in creating a prescriptive

22  programming plan that if the Board

23  has recommended certain treatments or

24  classes that the --- that they want

25  to see the inmate participate in,

1    that for the individual to have a

2    good chance of actually being re-

3    paroled they need to participate in

4    those - - -

5    A.        Exactly.

6    Q.        - - - activities?

7    A.        Exactly.

8    Q.        Has your experience shown that

9    if an inmate does not participate in

10   the programs that the Board may

11   identify in a green sheet that that

12   is going to have a detrimental impact

13   on the person's ability to get

14   paroled?

15   A.        It depends on the crime.  Most

16   of the time the Board was regional.

17   For instance, if they come through

18   and say this guy has to get - - - a

19   good example would be Gamblers

20   Anonymous which Houtzdale didn't

21   have.  We say, we don't have Gamblers

22   Anonymous.  He can't participate in

23   this, but he participated in this.

24   And most of the time if you explain

25   your reasoning the Board would accept

16

1    that.

2    Q.      Okay.  You used the Gambling

3    Anonymous ---

4    A.      Right.

5    Q.      --- as one example.  Were

6    there examples of some programs where

7    the Board recommended it and the guy

8    didn't do it, history and experience

9    showed the guy wasn't going to get

10   paroled?

11   A.      Yeah, that's true.

12   Q.      Sex offender is one of those

13   programs?

14   A.      Sex offender is one where it

15   is pretty much set.  And it's

16   understood by the Department of

17   Corrections and by the Board.

18   Q.      But if you're told to take sex

19   offender and you don't you're not

20   going to get paroled?

21   A.      That's correct.

22   Q.      And is that --- would it be

23   fair to say that the counselors would

24   probably pass that information on to

25   an inmate when they're talking to an

17

1    inmate about the prescriptive

2    programming plan and working with the

3    inmate to try and get him situated so

4    that they have a shot at getting

5    paroled?

6    A.        They're told that up front or

7    at least they should be.

8    Q.        That if the Board has

9    recommended sex offender treatment

10   and they don't do it they're not

11   going to get paroled?

12   A.        Right or we recommend sex

13   offender treatment and they don't do

14   it you're not going to get our

15   recommendation.

16   Q.        You mentioned the inmate not

17   getting your recommendation.

18   A.        Right.

19   Q.        Is it accurate to say that the

20   Department of Corrections provides

21   the Board with a --- an opinion for

22   each individual who comes up for

23   parole or re-parole consideration as

24   to whether or not the Department of

25   Corrections supports release or

18

1  nonrelaease?

2  A.       That's correct.

3  Q.       And how does the Department of

4  Corrections go about reaching its

5  conclusion as to what its

6  recommendation is going to be?

7  A.       Okay.  They have the

8  prescription program plan.  At a

9  certain time before his parole

10  minimum, let's say his parole minimum

11  is December --- it's December 1st of

12  2006.  I don't know what it is now,

13  it was three months or six months

14  prior to that minimum the staff would

15  --- the institution staff, the unit

16  manager, unit staff.  They call the

17  inmate in front of them and they'd

18  interview him and they'd see how he

19  was doing.  They go over the

20  prescription program plan.  Does he

21  have any misconducts or are his work

22  and housing reports good and did he

23  follow his plan.  Did he follow his

24  prescription program plan?  And based

25  on that and their assessment of the

19

1   inmate then they would recommend for

2   or against.

3   Q.      Once they make --- the unit

4   staff makes that recommendation does

5   that get passed on to the

6   superintendent for the

7   superintendent's either approval or

8   non-approval?

9   A.      Yeah.  It goes from the unit

10  manager to the --- it's a long

11  process.  It goes from the unit

12  manager to the CCPM ---.

13  Q.      Which is?

14  A.      Correction something Program

15  Manager.  It used to be the old

16  director of treatment.

17  Q.      Okay.

18  A.      It goes to both deputy

19  superintendents and then it goes to

20  the superintendent for the final

21  decision.  And it comes to him on

22  what's called a vote sheet because

23  they actually vote.

24  Q.      Does the superintendent

25  actually have the final word on what

1    the recommendation of the Department

2    of Corrections is to the Parole

3    Board?

4    A.       That's correct.  If everybody

5    voted yes and the superintendent

6    voted no, no is the recommendation.

7    If everybody voted no and the

8    superintendent voted yes, yes the

9    recommendation.

10    Q.       You had --- I asked you ---

11    you talked some about if the Board

12    had recommended sex offender

13    treatment and an inmate hadn't done

14    it, it was the understanding of the

15    Department that you guys wouldn't

16    make a recommendation.  Let me ask

17    that differently.

18           Is it accurate to say that the

19    Board can recommend sex offender

20    treatment which could be separate

21    from the Department of Corrections

22    itself determining that sex offender

23    treatment is called for?

24    A.       They could do that.  That's

25    unusual.  And generally, the sex

21

1    offender treatment if they say has to

2    have it we would go along with that.

3    Q.    Okay.

4    A.    There are situations in which

5    we wouldn't, for instance, if there

6    was no sex offense.  There was a

7    couple domestic cases where we saw it

8    more as an anger assault thing and,

9    you know, and we wouldn't, but in

10    general, if the Board says he shall

11    have sex offender treatment most of

12    the time we've already agreed with

13    that.

14    Q.    In the instances where the

15    Department disagreed with the Parole

16    Board's recommendation of sex

17    offender, would the Department

18    communicate with the Parole Board to

19    try and explain why there was the

20    difference of opinion?

21    A.    Yes.  We would use --- there's

22    two ways of doing that.  You could

23    challenge the green sheet.  The green

24    sheet comes back saying you will and

25    we could write back to the Board and

22

1    say, wait a minute.  This isn't
2    right.  This guy never did this
3    crime.  We see this in a different
4    way.  The other way to do it is we
5    can take him back up for parole and
6    say, we didn't --- he satisfied our
7    prescription program plan and here's
8    why and here's why we think he should
9    go home.  We understand your
10   recommendation, this is why we didn't
11   do it.  So there's a couple of ways
12   to get your own opinion in there.
13   Q.       Okay.  In your experience if
14   the Board disagrees with the
15   Department's assessment of whether or
16   not sex offender treatment had been
17   called for, were the inmates paroled
18   or re-paroled?
19   A.       The cases are so few in this
20   kind of --- in this kind of instance.
21   I do remember a domestic thing where
22   it really --- there was no sex
23   offense involved where they agreed to
24   let them go.  But by and large, with
25   sex offenders the concurrence is

23

1   there and they're not going to let

2   them go.  A lot of times they won't

3   let them go even when you do

4   recommend it.

5   Q.      Is the --- you guys, the

6   Department of Corrections, that is,

7   use what's referred to as a DC-13A

8   form to convey your recommendation as

9   to whether the inmate should be

10  paroled or not paroled to the Board.

11  Is that the form?

12  A.      That's what's used, yes.

13  Q.      Okay.  And that would be the

14  form that is done up by the unit

15  staff that you talked about and then

16  reviewed by the multiple layers of

17  review and ultimately reviewed by the

18  superintendent?

19  A.      That's correct.

20  Q.      Okay.  I want to talk to you

21  some now about the particular --- Mr.

22  Defoy's case.

23  A.      Uh-huh (yes).

24  Q.      And some times that he came up

25  for review by the Parole Board while

24

1   he was housed at Houtzdale while you

2   were the superintendent.

3   A.      Uh-huh (yes).

4   Q.      I'd like to show you on

5   Petitioner's Exhibit A.  Can you

6   explain to me what Petitioner's

7   Exhibit A is?

8                   (Petitioner's Exhibit A

9                   marked for

10                  identification.)

