IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

ROBERT LEE DEFOY,            *

    Petitioner           * C.A. No.

    vs.                  * 00-110 ERIE

Superintendent JOHN M.* District Judge

MCCULLOUGH, Att.         * McLaughlin

General D. MICHAEL       *

FISHER, PENNSYLVANIA  * Magistrate

BOARD OF PROBATION AND* Judge Baxter

PAROLE,                  *

    Respondents          *

* * * * * * * *

DEPOSITION OF

MICHAEL OCILKA

August 16, 2006



Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

1              D E P O S I T I O N

2                    O F

3    MICHAEL OCILKA, taken on behalf of

4    the Petitioner herein, pursuant to

5    the Rules of Civil Procedure, taken

6    before me, the undersigned, Lori A.

7    Behe, a Court Reporter and Notary

8    Public in and for the Commonwealth of

9    Pennsylvania, at the offices of the

10   Keystone Building, Office of Attorney

11   General, 444 East College Avenue,

12   Suite 440, State College,

13   Pennsylvania, on Wednesday, August

14   16, 2006, beginning at 11:45 a.m.

15

16

17

18

19

20

21

22

23

24

25

3

1                    A P P E A R A N C E S

2

3      THOMAS  W.  PATTON,  ESQUIRE

4      Assistant  Federal  Public  Defender

5      1001  State  Street

6      Erie,  PA   16501

7          COUNSEL  FOR  PETITIONER

8

9      SCOTT  A.  BRADLEY,  ESQUIRE

10     Office  of  Attorney  General

11     564  Forbes  Avenue

12     6th  Floor,  Manor  Complex

13     Pittsburgh,  PA   15219

14         COUNSEL  FOR  RESPONDENTS

15

16

17

18

19

20

21

22

23

24

25

4

1                    I N D E X

2

3    WITNESS:  MICHAEL OCILKA

4    EXAMINATION

5       by Attorney Patton            7 - 34

6    EXAMINATION

7       by Attorney Bradley          34 - 38

8    CERTIFICATE                          39

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    EXHIBIT PAGE

2

3                                        PAGE

4   NUMBER      DESCRIPTION          IDENTIFIED

5   A           SCI Houtzdale

6               Psychological

7               Evaluation for Parole      23

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1          OBJECTION PAGE

2

3   ATTORNEY                                    PAGE

4                    NONE MADE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1          P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3    MICHAEL OCILKA, HAVING FIRST BEEN

4    DULY SWORN, TESTIFIED AS FOLLOWS:

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6    EXAMINATION

7    BY ATTORNEY PATTON:

8    Q.      Mr. Ocilka, can you tell us

9    your full name please?

10   A.      Michael George Ocilka.

11   Q.      Spell your last name.

12   A.      O-C-I-L-K-A.

13   Q.      Mr. Ocilka, how are you

14   employed?

15   A.      I'm employed with the

16   Department of Corrections in the

17   State Correctional Institution of

18   Houtzdale in the Psychology

19   Department as a Psychological

20   Services Specialist.

21   Q.      How long have you had that

22   position?

23   A.      I believe seven-plus years.

24   Q.      What did you do before that?

25   A.      I did counseling with a

8

1    private practice in Johnstown,

2    Pennsylvania, Family Practice and

3    Associates. I worked for Cambria

4    County Mental Health. These were

5    part-time jobs. I was an

6    investigator with the Office of

7    Inspector General. I was a case

8    worker with Cambria County Children

9    and Youth Services. I worked in

10    Cambria County Detention Home for a

11    period of time, a brief period with

12    the Cambria County Office on Aging.

13    I think that covers my ---.

14    Q.    Can you give me a rundown of

15    your educational background?

16    A.    Sure. I graduated from

17    Indiana University of Pennsylvania in

18    1974 with a Bachelor's degree in

19    Criminology. I went back to Indiana

20    in 1989 and graduated with a Master's

21    in Counseling.

22    Q.    Could you just give me a

23    general description of what your

24    duties are as a Psychological

25    Services Specialist with the

9

1    Department of Corrections?

2    A.      Sure.   Specifically, I'm a

3    Mental Health Coordinator for the

4    facility, and I oversee a lot of the

5    mental health issues, which includes

6    monitoring the special needs unit,

7    which is a block reserved for inmates

8    with mental health problems.

9    Generally speaking, I perform risk

10   assessments for the Office of Parole.

11        I provide individual

12   counseling for inmates who request

13   it.  I do sex offender treatment

14   group therapy for sex offenders.  And

15   I also do group therapy for special

16   needs sex offenders, which are the

17   guys who have severe mental health

18   problems who low level of

19   intellectual function.