11  A.      That is a reclassification

12  summary.  It is a parole summary.

13  And it was a document prepared for

14  the Parole Board.

15  BY ATTORNEY PATTON:

16  Q.      Okay.  Is it this DC-13A form

17  that we've referred to?

18  A.      Right.

19  Q.      Okay.  Now, is it accurate to

20  say that this is the DC-13A form that

21  was done up for Mr. Defoy.  It looks

22  like it was prepared at Houtzdale on

23  May 7th of 1997?

24  A.      That's correct and I signed

25  it.

25

1  Q.       Okay.  Now, the --- if you

2  look on page two of that form under

3  psychological and psychiatric, does

4  it note that a mental health

5  evaluation had not been requested by

6  the Pennsylvania Board of Probation

7  and Parole?

8  A.       Right.

9  Q.       And then underneath that under

10  the heading of sex offender

11  treatment, it states Mr. Defoy was

12  prescribed sex offender treatment and

13  he refused to participate under the

14  premise that his case was under

15  appeal.

16  A.       Right.

17  Q.       When it says Mr. Defoy was

18  prescribed sex offender treatment, is

19  there any way for you to know based

20  on your experience in that language

21  whether or not they're saying who

22  prescribed him for sex offender

23  treatment?

24  A.       It would be the counselor, the

25  unit manager.  One or the other or

26

1    both.

2    Q.    Okay.  So this form stating

3    that Mr. Defoy had been prescribed

4    sex offender treatment was a

5    representation that the Department

6    itself had stated that Mr. Defoy

7    should do sex offender treatment as

8    part ---

9    A.    Right.

10    Q.    --- of his ---?

11    A.    Right.

12    Q.    Okay.  Now, Mr. Defoy did not

13    complete the sex offender treatment.

14    A.    Correct.

15    Q.    But even though he had not

16    completed the sex offender treatment

17    program, he had been earning positive

18    housing and work reports; ---

19    A.    Right.

20    Q.    --- correct?  And based ---

21    according to the form based on Mr.

22    Defoy's positive adjustment the staff

23    supported parole to --- a state

24    detainer sentence that Mr. Defoy had

25    on him and ---

27

1    A.        Right.

2    Q.        --- and you agreed with that;

3    correct?

4    A.        Right.  Uh-huh (yes).

5    Q.        Okay.  And so, at least, for

6    when Mr. Defoy came up for parole

7    consideration in 1997, the Department

8    of Corrections supported his release

9    to the detainer sentence that was on

10   him?

11   A.        Right.

12   Q.        Even though he had not

13   participated in sex offender

14   treatment?

15   A.        Right.  That isn't unusual.

16   In some ways it's an unusual

17   recommendation, but considering he

18   had all the other time left, he's

19   done well, let him go to his next

20   sentence and he ---.  The other thing

21   is the time frame on sex offender

22   programs, but I think it's about two

23   years long.  So they had plenty of

24   time to complete it.

25   Q.        Okay.  I'll show you

28

1    Petitioner's Exhibit B.   It's one for

2    '98.   Does that appear to be, at

3    least, a copy of the DC-13A

4    Reclassification Summary prepared for

5    Mr. Defoy by the Department of

6    Corrections on May 18th of 1998?

7                        (Petitioner's Exhibit B

8                        marked for

9                        identification.)

10   A.      That's correct.   That's our

11   summary.

12   BY ATTORNEY PATTON:

13   Q.      Okay.   And again on page two

14   does it indicate that sex offender

15   programming had been recommended,

16   however that Mr. Defoy had --- was

17   not interested in participating?

18   A.      Correct.

19   Q.      But also the report indicates

20   that Mr. Defoy had had no misconducts

21   since his last review and had earned

22   positive housing and work reports?

23   A.      Correct.

24   Q.      And therefore the staff

25   recommended and you agree that the

29

1  Department's recommended ---

2  recommendation, excuse me, to the

3  Board was to re-parole to the state

4  detainer sentence?

5  A.      You're on the one in 1998.

6  Q.      Yeah.

7  A.      Yeah, we did recommend that he

8  be re-paroled then.  But he had been

9  turned down by the Board already, at

10  that point.

11  Q.      Correct.  He had appeared in

12  front of the Board in '97, had been

13  denied, was reset for a hearing in

14  '98.

15  A.      Right.  We recommended him

16  again.

17  Q.      Petitioner's Exhibit C is a

18  group of documents.

19                  (Petitioner's Exhibit C

20                  marked for

21                  identification.)

22  A.      Okay.

23  BY ATTORNEY PATTON:

24  Q.      We're referring it when Mr.

25  --- regarding when Mr. Defoy came up

30

1   for another parole hearing in 2000.

2   A.      Yep, I remember these.

3   Q.      Now, the first page of Exhibit

4   C, it appears to be a letter from you

5   to the Chairman --- Chairman William

6   Ward of the Pennsylvania Board of

7   Probation and Parole?

8   A.      Right.

9   Q.      Okay.  And the letter conveyed

10  to the Board the Department's

11  recommendation as to whether or not

12  Mr. Defoy should be re-paroled when

13  he was going to be considered by the

14  Board in August of 2000?

15  A.      Right.  Yes.

16  Q.      The letter indicates that Mr.

17  Defoy had continued to earn above

18  average housing and work reports and

19  goes on to state, however, he

20  continues to refuse to participate in

21  sex offender treatment, therefore

22  staff continues to not support

23  parole; is that accurate?

24  A.      That's correct.

25  Q.      Okay.  And if --- then go to,

31

1    I guess, it would be the third page,

2    would be the first page of the DC-13A

3    form that the Department would have

4    filled out in April 25 of 2000.

5    A.       Right.

6    Q.       Okay.  And on the last page of

7    that document under staff

8    recommendation does it state that Mr.

9    Defoy refuses to participate in sex

10   offender treatment, and that based

11   upon his refusal to participate in

12   sex offender treatment staff does not

13   support parole?

14   A.       Correct.

15   Q.       And that you agreed with that

16   recommendation not to parole?

17   A.       Correct.

18   Q.       Can you explain why the first

19   --- in '97 and '98 when Mr. Defoy

20   came up for parole hearings the staff

21   and yourself would have agreed or

22   recommended that he should be

23   released despite the fact that he had

24   not participated in sex offender

25   treatment program, but in 2000 under

32

1    the same circumstances the Department

2    of Corrections recommendation was

3    that Mr. Defoy not be released

4    because he had not participated in

5    sex offender treatment?

6    A.      Okay.  I can't answer that

7    specifically, but I can give you

8    generally why that may have happened.

9    Q.      Okay.

10   A.      Okay.  Because I simply don't

11   remember.

12   Q.      Sure.

13   A.      One is we may just have --- if

14   the Board is going to be adamant in

15   that --- I mean, he does have a ---

16   he is a convicted sex offender at

17   that time, we're just going to go

18   along with that because eventually

19   he's got --- he has to face going to

20   that program.  But the second reason

21   --- so that --- my guess is that's

22   what it is that, you know, the

23   Board's saying no, no, no he has to

24   go and as far as we're concerned at

25   that point, eventually he has to go

33

1    anyway and we're going to --- we

2    agree with that.

3           The second thing is I don't

4    know the time frames, but if you

5    remember in the State of Pennsylvania

6    there was some serious sex crimes,

7    there was a major tightening of

8    parole and that may have occurred

9    during that period, too.  Because

10   what's happen is over time the amount

11   of sex offenders paroled has

12   narrowed.