20        Essentially, that's it.  I

21   write a lot of reports and insure

22   that inmates receive adequate mental

23   health services.

24   Q.      Let's talk a little bit about

25   your work in the sex offender group

10

1    treatment.

2    A.       Sure.

3    Q.       Can you give me a general

4    description of the sex offender

5    treatment program?

6    A.       Sure.   There is a therapeutic

7    community at SCI Houtzdale which is a

8    block or a pod of a particular

9    housing unit which houses individuals

10   who have been convicted of sex

11   crimes.   And on that particular

12   block, we run a number of sex

13   offender groups.   And it consists of

14   --- initially individuals come in and

15   they take an orientation for a period

16   of time.

17         Then they get involved in

18   what's called a core group and that's

19   essentially phase two to the program.

20   The core group would run anywhere

21   from 16 to 24 months in length.   And

22   during that period of time the

23   offenders would present a life

24   history, talk about their duty and

25   cycle, deal with aspects of empathy.

11

1          And if at the conclusion, the

2     facilitator believes at the

3     conclusion of a program, all aspects

4     of treatment have been met, the

5     individuals in the group are then

6     assessed by an assessment board,

7     which consists of other

8     psychologists.  And then it's

9     determined if they should issue a

10    certificate in which they would have

11    deemed to satisfactorily completed

12    the program.

13    Q.      In the core treatment phase or

14    phase two, talk about getting a life

15    history from the individual.  Does

16    that life history include asking the

17    individual to provide basically a

18    detail of all the deviate behavior

19    they've engaged in?

20    A.      Ideally, certainly.

21    Q.      In the situation where a

22    person has been convicted of a sex

23    crime, is part of the core treatment

24    having the individual admit their

25    guilt for that crime and admitting to

12

1    the official version of the offense?

2    A.      Yes, that would be accurate,

3    yes.

4    Q.      And where does the official

5    version come from?

6    A.      The official version can be

7    located in the inmate's file.  And

8    oftentimes, if available, we attempt

9    to get the preset investigation which

10   usually has a much more detailed

11   official version.

12   Q.      At any point in the program

13   are inmates granted any kind of

14   immunity from the Attorney General's

15   office or any prosecuting agency that

16   says that the statements they make in

17   the treatment process cannot be used

18   against them in any future criminal

19   proceeding?

20   A.      We advise the inmates that we

21   want to know about the other

22   behaviors which may have been

23   deviant, but as long as they do not

24   provide names or dates, we certainly

25   are not in the position where we

13

1  would be able to pursue that

2  criminally or report that.  So we ask

3  them not to provide names.

4  Q.     Okay.  Are they told that you

5  --- let me put it this way.  When you

6  were doing private counseling, for

7  example in your past, would it be

8  common for you to discuss with the

9  person you were doing your counseling

10  session with the fact that your

11  discussions were privileged and that

12  you would not be --- you would be

13  prevented from revealing any

14  information that they may provide to

15  you to any outside source?

16  A.     Well, I would indicate that

17  there would be, certainly there would

18  be exceptions to that.  The

19  exception, for example, would be if

20  they're suicidal, homicidal and they

21  have an intended victim or if ---

22  being a therapist, one is also a

23  mandated reporter for children and

24  youth.  So in a private practice, if

25  somebody reported a sexual abuse

14

1    situation, I'd be compelled by law to

2    report that.

3    Q.      Okay.  Do you make similar

4    statements to the inmates that are in

5    the sexual treatment program

6    concerning that the conversations

7    they have with you are privileged,

8    and you could only reveal them in

9    situations if ---?

10   A.      Yes.

11   Q.      You told them that you cannot

12   reveal that to anyone?

13   A.      Well, again, there are

14   exceptions.  The exceptions change a

15   little bit in the Department of

16   Corrections.  I mean suicidal,

17   homicidal would remain if they would

18   plan on some sort of --- being

19   involved in some sort of disturbance

20   or anything that would affect the

21   security of the jail, you would be

22   compelled to report.  But again, I

23   would advise them if there are other

24   incidents not to indicate to me names

25   of those particular victims or dates

15

1    and times.

2    Q.        When you're discussing ---

3    going back, assuming the person who

4    is in sex offender treatment program

5    has an actual conviction for a sex

6    crime, would you discuss with the

7    inmate the details of that offense?