13          The third thing could be, and

14   I do not know this, but we could go

15   through it, is whether the

16   psychological reports or something

17   would indicate something different, a

18   nastier attitude.  Whether there was

19   new light on the facts of crime.  It

20   could be any one of them.

21   Q.      Actually, the report done in

22   2000 indicated that he presented a

23   minimal risk, but he hadn't

24   participated in sex offender

25   treatment program and therefore ---

34

1   and the report didn't say that he

2   needed to participate in sex offender

3   program.

4   A.      It is standard either are

5   acceding to the Parole Board or the

6   change which happens all the time

7   with different types of offenders of

8   tightening up parole.

9   Q.      When you talk about a change

10  in tightening up parole, is that a

11  change that's communicated to the

12  Department of Corrections by the

13  Parole Board or a change in --- an

14  internal change within the Department

15  of Corrections as to how it's going

16  to make its recommendations to the

17  Parole Board?

18  A.      It can be both.  It can be

19  both.  One of the things you tell

20  though is when you start seeing the

21  green sheets, such as the parole

22  grants, the parole action is coming

23  back, no, no, no.  And also if you

24  read the newspapers.  And this has

25  happened over time.  It happened with

35

1    lifers, with commutation.  It happens

2    with DUIs, murder by --- homicide by

3    motor vehicle you see people not

4    getting out that used to get out.

5    Q.      Okay.  Are these changes that

6    you're referring to --- well, let's

7    focus on the change with sex

8    offenders.

9    A.      Sir, may I go back one?

10   Q.      Sure.

11   A.      There's another reason I want

12   to tell you that would intervene in a

13   recommendation.  We wouldn't know

14   this, but we would sense it and that

15   is the victim's objection.  We're not

16   allowed to tell the inmate that.  I

17   would only know that for pre-release.

18   The Parole Board, however, would know

19   it.  They have to skirt that issue

20   and while we're never told

21   officially, if I --- I can read a

22   green sheet and tell whether all of a

23   sudden there's a victim's objection.

24   And that's another thing --- and

25   sometimes in these cases, I don't

36

1  know whether it's in this one, you'll
2  get a late objection from a victim
3  and that will, in many cases, stop a
4  parole or stop a pre-release.
5  Q.    In that situation, though, you
6  would expect to see some change in
7  the green --- in the green sheets
8  that were coming down that one would
9  be different --- worded
10  differently  ---
11  A.    Right.
12  Q.    --- than the prior green
13  sheets?
14  A.    They would go to a very
15  generalized type of thing.  Release
16  of you would depreciate the
17  seriousness of your offense or
18  justice is served.  One of these
19  things that is global but protects
20  the victim as we have to do by law.
21  So that can intervene at any --- in
22  any stage in parole.
23  Q.    Okay.  Does that, though, have
24  any impact on the Department of
25  Corrections recommendation to the

37

1  Board?

2  A.      You see, we're not allowed to

3  know that.  Often, however, the

4  victim would call me or somebody

5  would call me or the Defense attorney

6  --- the DA would call me and say,

7  look, this is, you know, in that

8  case, yes, it would.  Particularly if

9  it was in writing.  But on the Board,

10  if I have no way of knowing, my

11  feeling was that's the Board's

12  determination and we would,

13  generally, still support.  Unless we

14  got some new --- there's new

15  information that the crime was

16  particularly odious or worse than we

17  thought or something like that.

18  Q.      Okay.  Is it fair to say you

19  don't have any recollections with

20  regards to Mr. Defoy, if that

21  happened or do you have any

22  recollection of Mr. Defoy at all?

23  A.      I remember him vaguely.  I do

24  remember his wife because I think I

25  talked to her on the phone.  He was

38

1    hooked up for awhile with an attorney
2    by the name of Grazella Barra
3    (phonetic) who was a friend's of
4    Doris who, by the way, I like
5    Grazella, although she's nutty.  But
6    that's why I'm being general on why
7    we would switch.  Because I really
8    don't remember the specifics of why
9    we did that.
10   Q.    Okay.  You had talked some
11   about how just attitudes can change
12   with regard to whether or not
13   particular --- a particular class of
14   inmate with a particular type of
15   conviction would become less likely
16   to be paroled?
17   A.    Right.
18   Q.    Was any of that done by what I
19   would call any kind of official
20   writings, official policies being
21   issued saying the Department of
22   Corrections is now taking the policy
23   in sex offender cases that the person
24   should not parole.  That their
25   minimum sentence --- is it that ---?

39

A.      No.  No.  You can't do that.

It's with --- with the advent of

Governor Ridge we entered a crime

control period in Pennsylvania as

well in the nation.  And less people

released and certain crimes were

highlighted.  The Department never

and shouldn't tell us because there's

individual exceptions all over the

board, this guy can never go home or

that guy can never go home.  They

left it up, generally, to our

discretion.  But you can tell, you

know, what's going to happen just by

the parole outcomes and by what

people are saying and things like

that.  But they really can't say to

you can't release --- you can't

recommend parole on a person when

he's minimal because, really, at that

point, we're second guessing the

Courts.  And the Courts say this is

his minimal.  He has to be

considered.

Q.      Okay.  We had talked earlier

40

1   about an inmate being recommended to

2   take sex offender treatment.

3   A.        Right.

4   Q.        And if the Board had

5   recommended --- had stated that they

6   wanted the individual to take sex

7   offender treatment programming then

8   if the inmate had not done that they

9   simply --- they weren't going to get

10  parole.

11  A.        Right.

12  Q.        Is that an accurate statement?

13  A.        And we told the inmates that.

14  And that was accurate.  Find that in

15  writing, you won't.

16  Q.        Okay.  But it's the reality of

17  the situation and the inmates would

18  actually be informed by the staff of

19  that?

20  A.        Right up front.

21  Q.        And would it be fair to say

22  that the staff was telling that

23  inmate that --- so that --- because

24  the staff wanted to fairly inform the

25  inmate of what the inmate needed to

41

1    do if they expected to really get

2    released?

3    A.        Right.  Because it'd be very

4    unfair at the last minute, two years

5    or three years out or six months, I'd

6    say you got to do this.  And that's

7    not right.  And the stability of your

8    institution depends on how well you

9    handle the parole situation, how fair

10   you are.

11   Q.        Is it fair to say that with

12   the sex offender treatment

13   recommendation that you guys would

14   say, --- tell the inmate, look, if

15   you don't do this you're not getting

16   paroled, but that would not

17   necessarily be the case if the Board

18   had recommended some other treatment

19   plan that, you know, didn't carry the

20   same kind of weight as the sex

21   offender program?

22   A.        The sex offender program is

23   certainly the most --- the sex

24   offender thing is the biggest issue.

25   If a guy --- drug and alcohol, you

42

1   really don't want to put them back
2   out unless they've had some kind of
3   treatment.  People have hurt people,
4   certain types of those types of guys,
5   the ones who enjoy hurting people,
6   what you find out that's the type of
7   guy that, you know, go through some
8   kind of thing, I wouldn't do anything
9   with.  Not going to a vocational
10  program, not going to an educational
11  program, minor misconducts, to me
12  that doesn't, you know, that
13  shouldn't separate who goes home from
14  who doesn't go home.
15  Q.      Okay.  And in your experience
16  is that actually the case like with
17  some of the stuff about misconduct or
18  not doing educational or vocational
19  stuff.  That doesn't have the
20  absolute foreseeability like the sex
21  offender thing has of, you know, sex
22  offender you don't do it you're just
23  not getting paroled, but if it's the
24  vocational or educational stuff, even
25  if they don't do it they still have a

43

1   chance of getting released?