8    A.        I would ask them to discuss

9    those with me.  Certainly, because

10   it's essential that we find out the

11   thoughts and the cycle that might be

12   --- which would be leading up to the

13   acting out deviant behaviors.

14   Q.        Then, so they'd have to

15   certainly admit that they committed

16   the offense?

17   A.        Yes, treatment is voluntary.

18   These individuals admit to their

19   offense and come to the program

20   voluntarily.  We do not mandate

21   anyone.  I think the philosophy

22   behind that is that these

23   individuals, being there voluntarily,

24   most likely would be more amenable to

25   treatment and rehabilitation.

16

1   Q.        Is group therapy also a part

2   of the core treatment?

3   A.        Yes.

4   Q.        During the group therapy, do

5   the inmates in the program have to

6   discuss their sex offense of

7   conviction?

8   A.        Yes.

9   Q.        And discuss the details of

10  that offense and their commission of

11  that offense?

12  A.        Yes, in detail, yes.

13  Q.        Okay.  In the group therapy

14  session?

15  A.        Yes.

16  Q.        Okay.  If they will not admit

17  to their offense or conviction, will

18  they be removed from the core

19  treatment phase?

20  A.        Most likely they would.  We

21  have a coordinator of the program.  I

22  would advise that individual that a

23  particular inmate is denying their

24  offense.  And the likelihood would be

25  that they would be dismissed from the

17

1  core phase of the program.

2  Q.      Okay.  Can you generally give

3  me an idea of how many individuals

4  will be in these group sessions, the

5  group therapy sessions?

6  A.      My last group began with 15

7  inmates in the program.  During the

8  course of treatment, there are

9  individuals who drop out for various

10  reasons.  Some get misconducts.  If

11  one gets a misconduct, you're

12  suspended from a program, and I'm

13  down to eight, so around 15.  And the

14  reason for that there's a

15  considerable number of sex offenders,

16  I presume throughout the system.  But

17  I know in our jail the sex offender's

18  therapeutic community block is always

19  full.

20  Q.      Okay.  So each inmate

21  participating in the core treatment

22  phase of the sex offender treatment

23  will have to admit their guilt to the

24  sex offense and discuss it in detail

25  with this group of roughly 15 or so

18

1    other inmates?

2    A.      Yes, sir.

3    Q.      As well as with yourself and

4    any other facilitator in the group?

5    A.      Yes, sir.

6    Q.      Do you facilitate the groups?

7    A.      Yes.

8    Q.      Okay.  As part of your

9    responsibilities as a Psychological

10   Services Specialist, do you sometimes

11   do psychological evaluations for use

12   by the Pennsylvania Board of

13   Probation and Parole?

14   A.      Yes, a significant portion of

15   my job is providing them with these

16   risk assessments or psychological

17   evals.

18   Q.      Okay.  How do you get notice

19   that you need to do an evaluation for

20   a particular inmate?

21   A.      The parole office located in

22   the jail provides the Psychology

23   Department with a list of those

24   individuals for whom they wish to

25   have a psychological evaluation.  My

19

1    supervisor, who's a licensed

2    psychologist manager, will then

3    delegate responsibility as to which

4    psychologist will do which

5    evaluation.

6    Q.        Okay.  Are you involved in

7    doing the actual evaluation?

8    A.        Yes, sir.

9    Q.        Is there a set pattern of

10   tests that you have to administer in

11   doing these evaluations?

12   A.        There are some evaluation

13   tools that are used now but --- and

14   this is just recently.  Up until that

15   time --- let me rephrase things.

16   When I first began my job, we used to

17   administer the MMPI and projective

18   testings and a lot of developmental

19   tests and personality characteristic

20   tests.  But under this new format and

21   this risk assessment, the Department

22   of Corrections didn't feel that those

23   were necessary unless asked for.  And

24   so these recent evaluations, risk

25   assessments, we only use psychometric

20

1  tools if they're requested.

2  Q.      Okay.  You would have first

3  started working for the Department of

4  Corrections sometime in 1998, 1999?

5  A.      In that area, yes, sir.

6  Q.      Okay.  And at that time when

7  you started, when you were asked to

8  do an evaluation, you said you would

9  use some of these tests, the MMPI and

10 that stuff; is that accurate?

11 A.      Yes, sir.

12 Q.      Okay.  Did you have any kind

13 of formal guidelines or checklist of

14 things that, okay, you need to do

15 this test, this test, this test, to

16 complete your evaluation?