2   A.      Right.  The sex offender is

3   more certain.

4   Q.      Okay.

5   A.      That's more certain than any

6   of them.

7   Q.      Would it be fair to say it's

8   absolutely certain?

9   A.      It's so certain that even the

10  ones you recommend don't go home.

11  Q.      Okay.  Can you ever recall in

12  your experience, someone who the

13  Board said we want him to do sex

14  offender treatment and the inmate did

15  not do sex offender treatment where

16  the inmate was actually paroled or

17  re-paroled?

18  A.      Again, let me go back.  There

19  was --- there was a domestic

20  relations thing where they had gotten

21  something fouled up.  They thought a

22  rape had occurred and it hadn't, that

23  they let go because we had pointed it

24  out to them.  I also remember --- and

25  I can't give you specifics, in a

44

1    couple of occasions where you had a

2    19-year old man and a 16-year old kid

3    and to me that three year --- that

4    didn't seem to me to be an adult ---

5    it seemed to me to be a child and a

6    child.  And we could recommend in

7    those cases --- and I think there's

8    one or two of them, we're not going

9    to put into a whole sex offender

10    program this is part of a teenage

11    type of --- it was adolescent

12    behavior.  It's developmental

13    behavior rather than deviance.  I

14    don't know if I made that clear.

15    Q.     No, I understand.

16    A.     Yeah.

17    Q.     And --- well, in those cases

18    were you guys able to convince the

19    Board that sex offender treatment

20    just wasn't appropriate for those

21    particular individuals?

22    A.     Yes.  The Board is in an

23    unenviable position.  Nobody cheers

24    when they let somebody go.  They've

25    had some very unfortunate releases

45

1    over the last 15 years. Mudman Simon

2    and Reggie McFadden, people who have

3    done terrible things out there. If

4    they feel that we're reasonable and

5    they have something to hang their hat

6    on, sometimes they will take the

7    chance. Sometimes. But ultimately

8    it is their repsonsibilty whether

9    they release the guy or not.

10   Q.     Okay. In your experience, if

11   the Board has required sex offender

12   treatment and the Department agrees

13   that sex offender treatment is --- is

14   it a reasonable ---

15   A.     Right.

16   Q.     --- condition for the

17   particular individual and the

18   individual has not done sex offender

19   treatment, do you recall any of those

20   situations where the Board has

21   actually released?

22   A.     Never. Never.

23   Q.     So the only exceptions that

24   you can recall are ones where the

25   Department of Corrections through

46

1    their, I would say, perhaps more

2    intimate knowledge of the inmate and

3    the circumstances of his offense have

4    been able to convince the Board that

5    sex offender treatment just wasn't an

6    appropriate treatment for this

7    particular individual?

8    A.       Right.  That's correct.

9    Q.       Okay. And if the Board --- if

10   you're able to ultimately convince

11   the Board that sex offender treatment

12   was just not appropriate for this

13   particular person then there were a

14   couple of instances where individuals

15   were released?

16   A.       That's correct.

17   Q.       But if the Board felt sex

18   offender treatment was appropriate

19   and the Department agreed that sex

20   offender treatment was appropriate

21   and the inmate doesn't do it ---?

22   A.       He isn't going home.

23   Certainly.

24   Q.       As from your review of the

25   DC-13A forms for Mr. Defoy, is it

47

1    accurate to say that in his case the

2    Department agreed that sex offender

3    treatment was an appropriate

4    condition for him?

5    A.        Early on?

6    Q.        Yes.

7    A.        Yeah, my guess is our

8    reasoning in that was, I'm guessing,

9    that he had all this time left, we'll

10   cross that bridge later, he's done

11   his violator time, let him go to the

12   new one, he's got six and a half

13   years for us to fight with him and

14   get him into the program, he's had

15   six and a half years for his appeal

16   process to go through, and that's my

17   guess as to why he was recommended.

18   Q.        And the switch in 2000 was

19   most likely attributable to the fact

20   that the Board has made it clear that

21   there's not going to be a parole

22   without the sex offender treatment.

23   A.        Right.  They dug in their

24   heels.  And we're not going to second

25   guess that because eventually we're

48

1    going to say that anyway.  I think

2    from a pure fairness standpoint with

3    the inmate, you have to tell them all

4    along this, look, this is something

5    eventually you have to go to.  If

6    they have a long enough time --- and

7    the amount of admitters among sex

8    offenders is very small, at the

9    beginning, and so it's a process you

10   go through to get them to finally

11   take responsibility.  But we can ---

12   it's something we can wait out.

13   Q.      Okay.  We talked some about

14   attitudes changing with time whether

15   it's a formal policy or just an

16   informal policy that's being

17   implemented.  With regard to your

18   experience with the sex offender

19   requirement and what we've discussed

20   where if the person is told that they

21   need to take sex offender treatment

22   and they don't do it, they aren't

23   getting paroled, has that been a

24   situation that has existed

25   consistently throughout your time as

49

1  you were working with the Department

2  of Corrections?

3  A.      Yes.  It probably was --- I

4  think the sex offender programs were

5  started --- I was at Rockview then,

6  my guess is in the mid to late '80s,

7  and from then on it was if you don't

8  go you're not going home.

9  Q.      Okay.  And so that --- that

10  practice or reality, whatever you

11  want to call it, has been in

12  existence, based on your experience

13  of working with the Department of

14  Corrections, from the mid, at least,

15  the mid '80s on through today?

16  A.      Yes.

17  Q.      And so that's not one of the

18  things that changed over the course

19  of time --- well, I guess and

20  I'm ---.

21  A.      I think it's gotten tighter in

22  terms of who's going to be released.

23  But the stance that you have to get

24  treatment before you go, now, that's

25  a 20-year old --- that's 20-year old

50

1    practice.

2    Q.      With the sex offender ---

3    A.      Yes.

4    Q.      --- program?

5    A.      Yes.  Uh-huh (yes).

6    Q.      Okay.  And that's something

7    that you have, yourself, witnessed as

8    a reality of the parole system and

9    the way it's administered in the

10   Commonwealth of Pennsylvania?

11   A.      Yes.

12   Q.      Okay.  When you talk to the

13   inmates or you --- excuse me, the

14   counselors talk to the inmates about

15   wanting to take sex offender or the

16   need to take sex offender, does the

17   issue of, hey, I got my case on

18   appeal, you know, does that get

19   brought up and discussed with the

20   inmate?

21   A.      Yeah.  The inmates will say

22   --- and by the way, this is the rule

23   not the exception, ---

24   Q.      Okay.

25   A.      --- the inmates will say, I

51

1    didn't do it. That is very, very

2    common among sex offenders. And

3    they'll say I can't do anything

4    because my case is under appeal and

5    my attorney advised not to admit to

6    it, not to get into the program, not

7    to go to the program. And that is

8    discussed the inmate. Now, what I

9    told them is when you get here you're

10   guilty. We don't --- we're not a

11   courtroom. You're convicted. This

12   is what you did. As far as I'm

13   concerned that's what you did so this

14   is what you have to do. You want to

15   do that with your --- you want an

16   appeal process, you know, once you

17   lose your appeal maybe you might

18   think of admitting, but regardless of

19   the appeal until you admit and go

20   into the program, you're not going to

21   go home.