17 A.      The guidelines, they weren't

18 rigid as such.  It depended on the

19 individual and what guidance I would

20 receive from my boss, who's the

21 licensed psychologist manager.  And

22 back prior to using the critical risk

23 assessment we used to do testing

24 minimally MMPI on these guys every

25 two years.  If the test was two years

21

1  old, we'd do another one.

2  Q.      Now is a new format being

3  used?

4  A.      Yes, it was felt at one point

5  by the Department of Corrections and

6  psychology that the risk assessment

7  format was more valuable.  And I

8  presume parole was involved.  And

9  they felt that this was more

10  effective for them in making whatever

11  decisions they had to make regarding

12  an inmate.

13  Q.      So how does the new system

14  work, the new risk assessment system

15  work?

16  A.      The new system, we interview

17  the individual and we also evaluate

18  their mental health.  And we do

19  review their medical files to see if

20  they're on psychotropic meds, if

21  they're seeing a psychiatrist.  And

22  we consult with the psychiatrist if

23  they are.  If they're not, then

24  they're considered to be stable, we

25  do what's called a clinical

22

1    interview.  And based upon the

2    information we get in the interview

3    and the information we receive from

4    the case file, from reviewing the

5    case file, we make some

6    determinations.  And those

7    determinations are risk factors based

8    upon factual information we receive

9    and also attenuating factors based

10   upon that same information.

11   Q.      Okay.  Do you then try and

12   give some opinion as to whether or

13   not the person has mental health

14   issues that would cause them to be a

15   potential danger if released?

16   A.      In the report, we would

17   indicate if they had a mental health

18   diagnosis, what meds they're on and

19   any other additional factors like

20   mental health commitments or

21   medications, noncompliance, that sort

22   of thing.  But we don't really and

23   shouldn't make any firm

24   recommendation, such as this

25   individual should not be granted

23

1  parole based upon or should be.  We

2  won't make a recommendation.  We just

3  provide with as much factual

4  information as we can.

5  Q.     Okay.  I'm showing you

6  Petitioner's Exhibit A.

7                    (Petitioner's Exhibit A

8                    marked for

9                    identification.)

10  BY ATTORNEY PATTON:

11  Q.     Does that appear to be a copy

12  of a psychological evaluation for

13  parole that you did on inmate, Robert

14  Lee DeFoy?

15  A.     Yes.

16  Q.     Okay.  And is this under the

17  newer system that we've been talking

18  about, where you do the risk

19  assessment?

20  A.     Yes, sir.

21  Q.     The reports says on the first

22  page, under the heading of Mental

23  Health, it says that Mr. Robert Lee

24  DeFoy carries a mental health

25  stability rating of capital A, which

24

1   indicates that the inmate does not

2   require mental health services at

3   this time; is that correct?

4   A.     Yes.

5   Q.     Is that basically saying that

6   your psychological staff at Houtzdale

7   has decided that, as far as you're

8   concerned, he doesn't need to be in

9   any mental health treatment?

10   A.     That would be based upon ---

11   first, let me say, oftentimes I'm not

12   familiar with these individuals and

13   the test I'm sure has some

14   objectivity in writing this. And so

15   what I'll do is redo the medical

16   files and find out if they are seeing

17   a psychiatrist. And then this

18   interview will also give me

19   information as far as --- I mean,

20   they report if they're on meds or if

21   they're having problems. I ask them

22   about any symptomatology. And then,

23   obviously, I make observations while

24   I'm speaking to them during the

25   dialogue.

25

1    Q.      What is a mental health

2    stability rating?

3    A.      They're four different ratings

4    Department of Corrections uses.  This

5    as indicated A, indicates that there

6    does not appear to be a need for any

7    sort of mental health treatment.

8    Then it goes to B, which means that

9    they have received treatment, but

10   they're now on an inactive mental

11   health roster.  A C indicates that

12   they're in treatment and that they're

13   active on the mental health roster.

14   And then there's a D, which indicates

15   they're in treatment.  They're on the

16   mental health roster, and they're

17   considered to be seriously mentally

18   ill.

19   Q.      From what appears on your

20   report, did your interview of Mr.

21   DeFoy indicate that there was

22   anything wrong with him being on a

23   mental health stability rating of A?

24   A.      According to my report on that

25   particular date, based upon my

26

1   research and based upon a clinical

2   interview, the stability rating of A

3   seemed appropriate.

4   Q.      Okay.  On the second page of

5   that document, there's a heading

6   called Analysis of Current Evaluation

7   Results.

8   A.      Yes.

9   Q.      What generally is supposed to

10  go in that section of the report?