22   Q.      Did you ever confirm with

23   inmates who said, look, I testified

24   at my trial that I didn't do this

25   and, you know, I could get into

52

1   trouble if I now say I really did do
2   it because I'd basically be saying I
3   committed perjury.
4   Q.      That's --- that's a common
5   occurrence.  Certainly.  They're
6   saying I'm not going to change
7   anything.  I'm going to win this.
8   I'm going to whatever.  But again, to
9   us he's convicted --- he's a
10  convicted sex offender.
11  Q.      Under the sex offender program
12  --- the program is actually
13  administrated by the Department of
14  Corrections; is that correct?
15  A.      That's correct.
16  Q.      Okay.  The inmates are not
17  granted any type of immunity from
18  having the statements that they make
19  during the sex offender treatment
20  program from being used against them
21  in the future; is that correct?
22  A.      That's a legal question for
23  which I don't really know the answer.
24  I don't know what's immunity and what
25  isn't.  Supposedly, and this is why

53

1    they don't want non-admitters and

2    deniers in the programs, what's held

3    in those groups is confidential, but

4    I'm sure from a criminal standpoint

5    there's nothing confidential in jail.

6    But, Counsel, I really don't know the

7    answer to that. I don't know whether

8    after a trial and all that what he

9    says in that group can be held

10   against him or not. I don't know the

11   answer to that.

12   Q.       Okay.

13                 ATTORNEY PATTON:

14                 Mr. McCullough, I

15        believe that those all are the

16        question I have for you this

17        morning. Thank you.

18   A.       Thank you.

19                 ATTORNEY BRADLEY:

20                 I just have a few

21        questions.

22   EXAMINATION

23   BY ATTORNEY BRADLEY:

24   Q.       I think we stared with your

25   employment history. Could you just

54

1    briefly describe your post high

2    school education?

3    A.        Yeah.  I have a bachelors

4    degree in psychology from Versinus

5    (phonetic) College and a masters in

6    social work from Bryn Mawr College,

7    School of Social Work.

8    Q.        You talked about how that

9    looking at, for example

10   reclassification summary and seeing

11   that an inmate has not participated

12   of his own accord with sex offender

13   treatment and you say that it's

14   fairly predictable that that inmate,

15   in your terms, won't be going home

16   and I assume by that you mean he

17   won't be paroled?

18   A.        That's correct.

19   Q.        Even though you can make that,

20   I guess, prediction, if you want to

21   call it that, at least from the

22   Department of Corrections standpoint,

23   are all of these inmates given

24   individualized assessments in making

25   the recommendations whether to be

55

1   paroled or not?

2   A.      That's correct.

3   Q.      So you don't simply look at

4   that one block to see whether they've

5   participated in sex offender

6   treatment and then go to the end of

7   the thing and not supported?

8   A.      You evaluate the whole guy and

9   you can see that in these reports

10  because they review the work and

11  housing reports because sometimes one

12  thing will balance another.

13  Q.      So even though you may be able

14  to predict the outcome in terms of

15  parole with respect to one aspect of

16  it, you're not suggesting that

17  they're not being individually

18  assessed on an inmate-by-inmate

19  basis?

20  A.      No.  Every inmate is

21  considered on his own merits

22  including the facts of his crime.

23  Q.      One other thing and I don't

24  know if it was touched upon or came

25  up tangentially, but would the status

56

1    of an inmate's conviction affect a

2    recommendation and just to clarify,

3    in this case, there was some evidence

4    and I think Mr. Defoy mentioned it in

5    one of those papers that his case was

6    on appeal and I believe at one point,

7    he did obtain, at least in a lower

8    court, a reversal of his conviction,

9    would that information affect the

10   recommendation?

11   A.       As long as that crime is held

12   on his record, whether it's under

13   appeal, whether whatever, he is still

14   guilty of that in our eyes.  Now,

15   often we don't know when there's that

16   kind of --- that kind of court

17   action.  We would know when the clerk

18   of courts sends us this thing this

19   charge has been nulled or dismissed

20   or whatever.  But something under

21   appeal, something that's been

22   reversed and appealed to a higher

23   court to us he's still --- he's ---

24   because that doesn't take the charge

25   off of his record.

57

1  Q.    Okay. You talked about and it
2  came up in the context of sex
3  offender treatment, but this idea
4  that you have to get treatment before
5  you go home and, again, that's
6  getting treatment before you are
7  paroled. And again, that was in the
8  context of sex offender treatment.
9  Philosophically, is the same
10 approach, and I believe you touched
11 on this, but is the same approach
12 used with DUI offenders or drug and
13 alcohol violators or persons with
14 assaultive behavior or other
15 classifications of offender?
16 A.    Yeah. If you have a guy who's
17 been a long term alcoholic or drug
18 addict who has --- particularly one
19 who has aggressive crimes along with
20 domestic crimes, stick-ups, stuff
21 like that, if you have --- aggravated
22 assault is a large category of
23 inmates and murder in the state
24 prisons. Some of them you're going
25 to mandate you have to go to

58

1   something or other before you even

2   let that type of guy go,

3   particularly, if the crime is

4   particularly strange or bad or if

5   it's unprovoked or things like that.

6   So there are other categories of

7   people who we would not let go if

8   they didn't --- if they didn't show

9   some progress.

10  Q.      And I guess given your

11  background of 30 years in the

12  Department of Corrections, do you see

13  anything wrong with the approach of

14  requiring someone to go through

15  treatment before they're released

16  back onto the street?

17  A.      No, I don't.

18  Q.      Can you elaborate on that?

19  A.      You know, I'm not --- first of

20  all, it's a general --- institutions

21  are run better when inmates are

22  involved in programs.  And, you know,

23  the more that are involved the better

24  off the jail runs.  Plus the

25  programs, themselves, give inmates

59

1    hope.   It gives them hope for the

2    future and things like that.   I'm not

3    going to argue because I really don't

4    believe in any of the statistics and

5    I'm not sure what works or whatever.

6    But, at least, if a guy goes through

7    the motions going through a program

8    you know he's trying.   You know that

9    he's trying.   I'm not sure that any

10   one assessment is any better than the

11   other.   But the only assessment we

12   have is really program completion,

13   he's been willing to go through a

14   program that may have an effect on

15   whether he stays out or not.   And so

16   that's why the whole program is

17   important.

18                    ATTORNEY BRADLEY:

19                    I think that's all the

20        questions I have.   Mr. Patton

21        may have some follow-ups.

22                    ATTORNEY PATTON:

23                    Yes.   And I forgot to

24        ask a couple about a subject

25        that I wanted to ask before.

60

1  RE-EXAMINATION

2  BY ATTORNEY PATTON:

3  Q.        And that was about calculating

4  the minimum and mandatory dates and

5  who does and how that gets done.

6  A.        Help.  There isn't --- if a

7  guy comes in with straight sentence,

8  two to four or five to ten, it's done

9  by the record office.  But it's very

10  clear, the clerk of courts sends us

11  the record.  The judge will have date

12  of sentence, he'll have in credit

13  times, the judge sentence.  No

14  problem.  Easy.  When you have

15  violator time --- there is so much

16  case law in this that none of us

17  understand of when the violator time

18  starts, how much credit they get,

19  when they --- it's totally confusing

20  to me.  What will happen is, if a guy

21  violates, the Parole Board comes back

22  to us and says, this amount of days

23  goes to his new time, this amount of

24  days to his old time and we calculate

25  that there.  It is under so many

61

1    challenges.    It is so confusing half

2    the time that --- and the inmates

3    complain it about it all the time.

4    They should have gotten this amount

5    of time or they should have gotten

6    that amount of time.    It is

7    eventually done by the records office

8    in the institutions, but under the

9    direction of the Parole Board.

10   Q.        Okay.    So when it's a violator

11   coming in it's the Board that

12   transmits the information to the

13   Department of Corrections as to how

14   much time the person has to serve as

15   a violator ---

16   A.        Right.

17   Q.        --- and how much --- if the

18   person's been in custody how much of

19   that time goes to the old sentence

20   and how much, if any, should go to

21   whatever new sentence the person has?