11  A.      We indicate the degree of

12  cooperativeness of the inmate being

13  interviewed.  And we determine if

14  there are any disturbances of thought

15  or mood at that point in time.  And

16  then we also --- if they were aware

17  of mental health problems, explore a

18  little bit about of how much insight

19  they have into their mental health

20  problem.

21  Q.      Okay.  In the first paragraph

22  under heading of Analysis of Current

23  Evaluation Results, the last sentence

24  of that paragraph, does that indicate

25  that your impression based on your

27

1  interview of Mr. DeFoy was that he
2  was not suffering from any
3  significant psychopathology at the
4  time of the interview?
5  A.      Yes.
6  Q.      The next paragraph in that
7  section talks a little bit about Mr.
8  DeFoy denying his guilt for the
9  offense that he was incarcerated in;
10  is that correct?
11  A.      Yes.
12  Q.      Then the third paragraph ---
13  is it accurate to state that that
14  third paragraph is one sentence long
15  that states, since the inmate denies
16  guilt of a sex offense and refuses to
17  participate in sex offender treatment
18  this writer believes that any
19  additional information in that report
20  regarding Mr. DeFoy will be
21  superfluous?
22  A.      Yes, sir.
23  Q.      Why did you feel that it would
24  be superfluous to put any more
25  information about Mr. DeFoy in the

28

1    report?

2    A.      He was convicted of a sex

3    offense.  He was not involved in

4    treatment.  I would have extended the

5    report had he indicated he was

6    involved or admitted to his offense

7    and was in treatment.  However,

8    extended it was to determine how much

9    insight he had what his level of

10   empathy was, how much denial might be

11   remaining in regard to the sex

12   offense.  In this particular report,

13   he's denying his offense.  He's not

14   involved in treatment.  Therefore,

15   none of the other information, which

16   are usually included in such a

17   report, would be necessary.

18   Q.      So you just felt that it would

19   not be helpful to the Board to have

20   any more information about Mr. DeFoy?

21   A.      At that time, no.  It would

22   not be helpful.  Certainly, one of

23   the factors behind this is if we have

24   a convicted sex offender, and that

25   individual is denying their offense

29

1    and vehemently aversive to any type

2    of treatment, their likelihood of

3    being paroled is extremely limited.

4    Q.      Okay.  And so since you note

5    that he is a sex offender and

6    refusing to participate in a sex

7    offender treatment program, would it

8    be fair to say in your statement that

9    any more information would be

10   superfluous was just the recognition

11   of the fact that the guy's not going

12   to get paroled and so putting any

13   more information in than that just

14   doesn't --- as you said, is

15   superfluous, it's just not going to

16   matter?

17   A.      Essentially, yes.

18   Q.      Has it been in your experience

19   in the seven-plus years that you've

20   worked as a Psychological Services

21   Specialist for the Department of

22   Corrections that inmates who deny the

23   sex offense, or even just simply

24   won't take the sex offender treatment

25   program, that they're not going to be

30

1  paroled?

2  A.      In my time with the Department

3  of Corrections, I have never known or

4  learned of an individual being

5  granted parole who denied their

6  offense and was not involved in

7  treatment.  I personally do not know

8  of anyone.

9  Q.      Would it be accurate to say

10  that within the institution, within

11  the therapeutic community there at

12  Houtzdale, it's just understood among

13  the inmates and staff that if you

14  have a sex offense conviction and you

15  don't do sex offender treatment

16  program, you're just not going get

17  released on parole?

18  A.      I would suspect yes.  It's

19  understood that both the inmates and

20  staff would probably arrive at that

21  conclusion.

22  Q.      Do you discuss that with any

23  inmates when you're talking to them

24  about whether they want to be in

25  treatment or why they're in

31

1    treatment, if that's a motivating

2    factor for them to be in treatment?

3    A.    It certainly is discussed

4    because individuals will indicate

5    that they want help. Although,

6    certainly not being naïve we're are

7    aware that some individuals just

8    simply want to be eligible for

9    parole. So that's why they'll get

10   involved in the program. But to

11   answer your question, yes, that is

12   discussed.

13   Q.    You had mentioned that the sex

14   offender treatment program is

15   voluntary?

16   A.    Yes, sir.

17   Q.    If someone has been

18   recommended to participate in the

19   treatment, do you or anyone else

20   involved in the sex offender

21   treatment go out and talk with that

22   inmate just about the program and

23   it's availability and the fact that

24   they've been recommended for it?