22   A.        That's correct.    And the time

23   will start on the date --- there's

24   different times it starts.    There's

25   one when their warrant drops, you

62

1    know, because if he's picked up in

2    June by the Philadelphia Police, and

3    the warrant doesn't drop until July

4    20th, then that time goes to the new

5    time and it's all --- and nobody

6    understands --- there's been one

7    Pennsylvania Superior Court, Supreme

8    Court decision after another and I

9    still --- that credit time thing is

10   an endless boggle, frankly.

11   Q.      Okay. But it should be done

12   --- is it by the Parole Boards ---

13   some employee of the Board giving

14   direction to the Department of

15   Corrections if it's a convicted

16   parole violator ---

17   A.      Right.

18   Q.      --- who's coming back. The

19   Board giving the Department of

20   Corrections the information of this

21   is how much time the person has in,

22   this is how much that goes to the

23   violator sentence. This is how much

24   that goes to the new sentence?

25   A.      Right. And I believe they

63

1    compute the new max.  Became if he is

2    a convicted parole violator he looses

3    his street time.  It goes back on top

4    of his sentence.  If he is a

5    technical parole violator he loses

6    his street time if he's delinquent.

7    He loses the time that he was on the

8    run.  Then they'll come back and

9    they'll say and now this guy's

10   convicted for a variety of reasons,

11   next review date will be credit time

12   for old sentence this, you know, on

13   the old one and there's a couple of

14   other things they'll say.  But

15   generally we do it at their

16   direction.

17   Q.     Okay.  And if it's a green

18   sheet coming in on somebody who's a

19   convicted parole violator, will

20   generally the green sheet say the new

21   max - - -

22   A.     Yes, that's the new max.

23   Q.     - - - is X?

24   A.     The new max is X.

25   Q.     Okay.  And that's from the

64

1  Board?

2  A.     And that's from the Board.

3  Q.     And they do that calculation.

4  You guys just tying to implement the

5  calculations given to you ---

6  A.     Right.

7  Q.     --- by the Board?

8  A.     Right.

9              ATTORNEY PATTON

10             That's just what I

11        wanted cover.

12             ATTORNEY BRADLEY:

13             No questions.

14  A.    Thank you very much.

15             ATTORNEY PATTON:

16             Thank you.

17

18        *  *  *  *  *  *  *  *

19   DEPOSITION CONCLUDED AT 9:58 A.M.

20        *  *  *  *  *  *  *  *

21

22

23

24

25

1    COMMONWEALTH OF PENNSYLVANIA )

2    COUNTY OF CAMBRIA                )

3

4                 C E R T I F I C A T E

5

6         I, Lori A. Behe, a Notary Public in and for

7    the Commonwealth of Pennsylvania, do hereby

8    certify:

9         That the witness whose testimony appears in

10   the foregoing deposition, was duly sworn by me on

11   said date and that the transcribed deposition of

12   said witness is a true record of the testimony

13   given by said witness;

14        That the proceeding is herein recorded fully

15   and accurately;

16        That I am neither attorney nor counsel for,

17   nor related to any of the parties to the action in

18   which these depositions were taken, and further

19   that I am not a relative of any attorney or

20   counsel employed by the parties hereto, or

21   financially interested in this action.

22

23

24                          Lori A. Behe, Reporter

25

> NOTARIAL SEAL
> LORI A. BEHE, Notary Public
> Colver, Cambria County, PA
> My Commission Expires July 20, 2010

· PITTSBURGH, PA          SARGENT'S          · PHILADELPHIA, PA
· CLEARFIELD, PA       · ERIE, PA    COURT REPORTING    · SOMERSET, PA
· STATE COLLEGE, PA    · OIL CITY, PA   SERVICE, INC.   · INDIANA, PA    · WILKES-BARRE, PA
                                      210 Main Street    · GREENSBURG, PA
· HOLLIDAYSBURG, PA    · HARRISBURG, PA   Johnstown, PA  15901            · CHARLESTON, WV
                                       (814) 536-8908

LAWYER'S NOTES

| Page | Line | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

PITTSBURGH, PA
HARRISBURG, PA
GREENSBURG, PA
ERIE, PA
INDIANA, PA
HOLLIDAYSBURG, PA
STATE COLLEGE, PA



SARGENT'S
COURT REPORTING
SERVICE, INC.

210 MAIN STREET
JOHNSTOWN, PA  15901
(814) 536-8908

PHILADELPHIA, PA
WILKES-BARRE, PA
OIL CITY, PA
SOMERSET, PA
CLEARFIELD, PA
*CHARLESTON, WV*

DC-13A                           **CONFIDENTIAL**

## RECLASSIFICATION SUMMARY

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| CHECK TOPIC | ☒ PAROLE SUMMARY ☐ REPAROLE SUMMARY ☐ OTHER _____ | PREPARED AT | SCI-Houtzdale | 5-7-97 DATE |

| SID NUMBER | DC NUMBER | PBP NUMBER | NAME | | | | AGE |
|---|---|---|---|---|---|---|---|
| 9268847 | AK-1017 | | DEFOY, Robert | | | | 45 |

| EXPIRATION MINIMUM | EXPIRATION MAXIMUM | EFFECTIVE DATE | TIME SERVED TO DATE | EXPIRATION OF ½ MINIMUM | EFFECTIVE DATE OF PV RETURN | CLASS STATUS | MEDICAL PROFILE P U L H E S T |
|---|---|---|---|---|---|---|---|
| 1-29-82 | 9-29-92 | 9-29-79 | | | | 3 | 1111223 |

| PBP DOCKET STATUS | ☐ FIRST HEARING ☐ REVIEW HEARING | TOTAL ARRESTS | JUVENILE ARRESTS | JUVENILE COMMITMENTS | ADULT ARRESTS | CONVICTIONS | COMMITMENTS | PROBATION VIOLATIONS | PAROLE VIOLATIONS |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

ACCOMPLICE(S) AND KNOWN DISPOSITION(S)

lone

SENTENCE STATUS CHANGE AND/OR DETAINER(S) STATUS

-25-93; York Co.; IDSI, Stat. Rape, CMM; CP#3623, 1991

MISCONDUCTS:
See attached misconduct report.

Steve Kechisen
Corrections Counselor II

EDUCATIONAL/VOCATIONAL: WRAT scores dated 3-23-84 revealed:
Reading:6.9; Spelling:5.7; Arithmetic:5:3

. DeFoy resides in C Unit.  He was scheduled to take the TABE test on 8-96 and 12-96, however, he
fused to take the test.

Education Department

VOCATIONAL:

. DeFoy arrived at SCI-Houtzdale on 5-8-96 and was assigned to Culinary PM and is presently assigned
a Blockworker.

Susan McQuillen
Voc. Placement Coordinator Clerk

PETITIONER'S
EXHIBIT
A

CONFIDENTIAL

Robert DeFoy, AK1017
Parole Summary
Page -2-

**MEDICAL:** Mr. DeFoy has a previous +PPD. He is not receiving any medical treatment at this time. He wears corrective lenses and he has no dental problems.

Medical Department

**PSYCHOLOGICAL/PSYCHIATRIC:** A mental health evaluation has not been requested by the Pennsylvania Board of Probation and Parole.

Steve Kechisen
Corrections Counselor II

**SEX OFFENDER TREATMENT:** Mr. DeFoy was prescribed sex offender treatment. He refused to participate under the premise that his case was under appeal.