25   A.    Yes, the coordinator of the

32

1    program and I'll step back and just

2    provide you with what the procedure

3    is.  If an individual is convicted of

4    a sex offense, the participation in

5    sex offender treatment would be part

6    of their correctional plan.  And the

7    counselor would then send a referral

8    to the coordinator of the sex

9    offender program, and he would

10   interview that particular individual

11   to determine if they're appropriate

12   for the sex offender treatment.

13   Q.       Okay.  So the coordinator of

14   the program would do that?

15   A.       Yes.

16   Q.       And then after that, it's up

17   to the inmate as to whether or not

18   they want to sign up for the program

19   or not sign up?

20   A.       Well, usually at that point in

21   time, they sign a --- and a form is

22   filled out indicating that they wish

23   to participate in the program or if

24   they don't wish to participate in the

25   program.

33

Q.      When you're doing an
evaluation, a psychological
evaluation for parole --- for
example, in Mr. DeFoy's case, it was
stated he's got the mental health
stability rating of A and that based
on your interview you didn't think
he'd have kind of psychopathology
going on at the time.  Is that, for
lack of a better word, your clinical
assessment of, would he have mental
health issues that would need to be
dealt with if he was on parole so
that the Board would know if you
parole this person, some attention
needs to be paid to his mental health
or no attention needs to be paid to
his mental health?

A.      That would not necessarily be
part of that particular area of the
report.  There are --- towards the
end of the report we talk about
treatments summary and there's also
community treatment recommendations.
In that part of the report, I would

34

1    recommend that they be involved in

2    community mental health and with

3    medication compliance monitoring that

4    sort of thing.

5    Q.      Is someone considered to have

6    a mental health --- by definition

7    have a mental health problem if

8    they're convicted of a sex offense?

9    A.      No.

10   Q.      So those are treated as

11   separate items, I guess, for lack of

12   a better word?

13   A.      Well, yes.

14   Q.      Inter-related but separate

15   perhaps?

16   A.      Oftentimes individuals who

17   have been to sex offender programs do

18   have mental health problems.  But

19   conversely, there are those

20   individuals that it's more character

21   pathology than it is any true mental

22   health issue.

23                 ATTORNEY PATTON:

24            Those are my questions.

25   EXAMINATION

35

1    BY ATTORNEY BRADLEY:

2    Q.    I just wanted to clear up.

3    You had talked about that at some

4    point you felt that, I guess it's in

5    the middle of page two, it says

6    inmate denies guilt of sex offense

7    and refuses to participate in sex

8    offender treatment.  This writer

9    believes that any additional

10   information in the report regarding

11   Mr. DeFoy would be superfluous.  And

12   I believe you then identified that

13   there were, if he did admit or would

14   be willing to participate or was

15   participating in sex offender

16   treatment there would be some

17   additional areas to explore in that

18   regard.  Is that the only thing that

19   would have been what you're talking

20   about there in terms of Mr. DeFoy in

21   this case or were there other things

22   that you just simply did not explore

23   because in your mind he wasn't going

24   to get paroled?

25   A.    Each situation provides a

36

1    different direction.  One might go in

2    the report, for example, if one

3    is --- there's a history of violent

4    behaviors, then it might be support

5    impulse control, et cetera, et

6    cetera.  But essentially, with this

7    particular report, this man denied

8    his offense.  He was not going to

9    participate in treatment.  My remark

10   there was based upon the fact that,

11   yes, he was --- my knowledge of how

12   parole operates, they were not going

13   to parole this man.  And therefore,

14   additional information was not

15   necessary.

16   Q.      But given that he was denying

17   and not participating was there, I

18   think was ultimately the question,

19   were there other avenues that could

20   have been explored, but you chose not

21   to?

22   A.      Yes, I chose not to ---

23   lengthening the report would not have

24   benefited him nor myself nor parole.

25   Q.      And that was again --- bear

37

1    with me, was that because he was

2    denying the offense and refusing to

3    participate or that was because,

4    ultimately, it was likely he was not

5    going to be considered for parole or

6    recommended for parole?

7    A.      They have been directly

8    related so he was not going to be

9    involved with parole.  Parole was not

10   going to be granted to this

11   individual based upon my knowledge of

12   the system.  And therefore,

13   additional information just was not

14   necessary.  Maybe if you rephrased

15   it.  I'm not sure what your ---.

16   Q.      I guess what I'm trying to ask

17   is that were there any areas that you

18   believe would have been fruitful in

19   providing more information that you

20   chose not to explore those areas that

21   might have been helpful because in

22   your mind it would have been, for

23   lack of a better term, it would have

24   been a waste of time because you knew

25   the guy wasn't going to be paroled?