Steve Kechisen
Corrections Counselor II

**DNA ACT NOTIFICATION:** Mr. DeFoy is not subject to DNA Act Requirement.

Steve Kechisen
Corrections Counselor II

**PRE-RELEASE:** Mr. DeFoy has not participated in any form of pre-release programming since his arrival at SCI-Houtzdale.

Steve Kechisen
Corrections Counselor II

**COUNSELOR'S EVALUATION:** Mr. DeFoy, age 45, is a CPV serving an original 10 to 20 year sentence for Robbery. As recorded on 11-23-93 the Pennsylvania Board of Probation and Parole indicated to re-parole Mr. DeFoy to his state detainer sentence. His detainer sentence is 6 years, 6 months to 13 years for Statutory Rape, IDSI, and CMM. As recorded on 4-22-97, the Pennsylvania Board of Probation and Parole rendered the following decision: modify board action of 11-23-93 and 11-5-93 by temporarily rescinding the re-parole portion due to misconducts and now: list for re-interview on the next available docket.

Mr. DeFoy was received at SCI-Houtzdale 5-8-96 from SCI-Dallas as a custody level 2 transfer. He was misconduct free at SCI-Dallas. Upon his reception to this institution the following behavior and therapeutic expectations were identified: no misconducts, earn positive housing/work reports, drug & alcohol education, stress & anger and sex offender treatment. He received one Class I misconduct 11-6-96 for Refusing to obey an Order. He has earned above average housing/work reports.

Steve Kechisen
Corrections Counselor II

Robert DeFoy, AK1017
Parole Summary
Page -3-

## STAFF RECOMMENDATIONS:
Mr. DeFoy, age 45, is a CPV serving an original 10 to 20 year sentence for Robbery. As recorded on 11-23-93, Mr. DeFoy was to parole to a state detainer sentence of 6 years, 6 months to 13 years for Statutory Rape, IDSI and CMM. A new board action dated 4-22-97 lists Mr. DeFoy for reinterview on the next available docket. Since being received at SCI-Houtzdale, Mr. DeFoy has received one Class I misconduct for Refusing to Obey an Order. He has earned positive housing/work reports. Based on his positive adjustment, Staff supports parole to the state detainer sentence. He was informed of this decision and all aspects of Act 159.

John M. McCullough, Superintendent

5/13/97
ate

MM:SK:sjh

**DC-13A**

**CONFIDENTIAL**

## RECLASSIFICATION SUMMARY

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| CHECK TOPIC | ☒ PAROLE SUMMARY    ☐ REPAROLE SUMMARY | | PREPARED AT | SCI-Houtzdale | 5-18-98 |
|---|---|---|---|---|---|
| | ☐ OTHER _____ | | | | DATE |

| SID NUMBER 09268847 | DC NUMBER AK-1017 | PBP NUMBER | NAME DEFOY, Robert | | | | | AGE 46 |
|---|---|---|---|---|---|---|---|---|

| EXPIRATION MINIMUM 9-29-82 | EXPIRATION MAXIMUM 9-29-92 | EFFECTIVE DATE 9-29-72 | TIME SERVED TO DATE | EXPIRATION OF ½ MINIMUM | EFFECTIVE DATE OF PV RETURN | CLASS STATUS 2"0" | MEDICAL PROFILE PULHEST |
|---|---|---|---|---|---|---|---|

| PBP DOCKET STATUS | ☐ FIRST HEARING ☐ REVIEW HEARING | TOTAL ARRESTS | JUVENILE ARRESTS | JUVENILE COMMITMENTS | ADULT ARRESTS | CONVICTIONS | COMMITMENTS | PROBATION VIOLATIONS | PAROLE VIOLATIONS |
|---|---|---|---|---|---|---|---|---|---|

ACCOMPLICE(S) AND KNOWN DISPOSITION(S)

None

1-25-99, York Co. (Conc 8 1/2-15 yrs.) IDSI, Stat. Rape, CMM CP# 3623, 1991

**MISCONDUCTS:**
See attached DC-17.

Steve Kechisen
Corrections Counselor II

**EDUCATIONAL/VOCATIONAL:**   TABE scores dated — revealed:
Reading:—   Spelling:— Arithmetic:—

Mr. DeFoy resides in C Unit. He was scheduled for the TABE test on 8-96 and 12-96, however he refused to complete the test on both occasions.

Sharon Schall
Education Department

**VOCATIONAL:**

Mr. DeFoy arrived at SCI-Houtzdale on 5-7-96 and was assigned to Culinary PM and is currently assigned as a Blockworker.

Susan McQuillen
Corr. Emp./Voc. Coordinator

PETITIONER'S
EXHIBIT
B

**CONFIDENTIAL**

(OVER IF NECESSARY)

Robert DeFoy, AK1017
Parole Summary
Page -2-

**MEDICAL:** Mr. DeFoy has a medical history of +PPD, he needs a yearly chest X-Ray. His vision and dental are okay. He has no physical limitations.

Medical Department

**MENTAL HEALTH EVALUATION:** A mental health evaluation has not been requested.

Steve Kechisen
Corrections Counselor II

**SEX OFFENDER TREATMENT:** Sex Offender programming has been recommended, however Mr. DeFoy is not interested in participating.

Steve Kechisen
Corrections Counselor II

**DNA ACT NOTIFICATION:** Inmate is not subject to DNA Act requirements.

Steve Kechisen
Corrections Counselor II

**PRE-RELEASE:** Mr. DeFoy has not participated in any form of pre-release programming since his arrival a SCI-Houtzdale.

Steve Kechisen
Corrections Counselor II

**COUNSELOR'S EVALUATION:** Mr. DeFoy, age 46, is currently serving a 10 to 20 year sentence for Robbery With an Accomplice or While Armed or by Violence. He was recommitted on this offense as a Convicted Parole Violator. His PV maximum date is 6-7-01. Mr. DeFoy currently has a state detainer sentence of 6 1/2 to 13 years for IDSI, Statutory Rape and Corruption of the Morals of a Minor. As recorded on 8-12-97, the Pennsylvania Board of Probation and Parole refused Mr. DeFoy parole and decided to review him on or after June 1998.

Since his last review, Mr. DeFoy has had no misconducts and earns positive housing/work reports.

Steve Kechisen
Corrections Counselor II

Robert DeFoy, AK1017
Parole Summary
Page -3-

## STAFF RECOMMENDATIONS:

Mr. DeFoy, age 46, is currently serving backtime as a CPV on an original 10 to 20 year sentence for the offense of Robbery.  Pennsylvania Board of Probation and Parole action of 8-12-97 established a 6-98 review.  Since that time he has maintained a misconduct free adjustment.  Housing Officers state that he is mature and polite.  Work Supervisor states that he works effectively and learns quickly.  Based upon his very positive adjustment while incarcerated, Staff supports parole.    He was informed of this decision and al aspects of Act 159.

John M. McCullough, Superintendent

5/27/98
Date

JMM:SK:sjh




**Martin F. Horn**
Commissioner

**William E. Speck**
Deputy Superintendent for
Facilities Management

Pennsylvania Department of Corrections
State Correctional Institution at Houtzdale
P.O. Box 1000
Houtzdale, PA 16698-1000

**J. Barry Johnson**
Deputy Superintendent for
Centralized Services

**John M. McCullough**
Superintendent

Phone: (814) 378-1000    FAX: (814) 378-1030

July 11, 2000

The Honorable William Ward, Chairman
Pennsylvania Board of Probation and Parole
P.O. Box 1661
Harrisburg, PA 17105

RE:   DeFoy, Robert, AK1017

Dear Chairman Ward:

Mr. DeFoy is an addition to the August Parole Docket due to material from the PBPP Central Office in Harrisburg not being available for his originally scheduled interview, therefore this update is being submitted in letter form.