38

1  A.        Yes, that's my answer, yes.

2                   ATTORNEY BRADLEY:

3                   That's all I have.

4                   ATTORNEY PATTON:

5                   I have nothing further.

6         Thank you very much.

7

8              *  *  *  *  *  *  *  *

9   DEPOSITION CONCLUDED AT 12:20 P.M.

10             *  *  *  *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMMONWEALTH OF PENNSYLVANIA )

COUNTY OF CAMBRIA               )

C E R T I F I C A T E

I, Lori A. Behe, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness whose testimony appears in the foregoing deposition, was duly sworn by me on said date and that the transcribed deposition of said witness is a true record of the testimony given by said witness;

That the proceeding is herein recorded fully and accurately;

That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

Lori A. Behe, Reporter

NOTARIAL SEAL
LORI A. BEHE, Notary Public
Colver, Cambria County, PA
My Commission Expires July 20, 2010

· PITTSBURGH, PA

· CLEARFIELD, PA

· STATE COLLEGE, PA

· HOLLIDAYSBURG, PA

· ERIE, PA

· OIL CITY, PA

· HARRISBURG, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA 15901
(814) 536-8908

· INDIANA, PA

· GREENSBURG, PA

· PHILADELPHIA, PA

· SOMERSET, PA

· WILKES-BARRE, PA

· CHARLESTON, WV

LAWYER'S NOTES

| Page | Line | |
|------|------|--|
|      |      |  |



PITTSBURGH, PA
HARRISBURG, PA
GREENSBURG, PA
ERIE, PA
INDIANA, PA
HOLLIDAYSBURG, PA
STATE COLLEGE, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.

210 MAIN STREET
JOHNSTOWN, PA 15901
(814) 536-8908

PHILADELPHIA, PA
WILKES-BARRE, PA
OIL CITY, PA
SOMERSET, PA
CLEARFIELD, PA
*CHARLESTON, WV*





## SCI-Houtzdale
## Psychological Evaluation for Parole



| Name: DEFOY, Robert Lee | Inmate #: EU9678 | Closed On : | 6/7/2005 8:09:13 AM |

## Limits of Confidentiality

This document is considered confidential and is not to be read to the inmate nor it is to be quoted by counselor or parole agents for reviews or evaluations. Violation of the confidentiality of this report diminishes staff inmate rapport and endangers the safety of the mental health staff and the correctional institution.

Mr. Robert Lee DEFOY was advised of the purpose of the evaluation and limits of confidentiality, and he signed the Mental Health Informed Consent Document.

## Techniques Previously Administered

| S.No. | Evaluation Date | Evaluation Material |
|-------|-----------------|---------------------|
| 1. | 07/26/1993 | Clinical Interview |
| 2. | 03/23/1984 | MMPI - 2 |
| 3. | 07/26/1993 | Case file reviewed |
| 4. | 07/26/1993 | Mental Health Evaluation |
| 5. | 03/23/1984 | WRAT |
| 6. | 03/23/1984 | BETA |
| 7. | 07/26/1993 | Human Figure Drawing |
| 8. | 07/26/1993 | Bender Recall |
| 9. | 07/26/1993 | Bender Visual Motor Gestalt |

## Techniques Administered

| S.No. | Evaluation Date | Evaluation Material |
|-------|-----------------|---------------------|
| 1. | 06/03/2005 | Clinical Interview |
| 2. | 06/03/2005 | Clinical Risk Assessment (Attached) |
| 3. | 06/03/2005 | Mental Health Evaluation |

## Mental Health

Mr. Robert Lee DEFOY carries a Mental Health Stability Rating of "A",which indicates that the inmate does not require mental health services at this time.

Psychiatric/Mental Health History says that the inmate denies any history of Mental Health treatment, and does not currently require any Mental Health services.

History of Suicidal Behavior:

Denies suicidal behaviors. None known at this time.

---

The contents of this report are confidential and the information contained in it shall not be reviewed by or shared with persons who are not memt                    eam.

Name: DEFOY, Robert Lee            Inmate #: EU9678            Closed On :    6/7/2005 8:09:13 AM

## Referral and Background Information

Mr. Robert DEFOY is a 53-year-old man. Records do not indicate any prior adult convictions. There is no juvenile history reported. Verified problem areas listed at classification include Alcohol, Assault and Sexual. IQ was listed as 99 in the Average range. Wide range achievement testing yielded a reading grade of 6.9, spelling of 5.7 and math of 5.3. There are no misconducts reported for the preceding twelve(12) months.