Mr. DeFoy, age 48, is currently a convicted parole violator serving backtime on an original 10 to 20 year sentence for Robbery. The minimum and maximum expiration dates are 9-29-82 and 6-7-01. He currently has a 6 ½ to 3 year re-entry detainer for Statutory Rape, IDSI and COMM. Since the original 13A dated 4-25-00, Mr. DeFoy has continued to earn above average housing/work reports. However, he continues to refuse to participate in sex offender treatment, therefore Staff continues to not support parole.

RECEIVED
SCI-Houtzdale
JUL 1 3 2000
Pa. Board of Probation
& Parole

Sincerely,

John McCullough

John M. McCullough
Superintendent

JMM/MMl/sjh

c:   DC-14
     DC-15
     file

PETITIONER'S
EXHIBIT
C

| DC - 46 (Rev. 7/95) | **VOTE SHEET** | | **Commonwealth of Pennsylvania** Department of Corrections | |
|---|---|---|---|---|

| Facility HOU | Date 5/8/00 | Number AK1017 | Name Robert Defoy | Cus. Lev. & Code (s) Z |

| Purpose Parole Viol Review | YES | NO | COMMENTS |
|---|---|---|---|
| Counselor KECHTSEN | ✓ | | To detainer sent. 6y6m to 13y |
| Work Supervisor WILLIAMS | ✓ | | |
| Corrections Officer WILLIAMS/YASOLSKY | ✓ | ✓ | |
| Psychologist | | | |
| Unit Mgr., Couns. Supv., CCC Dir. BAER | | ✓ | |
| Inmate Program Mgr. MAZURKIEWICZ | | X | Program resistant |
| COT CHURNER | | ✓ | |
| _____ Votes Recorded | | X | York Detainer; No Minus Board mandated S.O.P. successful completion (Did not apply!) |

**STAFF RECOMMENDATIONS**

Defoy, age 48, is currently serving backtime on an original 10 to 20 year sentence for the offense of Robb w/ Accomp. He has a 6½ to 13 year detainer sentence for the offenses of IDSI, Stat. Rape & Corr. Morals of Minor. He refuses to participate in Sex Offender Trmt. Based upon his refusal to participate in Sex Offender Trmt, Staff does not support parole. He was advised of this decision and ACT 59.

| Deputy - Centralized Services | Yes ☐ No ☑ | Deputy - Facility Management | Yes ☐ No ☑ |
|---|---|---|---|
| Comments | | Comments | |

| Sign. of Supt., DCC Dir., Reg. Dir., Commander | | Approved | Disapproved |
|---|---|---|---|
| Comments | | | |

**DC-13A**           **CONFIDENTIAL**

## RECLASSIFICATION SUMMARY

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

| CHECK TOPIC | ☒ PAROLE SUMMARY    ☐ REPAROLE SUMMARY<br>☐ OTHER _____ | PREPARED AT | SCI-Houtzdale | 4-25-00 DATE |
|---|---|---|---|---|

| SID NUMBER | DC NUMBER | PBP NUMBER | NAME | | | AGE |
|---|---|---|---|---|---|---|
| 19268847 | AK-1017 | | DeFOY, Robert | | | 48 |

| EXPIRATION MINIMUM | EXPIRATION MAXIMUM | EFFECTIVE DATE | TIME SERVED TO DATE | EXPIRATION OF ½ MINIMUM | EFFECTIVE DATE OF PV RETURN | CLASS STATUS | MEDICAL PROFILE PULHEST |
|---|---|---|---|---|---|---|---|
| 9-29-72 | 9-29-82 | 9-29-92 | | | | 3 | |

| PBP DOCKET STATUS | FIRST HEARING REVIEW HEARING | TOTAL ARRESTS | JUVENILE ARRESTS | JUVENILE COMMITMENTS | ADULT ARRESTS | CONVICTIONS | COMMITMENTS | PROBATION VIOLATIONS | PAROLE VIOLATIONS |
|---|---|---|---|---|---|---|---|---|---|
| | ☐ ☐ | | | | | | | | |

ACCOMPLICE(S) AND KNOWN DISPOSITION(S)

None Listed

SENTENCE STATUS CHANGE AND/OR DETAINER(S) STATUS
CP#:3623;91 – 1-25-93, York County – 6 ½ to 13 years CS for IDSI, Stat. Rape, Corrupt Minors

**MISCONDUCTS:**
See attached DC-17.

> RECEIVED
> SCI-Houtzdale
> MAY 1 6 2000
> Pa. Board of Probation
> & Parole

Steve Kechisen
Corrections Counselor II

**EDUCATIONAL/VOCATIONAL:** WRAT scores dated 3-84 revealed:
READING, 6.9; SPELLING, 5.7; ARITHMETIC, 5.3

Mr. DeFoy resides on C Unit.

Melissa Miller
Education Department

**VOCATIONAL:**

Mr. DeFoy arrived at SCI-Houtzdale on 5-7-96 and was assigned to Culinary PM and Blockworker.

Susan McQuillen
Corr. Emp./Voc. Coordinator

**MEDICAL:** **Medical History:** +PPD, History WPW
**On-Going Treatment:** Chronic Clinic
**Medications:** NTG
**Vision:** Last Exam 2-95 **Dental:** Last Exam 3-96
**Physical Limitations:** No heavy lifting

Medical Department

CONFIDENTIAL

Parole Summary
Page -2-



**MENTAL HEALTH EVALUATION:** A Mental Health Evaluation will be forwarded to the Institution Parole Office as requested by the Parole Office Supervisor.

Steve Kechisen
Corrections Counselor II

**SEX OFFENDER TREATMENT:** Sex offender programming has been recommended. Mr. DeFoy denies guilt and refuses to participate.

Steve Kechisen
Corrections Counselor II

**DNA ACT NOTIFICATION:** A DNA sample material will be required when he turns over to his detainer sentence.

Steve Kechisen
Corrections Counselor II.

**PRE-RELEASE:** Mr. DeFoy has not participated in any form of pre-release programming since his arrival at SCI-Houtzdale.

Steve Kechisen
Corrections Counselor II

**COUNSELOR'S EVALUATION:** Mr. DeFoy, age 48, is a convicted parole violator serving backtime (4o months) on an original 10 to 20 year sentence for Robbery. He currently has a 6 ½ to 3 year detainer sentence for IDSI, Statutory Rape and Corrupting the Morals of a Minor. Mr. DeFoy was refused reparole at his last review and as recorded on 7-21-98 will be reviewed in June 2000.

Mr. DeFoy was received at Houtzdale 5-8-96 from SCI-Dallas. Since his last parole interview, he has earned very good housing/work reports and has consistently done this since his transfer to Houtzdale. However there has been no program involvement since his last review.

Steve Kechisen
Corrections Counselor II

Robert DeFoy, AK1017
Parole Summary
Page -3-



## STAFF RECOMMENDATIONS:

Mr. DeFoy, age 48, is currently serving backtime on an original 10 to 20 year sentence for the offense of Robbery With Accomplice. He has a 6 ½ to 13 year detainer sentence for the offenses of IDSI, Statutory Rape and Corruption Morals of Minor. He refuses to participate in sex offender treatment. Based upon his refusal to participate in sex offender treatment, Staff does not support parole. He was informed of this decision and all aspects of Act 159.

John M. McCullough, Superintendent

5/11/00
_____
Date

JMM:SK:sjh