No misconducts

## Analysis of Previous Evaluation Results

This writer used the results of two separate personality assessments, as one of the assessments was quite old, dated 1984. The results suggested he" is impulsive and ungiving. He fails to profit from past experiences, good or bad. Phallic preoccupation is suggested. The Human Figure drawings projectively indicate maladjusted behaviors and sexual insecurity."

## Analysis of Current Evaluation Results

Mr. Defoy easily engaged in the interview process, which allowed rapport to be quickly, and easily established. He maintained a clear stream of thought and his affect was congruent to thought content and situation. He denied any symptoms of a major mood disorder or thought disorder. He also denied suicidal/homicidal thoughts at this time. Interview impressions were not indicative of significant psychopathology at this time.

Asked about the offense for which he is incarcerated, Mr. Defoy emphatically denied any responsibility or guilt. He claimed the allegations were fabricated by a stepdaughter as directed by the child's mother. This is the same version of events he has maintained since his arrest in this matter. He added that his legal appeal of guilt remains in the judicial system at the state level in the Supreme Court. Since Mr. Defoy denies guilt he verbalized that he has no intention to participate in sex offender treatment at this time. He is aware this will impede his chances of earning parole.

Since the inmate denies guilt of a sex offense and refuses to participate in sex offender treatment, this writer believes that any additional information in the report regarding Mr. Defoy would be superfluous.

## Risk Analysis

Mr. Robert Lee DEFOY displays the following Risk Factors:

| S.No. | Risk Factors |
|-------|--------------|
| 1. | History of Drug and Alcohol abuse and dependency. |
| 2. | Failure(s) on prior release(s) (parole, probation, etc). |
| 3. | History of violent offenses. |
| 4. | Significant criminal history and variety of offenses. |
| 5. | Current sex offense and/or prior sex offense(s). |
| 6. | Family factors that include criminality and psychological problems. |
| 7. | History of juvenile offending. |
| 8. | School maladjustment (special education, LD, ADHD, MR, truancy, expulsion). |
| 9. | Anger management problems. |
| 10. | Unstable employment history. |
| 11. | History of impulsivity. |
| 12. | History of injuring victims. |

The contents of this report are confidential and the information contained in it shall not be reviewed by or shared with persons who are not members of the treatment team.

Version : 1.0

Name: DEFOY, Robert Lee                Inmate #: EU9678                Closed On :    6/7/2005 8:09:13 AM

| S.No. | Risk Factors |
|-------|--------------|
| 13. | Personality Disorder (DSM IV) criteria |
| 14. | Denial, lack of remorse, poor insight. |
| 15. | Never married/unstable relationship history. |

Mr. Defoy admitted that he abused alcohol in the past but denied the label of alcoholic. He said that he did not use drugs of any kind at any time. He indicated that he had violated parole on three different occasions while serving a prior sentence for armed robbery. The inmate has a long and quite extensive history of both juvenile and adult criminality. His offense history dates back to 1963 and includes numerous juvenile placements and adult incarcerations. He stated that he was in special education programs when he attended school. He quit school while in tenth grade. He claims to have earned a GED during an earlier incarceration at SCI- Dallas. This apparently has never been verified. Mr. Defoy claims to have been married three times. He has two adult children who reside in Florida. He stated that he does not maintain contacts with family members but believes that several of his brothers have also been incarcerated.

## Risk Attenuators and Treatment Summary

Mr. Robert Lee DEFOY displays the following Risk Attenuators:

| S.No. | Risk Attenuators |
|-------|------------------|
| 1. | Good institutional adjustment with no misconducts within the last year. |
| 2. | Over 35 years old. |
| 3. | Adequate literacy skills. |

Mr. Defoy has been behaviorally non-problematic while incarcerated. He is presently 53 years old and claims that his literacy skills are satisfactory.

Staff reported that the inmate remains misconduct- free but has failed to address the goals of his correctional plan.

## Community Treatment and Risk Management Recommendation

If granted parole the inmate should become involved in a sex offender treatment program.

The inmate should refrain from drug and alcohol use at all times. He should not have any unsupervised contacts with minor children.

_signature_

Ocilka, Michael G

Psychological Services Specialist

_signature_ Francis J. Schuster, LPM

Schuster, Francis J

Licensed Psychologist Manager

PA License # PS004385-L

The contents of this report are confidential and the information contained in it shall not be reviewed by or shared with persons who are not members of the treatment team.

Version : 1.0