IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT LEE DEFOY,
     PETITIONER

    V

SUPERINTENDENT JOHN M.
McCULLOUGH, ATTORNEY GENERAL
D. MICHAEL FISHER,
PENNSYLVANIA BOARD OF
PROBATION AND PAROLE,
    RESPONDENTS

:
:
:
:
:
:
:
:
:
:
:
:

CA. NO. 00-11 ERIE
DISTRICT JUDGE McLAUGHLIN
MAGISTRATE JUDGE BAXTER

DEPOSITION OF:  BENJAMIN MARTINEZ

TAKEN BY:     PETITIONER

BEFORE:     DONNA E. GLADWIN, RPR
        NOTARY PUBLIC

DATE:     NOVEMBER 9, 2006, 1:59 P.M.

PLACE:     PENNSYLVANIA BOARD OF
        PROBATION AND PAROLE
        1101 SOUTH FRONT STREET
        HARRISBURG, PENNSYLVANIA

APPEARANCES:

   BY:  THOMAS W. PATTON, ASSISTANT FEDERAL PUBLIC DEFENDER

      FOR - PETITIONER

   OFFICE OF THE ATTORNEY GENERAL
   BY:  SCOTT A. BRADLEY, SENIOR DEPUTY ATTORNEY GENERAL

      FOR - RESPONDENT



2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

1                            WITNESS

2              NAME                    EXAMINATION

3     BENJAMIN MARTINEZ

4          BY MR. PATTON                    3

5          BY MR. BRADLEY                   40

6

7

8

9                                                    .

10                           EXHIBITS

11    EXHIBIT NO.                  PRODUCED AND MARKED

12    A.   PAGE FROM PROCEDURE MANUAL            27

13

14

15

16

17

18

19

20                                                 .

21

22

23

24

25

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that reading, signing, sealing, certification and filing are hereby waived; and that all objections except as to the form of the question are reserved to the time of trial.

BENJAMIN MARTINEZ, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. PATTON:

Q    Could you tell us your name, please?

A    Benjamin A. Martinez.

Q    My name is Tom Patton.  I represent Robert DeFoy, who's the Petitioner in the case that we're here on today.

A    Okay.

Q    I'm going to be asking you a series of questions. If you don't understand any of my questions, just please ask me to repeat them or to try and clarify.

A    All right.

Q    Okay.  How are you currently employed?

A    I'm currently a board member.

Q    With the Pennsylvania --

A    Pennsylvania Board of Probation and Parole.

1    Q    How long have you been a board member?

2    A    I'm serving my second six-year term that commenced

3    July of 2005.

4    Q    Okay.

5    A    I don't have the exact date.  Sorry.

6    Q    Okay.  So you've been with the Board a little over

7    -- you've been a Board member for --

8    A    I've been a Board member.  This is my second term.

9    Q    So somewhere over six years?  So seven, eight

10   years?

11   A    Give or take.

12   Q    Okay.  Did you have any positions with the Board

13   before you became a member?

14   A    I've had a variety of positions, and I believe I

15   began employment May of 1984.  I've worked as a parole

16   agent, hearing examiner, parole supervisor, as chairman of

17   the parole Board, and as chief hearing examiner.

18   Q    As a Board member could you give us, in general, a

19   break down of what your responsibilities are?

20   A    My primary responsibilities are making decisions as

21   to the parole or reparole of inmates in the Department of

22   Corrections.  I'm also involved in the policy making end of

23   the agency.  Those are probably my primary responsibilities.

24   Q    Okay.  With regard to making parole or reparole

25   decisions, could you explain the process that you go

1   through, just in general terms, of addressing a case and the
2   steps that you go through in making the ultimate decision of
3   whether or not an inmate will be paroled or reparoled?·

4       A    Okay.  I'll try to generally describe that.
5   Generally I'm presented with a case that has been prepared
6   by our institutional parole staff and with documentation
7   provided from a variety of sources, including the Department
8   of Corrections or county facilities.  And it's in line with
9   the requirements of Act 19 of the Parole Act.  I won't go
10  into the detail on that, but generally there's documentation
11  prepared for me.

12       There's the actual case folder that I have before
13  me.  I generally make some preparatory notes and either
14  interview the person in person, either through video
15  conference or through a paper review when I haven't been
16  involved in the interview myself.  And I conduct those
17  interviews either in person or in panels of two involving
18  myself and another hearing examiner or in video conferencing
19  involving myself and a hearing examiner.

20       Q    And after the interview is concluded do you -- how
21  do you reach your decision on what your recommendations --
22  or what your vote is going to be?

23       A    I consider a -- a host of factors, and I cover all
24  the mandatory factors that -- that we're obligated to
25  consider under Section 19 of the Parole Act.  And it's tough

1    to give a specific answer because it -- I go on the merit of

2    each individual case.

3        But I consider essentially things such as the

4    offense itself, prior history, his or her comportment while

5    incarcerated, program participation.  I can give you a whole

6    laundry list, how the person has presented him or herself at

7    the interview, whether I sense that he or she has exhibited

8    benefits from programs that they participated in, whether

9    there was remorse.

10        I consider recommendations of the sentencing judge,

11   the District Attorney, any input provided by the victims, so

12   forth.  And it's tough to give you a -- each case is

13   individual, so it's tough to give you much more than that

14   unless you want me to go through more specifics under Title

15   19.

16   Q    Well, Title 19 requires you to look at the type of

17   the offense involved and any adjustments the inmate's made

18   in incarceration and protecting the public, general --·

19   general policy considerations that you have to consider,

20   would that be accurate?

21   A    Yeah.  With the ultimate goal to make an assessment

22   whether there will be a risk to -- or there will be a risk

23   to the public by releasing this offender back into the

24   community.  That's the ultimate goal of our assessment of

25   the individual generally.

1    Q    Has the Board created guidelines that can be used
2    to at least help in making the parole or reparole decision?

3    A    We've had guidelines, and I may be off on some of
4    these dates, since, I believe, 1983. We've had guidelines
5    that we use to assist us in our decision making. We're not
6    bound by those guidelines, but I believe since then we've
7    been using them.

8         They've been revised over the years. But the last
9    revision being, and I'm a little fuzzy on -- on that. I
10   can't recall when we last revised them, but they've been
11   revised over the years. They are in line with -- with the
12   requirements of Title 19, or Section 19 of the Parole Act.

13        But the goal of the -- of our assessment of the
14   case continues to be the public safety interests and whether
15   there are risks to the community.

16   Q    When you are reviewing a file and trying to reach
17   your decision as to whether or not you're going to vote for
18   parole or reparole, are the guideline -- the Board's parole
19   or reparole guidelines something that you would generally
20   review and consider in making that decision?

21   A    Yes, generally.

22   Q    Do you have -- does the Board keep any type of
23   statistics on how often the parole or reparole decision
24   tracks the recommendation of the guidelines?

25   A    Yes.

1    Q    Generally speaking do you know roughly how often

2    the actual parole or reparole decision tracks the

3    recommendation of the guidelines?

4    A    It hovers, I believe, around 80 percent is my

5    understanding.  Now, I'm not as specific on that as I used

6    to be, but it's my understanding that it hovers around that

7    percentage.  And the intent of the guidelines are to reflect

8    -- generally reflect our practices so that like offenders

9    receive like decisions.

10    Q    So would it be fair to say -- well, let me ask you

11    this.  Part of your duties you said were making policy type

12    decisions.  Would some of those policy decisions be on

13    amending the -- the parole or reparole guidelines and trying

14    to tweak them to come into line with the Board's policies

15    and practices?

16    A    Yes, yes.

17    Q    And so is it accurate to say when you say that the

18    percentages hover around 80 percent that in roughly 80

19    percent of the cases if the guidelines recommend parole, the

20    person would be paroled; but if the guidelines recommended

21    no parole, they would not be paroled?

22    A    Each case is still decided on its individual

23    merits, but I think it's accurate to say that the guidelines

24    generally reflect our practice.  So I would think yes.

25    Q    Okay.  I believe you also mentioned that you get

1   some input from the Department of Corrections --

2       A    Correct.

3       Q    -- regarding the Department's opinion as to whether

4   or not the inmate should or should not be paroled or

5   reparoled; is that correct?

6       A    Yes.

7       Q    In -- is that something that you take into

8   consideration when you are deciding on what your vote is

9   going to be as far as release or non-release?

10      A    Yes.

11      Q    And is that something -- strike that.  In the·

12  Department of Corrections, the information that they

13  provide, does that also contain information about

14  programming that the -- the inmate has participated in or

15  has not participated in?

16      A    Yes.

17      Q    Generally speaking, and I know it's tough, but I

18  just want to keep staying on generally speaking, if the

19  parole guidelines would recommend parole or reparole and the

20  Department of Corrections also would recommend parole or

21  reparole, would -- would it generally be the case that the

22  person would be paroled or reparoled?

23      A    It's tough to say because each case rests on its

24  individual merits.  I guess it's tough for me to answer

25  that.  But I would think a better than 50/50 chance the

1   results would probably be to parole in that kind of

2   scenario.  My hesitation's on the individuality of each

3   case.

4       Q    Sure.  Is one thing you consider when you're making

5   your decision as to whether or not to release the individual

6   or not to release the individual if -- is whether or not the

7   individual has an approved home plan to be released to?

8       A    Yes.

9       Q    If the inmate does not have an approved release

10  plan, would you feel comfortable in voting to release the

11  individual?

12      A    Again, it depends on -- on the case.  In some -- in

13  some cases, again, case by case, that would be an important

14  consideration.  In others we could parole directly to a

15  community correction center.  So, again, my hesitation is on

16  the uniqueness of each case.

17      Q    Do you guys have the ability to direct parole to a

18  -- to a community confinement center?

19      A    Right.

20      Q    For however period -- period of time you feel is

21  necessary for that person to be there?

22      A    We generally leave the period of time up to the

23  Department of Corrections, but in certain individual cases

24  we designate a minimum amount of time at such a facility.

25  We can also parole directly to an in-patient facility, drug

1    and alcohol facility, mental health facility, that sort of

2    thing.

3         Q    In the parole revocation and then reparole context

4    --

5         A    Um-hum.

6         Q    -- would it be accurate to say that when someone

7    has their parole revoked that they will get what's generally

8    referred to as a green sheet documenting the Board's action

9    revoking their parole?

10        A    Yes.

11        Q    If the Board feels it appropriate, can the Board

12   direct in the green sheet revoking parole particular

13   programs the Board would like to see the inmate participate

14   in?

15        A    Yes.

16        Q    If -- if that is done and the Board itself in a

17   green sheet indicates that there are particular programs

18   that they would like to see the inmate participate in, when

19   the inmate comes up for reparole will you look at whether or

20   not the inmate has participated in those programs?

21        A    Sure.

22        Q    Is -- is the fail -- would the failure to

23   participate in any programs that the Board indicated that

24   they wanted the inmate to take into account, would that

25   failure most likely have an impact on the decision of

1    release or non-release?

2        A    Again, generally speaking yes.  I think that would

3    -- the failure to comply with some recommended program would

4    have some impact.

5        Q    Okay.

6        A    Perhaps a significant impact depending on the case.

7        Q    Okay.  And can that be independent of whether or

8    not the Department of Corrections in its own prescriptive

9    programming would -- would normally put an inmate in that

10   program?

11       A    Yes, yes.

12       Q    So is it fair to say that the Board can,

13   independent of the Department of Corrections, indicate that

14   the Board wants an inmate to participate in a program

15   regardless of whether or not the Department of Corrections

16   wants the inmate to participate in the program?

17       A    I think that's accurate, yes.

18       Q    If the inmate fails to participate in a program

19   that the Board has said they want to see the inmate

20   participate in, can the inmate still be released by the

21   Board?

22       A    Yes.

23       Q    Okay.  Would it be fair to say that it would be

24   harder for the inmate to get released if they hadn't

25   participated in the program?

1    A    I would think in more cases than not if they failed

2    to participate in a program recommended by the Board that

3    more chances than not it would significantly impact on a

4    decision.  It would jeopardize their -- their likelihood of

5    being reparoled.

6    Q    Okay.  Does the Board occasionally require inmates,

7    if they're revoking parole, to participate in a sex offender

8    treatment program?

9    A    Yes.

10    Q    Okay.  And the sex offender treatment program,

11    that's run by the Department of Corrections; is that

12    correct?

13    A    Yes.

14    Q    Is -- well, I understand under current law there's

15    certain individuals that are convicted of certain sex

16    offenders now who are not even eligible for parole if they

17    don't --

18    A    Yes.  And I think -- again, don't hold me on this

19    date, December of 2000, any time after that they must .

20    participate in sex offender treatment.

21    Q    Okay.  When you get a case where the inmate has

22    been convicted of a sex offense does the file for some -- in

23    some way distinguish for you whether or not this is an

24    individual who's, by law, mandated to do a sex offender

25    treatment program to be eligible for parole versus it's an

1    inmate who has a sex offense but is not required under law
2    to do sex offender treatment to be eligible for parole?
3        A    You know, I -- my recollection is that there's --
4    there's nothing that sticks out in my mind that indicates
5    that's -- that it's a mandatory -- that it's that kind of
6    case that you've described.

7        I, by practice, take a look at when the offense
8    occurred and use December of 2000 as sort of the line of
9    demarcation.  But I don't recall anything that's flagged for
10   us indicating it's a mandatory case or not for sex offender
11   treatment.

12       And I think it's my understanding -- I believe the
13   practice now is that that would get -- if a person were
14   granted parole and did not participate in that treatment,
15   that will get caught during the chairman's certification
16   process.

17       There's a process that's undertaken before the
18   final approval for parole where all of those mandatory
19   requirements are checked.  And I think that's where it gets
20   caught.  But on my level I don't recall anything that
21   designates that case as a mandatory sex offender treatment
22   case.

23       Q    Okay.  In your experience when you get a file to
24   review, a file where the offender has been -- the inmate has
25   been ordered to undergo a sex offender treatment program, is

1    that something you will always check to see whether or not

2    that has actually been done?

3        A    Absolutely, yes.

4        Q    If you look at the inmate's file and see that the

5    inmate has not completed the sex offender treatment program,

6    will you vote to release the inmate?

7        A    In the vast majority I would say that would -- that

8    would greatly impact on their chance of being paroled.  I'd

9    be hesitant to recommend them for parole in that scenario

10   generally.

11       Q    Okay.

12       A    More likely than not.  Far more likely than not.

13       Q    Okay.  Would that be true even if the parole

14   decision making guidelines recommended release or reparole?

15       A    Yes.

16       Q    And would that be true regardless of whether or not

17   the Department of Corrections recommended release?

18       A    Yes, with some hesitation.  Because there again

19   every case is on its merit.  But that is a substantial

20   hurdle for a sex offender who has not participated in sex

21   offender treatment to be recommended parole.

22       Q    Or reparole?

23       A    Or reparole.  I'm sorry.

24       Q    Either case?

25       A    Right.

1    Q    Can you recall specifically any case in which you

2    have actually voted to release an inmate who has a sex

3    offense who had not participated in sex offender treatment?

4    A    My recollection is yes.  I do recall -- I don't

5    know if the ultimate decision was to parole, but I do

6    recall, on probably more than one occasion, where I've

7    recommended parole in that scenario.

8         And I don't -- I absolutely don't remember the

9    name, but I believe it was an offender nearing the end of

10   his maximum expiration term.  And I believe it was an

11   offender in his early teens, where the offense occurred in

12   his early teens, and the victim was also within a -- around

13   a four year period where the offense occurred.

14        It was, I believe, that sort of scenario, and it

15   was nearing the end of his sentence.  And in my judgement I

16   recommended parole for some sort of community -- transition

17   back into the community before his maximum expiration term.

18        I think I've done it before also on -- and this

19   goes back years, on mental health -- on at least one mental

20   health case.  Again, nearing the end of his sentence where I

21   thought some -- it was in the interest of community to at

22   least have some sort of supervision prior to the expiration

23   of the max and some sort of trans -- gradual transition back

24   to society.

25        There have been some in my history where I've

1    recommended.  Those two scenarios come to mind, jump out at

2    me.

3        Q    Okay.  Do you recall whether or not those

4    individuals were actually paroled?

5        A    No, no.

6        Q    After you cast your vote in a case -- and is it

7    accurate to say that in -- for you, you actually cast a vote

8    either in favor of release or in favor of non-release?

9        A    I can say -- if I understand your question right,

10   in that sort of scenario where a person didn't participate

11   in sex offender treatment I have cast votes to parole.

12   They're unique cases, but I have done that in the past.

13   That's my recollection.

14       Q    After you would -- you would make that vote what

15   process does the file then go through?

16       A    It would continue until there were at least five

17   Board -- or the majority of the Board voting to parole the

18   individual or to not parole them.  I recall in all the

19   scenarios I was not the final vote.  So I can't tell you how

20   many of those cases ended up.  But it continues through the

21   process until it achieves the required number of votes to

22   either parole or deny parole.

23       Q    So after you get done with the file, be it in the

24   sex -- the two cases that you've talked -- talked about with

25   the sex offender issue.

1    A    Um-hum.

2    Q    Or any other case after you review the file and

3    either participate in the interview or just do a file review

4    and cast your vote, I guess if your vote puts the person in

5    the majority, does something different happen than if your

6    vote is early enough in the process that there's not either

7    a majority for release or non-release?

8    A    I don't know if I understand the question.

9    Q    Okay.  There has to be a majority of Board members

10   either voting --

11   A    Correct.

12   Q    -- in favor of release or in favor of non-release;

13   is that correct?

14   A    Correct, yes.

15   Q    If you are the -- is there any particular order the

16   Board members get the files?

17   A    No, not to my knowledge, no.

18   Q    So you may be the first one or you may be the fifth

19   or sixth one?

20   A    I would be the first one if I were the interviewer,

21   the actual interviewer.  But I don't -- I'm sure there's

22   some processing logic, but there's no particular order that

23   I'm aware of.

24   Q    Okay.  So if -- if you're -- say you do the

25   interview, and so you're the first person -- the first Board

1    member who will vote.

2        A    Correct.

3        Q    Would it be accurate to say that that file is then

4    going to be circulated to other Board members?

5        A    It will continue until it has the requisite number

6    of votes either to -- majority either to parole or to deny

7    parole or reparole.

8        Q    What happens when it hits that -- that majority

9    number, be it either to parole or reparole?

10       A    Then it's processed accordingly for the person to

11   either be released or informed of the decision.

12       Q    Do you ever get any feedback as to whether or not

13   -- in the individual case where you vote early in the

14   process to ultimately find out what happened?

15       A    Not -- not typically, no.  And I can't recall of a

16   case where I asked to find out how it turns out frankly, not

17   in my recollection.

18       Q    Okay.  In the two cases that you singled out that

19   you could remember where you had voted for release even

20   though an individual had not participated in sex offender

21   treatment, do you recall -- in those cases have the

22   individuals been told that they needed to participate in sex

23   offender treatment?

24       A    Yes.

25       Q    And from your explanation of the two cases would it

1  be accurate to say that you saw these individuals as both

2  being close to their maximum dates where they were going to

3  be released anyway?

4    A    Yes, that's my recollection.

5    Q    And would it be fair to say your logic was it would

6  be better for these individuals to have some supervision

7  while they were out of the institution instead of being

8  released from the institution and then have absolutely no

9  supervision?

10    A    That's my recollection, that the cases that I

11  recall -- there may have been others, but the two that come

12  to mind right away, as I recall they were nearing their --

13  their maximum expiration date.

14    Q    Okay.

15    A    Now, there may have been others.  I process

16  literally thousands a year, so -- but those two jump to

17  mind.

18    Q    Has the Board promulgated any policies regarding

19  what procedures it will follow in cases in which an inmate

20  is required to participate in sex offender treatment?

21  Meaning that you're told that there's any particular way you

22  have to consider that fact versus the other facts you take

23  into consideration?

24    A    We receive training over the years and literature

25  regarding sex offender treatment and -- and studies and

1    research, but I don't believe we've ever developed specific

2    policy, if I'm understanding your question right.  I don't

3    believe we have.

4         Q    Okay.

5         A    Maybe you could rephrase it just so I'm sure I know

6    what you mean.

7         Q    Any formal policies that said when you get a file

8    that involves an inmate who has been directed to participate

9    in the sex offender treatment program that there are certain

10   steps that you are to take depending on whether the inmate

11   has or has not participated in the program?

12        A    No, not to my recollection, no.

13        Q    Okay.  Have you had any meetings as the Board and

14   discussed just in general policy terms how you as a Board

15   would take into consideration an inmate's participation or

16   lack of participation in the sex offender treatment program?

17        A    Not in policy terms, no.

18        Q    Any meetings in -- any discussions regarding --

19   rather than writing policies, just in general as a Board,

20   how you were going to approach the sex offender treatment --

21   or sex offenders and whether they would be released or not

22   released based on their participation in treatment?

23        A    Not with that specific issue.  Again, I've attended

24   a good deal -- a number of trainings that deal with sex

25   offenders, but no meetings that I recall that that was the

1   specific issue for the Board's discussion.  We have

2   speakers, and we have trainings that we attend and plenty of

3   literature, but not to my recollection.

4        Q    The training and the literature that you've

5   received on the issue, is that training on how the sex

6   offender treatment program actually works in Pennsylvania or

7   just the theories behind sex offender treatment?

8        A    General theories type training, yeah.  Also we've

9   had trainings on the approaches of certain treatment

10  providers, that sort of thing.  Some of the national trends

11  also with supervision of sex offenders, different types of

12  sex offenders, that sort of thing.

13       Q    Would it be fair to say that the failure to

14  participate in the sex offender treatment program would make

15  it at least very difficult for an inmate to be released on

16  parole or reparole?

17       A    I think that would be accurate.

18       Q    Even if everything else is indicating parole

19  guidelines and Department of Corrections recommendations?

20       A    I think there would be a more -- more of a

21  likelihood that a person would not be granted parole in that

22  scenario.  But, again, each case is on its individual merit.

23       Q    Okay.  So without you seeking input on the -- the

24  ultimate outcome of a case you voted on, you have no way of

25  knowing or tracking whether or not somebody who you voted

1    for release on actually ends up getting released or not?

2        A    I'm sure there's a mechanism that we could come up

3    with.  It may be tedious.  It may involve actual hands·on

4    going in the file rooms and -- but I'm not aware of any

5    process that would give those sort of results.  What you're

6    asking, can we tell of cases that I voted on how many were

7    actually paroled, that sort of thing, I'm not aware of any

8    process we have that gives us that data.

9        Q    Okay.  Are you aware of any statistics or data that

10   the Board keeps on the parole or reparole rate of sex

11   offenders?

12       A    That's a good question, and I'm not aware of any

13   data off the top of my head.  I haven't been in the position

14   where I -- where I'm privy to that information at this

15   point, but I'm not aware of any data.

16           There may be -- that data may be collected

17   unbeknownst to me, but I'm not aware of that occurring at

18   this point.  So how many sex offenders -- what's the percent

19   of sex offenders that are paroled each year.

20       Q    Right.

21       A    What's the percentage of sex offenders that don't

22   complete treatment that are paroled each year.  I'm not

23   aware of that data and that statistic being tracked.

24       Q    Okay.  Are the files that you get to review, are

25   they highlighted in any way as to whether or not the inmate

1    is a sex offender or not a sex offender?

2        A    They're highlighted -- the instant offense is what

3    we designate violent or non-violent; but, no, not whether

4    they're sex offenders or not.  Of course in the file once

5    you get into the guts of the file, but not flagged right

6    away, no.

7        Q    Okay.  Now, obviously there are other programs that

8    the Board can recommend that an inmate participate in other

9    than just the sex offender treatment program; would that be

10   accurate?

11       A    Yes.

12       Q    And if -- if the Board has indicated other

13   programs, such as anger management, that they want an inmate

14   to participate in, when you're looking at a reparole file

15   would you look to see whether or not the -- the inmate did,

16   just for example, the anger management program?

17       A    Yes, yes.

18       Q    And that would be something that would go into the

19   mix for you when you would be making your decision?

20       A    Yes.

21       Q    Okay.  Would it be fair to say that while there are

22   a number of different programs that inmates can be ordered

23   to take, that the sex offender program and participation in

24   the sex offender program is looked at with more care than

25   participation in other types of programs?

1      A    Depending on the circumstances of the case, if the
2   primary offense was a sex offense, I would say that that's
3   accurate.  There are some cases where there's a history of
4   sex offense that may perhaps go back a substantial amount of
5   time or that may not be our primary consideration.  But if
6   that's the instant offense, then I would say yes.

7      Q    All right.  Would the same hold true if the
8   original offense was a violent offense but not a sex offense
9   but the reason for violation of parole was the commission of
10  a sex offense and then the Board would order participation
11  in sex offender treatment as a consideration for reparole?

12     A    I would say more likely than not, yes.  The Board
13  would likely direct that sex offender treatment be part of
14  the programs that the -- the inmate would have to
15  participate in.

16     Q    And participation in that particular program, the
17  sex offender treatment program, is probably going to carry
18  more weight, either positive or negative, than participation
19  in other programs recommended by the Department of
20  Corrections just in the prescriptive programming plan?

21     A    Again, case by case, but I would say generally that
22  would have a significant impact.  That would be the -- one
23  of the primary focuses of our assessment when we consider
24  the case.

25     Q    Has the Board promulgated an internal set of rules

1    and guidelines for parole agents and hearing examiners to

2    follow in just doing their day-to-day jobs of preparing

3    files for review by the Board?

4        A    Yes.

5        Q    Okay.  And would it be fair to say that when we

6    talk about agents, the agents can be broken up into what I

7    would refer to as institutional parole agents versus field

8    agents?

9        A    Yes.

10       Q    And are the institutional agents then, are they

11   involved in getting the file put together and gathering the

12   information that you would need as a member to review in

13   making your decision?

14       A    Yes.

15       Q    And generally speaking is one area that the

16   institutional agent should be working on with the inmate is

17   getting the release plan put together for the inmate?  .

18       A    Correct.

19       Q    And once the agent works with the inmate to try and

20   get -- get a release plan together, such as where is the

21   inmate -- where would he live, where would he work, that

22   those plans then get sent out to a -- the appropriate field

23   office for a field agent to go out and confirm that that's a

24   suitable place for the inmate to live or it's a suitable

25   place for the inmate to work?

1    A    Yeah, that's accurate.

2    Q    But has the Board indicated that there are certain

3    situations under which a -- an institutional parole agent

4    does not need to send the release plan out to a -- to a

5    field agent for the field agent to do an investigation?

6    A    I can't think of a scenario off the top of my head

7    where there would be a -- a plan submitted, if I understand

8    your question, a plan submitted by an inmate that wouldn't

9    require the field investigated.  Is that what you're asking?

10    Q    Yeah.

11    A    I can't recall of any scenario.  If a plan is

12    submitted, the field would investigate it.

13    Q    But there's some instances where the -- the

14    institutional agent is not even required to submit it to a

15    field agent for investigation?

16    A    I guess I'm -- there's circumstances where the

17    inmate requests to serve his or her entire sentence, in

18    those circumstances.

19    Q    Okay.

20    A    I can't recall any other off the top of my head.

21    (Page from procedure manual was produced and marked

22    as Deposition Exhibit A.)

23    Q    Mr. Martinez, I'm going to show you what was marked

24    as Exhibit A.  It was provided to me by Mr. Bradley.  My

25    understanding is this comes from the Board's procedure --

1    internal procedure manual?

2         A    Out of our manual, okay.

3         Q    And you're specifically looking at two exceptions

4    for providing release plan for Board interview?

5         A    Yeah.

6         Q    Can you just take a look at that?

7         A    Okay.  Okay.  And these, I think, have been revised

8    recently, but I reviewed those, and I think it is accurate.

9    Yeah, there are certain circumstances, for example, when the

10   offender indicates he wants to serve his max, refuses to

11   attend the parole interview, okay.

12        And -- yeah, this refreshes my recollection.  We

13   have made exceptions to where the field staff would not have

14   to investigate the plan.  And I think these are generally

15   circumstances where generally there would not be a

16   likelihood that the offender would be paroled or reparoled,

17   okay.

18        Q    Okay.  So would it be fair to say that as you just

19   mentioned, the specific six circumstances that are listed

20   under 2-A are circumstances under -- that are -- which if

21   they are present, it's very unlikely that the inmate is

22   going to be paroled?

23        A    I would say that's accurate.

24        Q    And so the reason the Board is then telling the

25   institutional agents that you don't need to send this out

1    for a field interview is to basically conserve resources?

2        A    Right.  And there are some resource issues.  And I

3    think we implemented that in the not too distant future --

4    past, yes.

5        Q    Okay.  And one of the six specific instances is No.

6    6.  Actually it's offender refuses to follow DOC

7    prescriptive programming or has been removed from

8    programming for cause; is that correct?

9        A    Correct.

10       Q    So if an offender has been told you need to do sex

11   offender treatment program as part of their prescriptive

12   plan from the Department of Corrections, and if the inmate

13   has just not done that, under the Board's policies the

14   institutional parole agent would not be required to send the

15   home plan out for review?

16       A    If I'm reading this -- this policy correctly, yes.

17       Q    Okay.  And I think you had indicated that if any

18   one of these six is actually present in a particular case,

19   the likelihood that that inmate is actually going to get

20   released is very low?

21       A    I would say there's a likelihood that parole or

22   reparole would not be granted.  Generally speaking again.

23       Q    Okay.  And because not only -- well, then even if

24   one of these six were involved, if you got the file and then

25   the inmate didn't have a release plan that had been

1    investigated and found to be appropriate, would that in and

2    of itself have a negative impact on --

3        A    It depends on the case.  I personally in most cases

4    leave that determination to the field to determine whether

5    the plan is appropriate or not.

6        Q    But if the field hasn't -- if it's not even been

7    sent out to the field for investigation so that you have no

8    information as to whether or not the plan -- the person can

9    really live at the address that he says he wants to live at

10   or is he going to have a job at the place that he says he's

11   going to have a job, that would -- would that have a

12   negative impact on the decision as to whether to release

13   him?

14       A    Not necessarily.  Not necessarily.  I tend to defer

15   to the judgement of the field on that.  So I assume that

16   that's something that will be developed and investigated by

17   the field.  And for myself, and again, depending on the

18   merits of the case, that's one factor that I -- that I defer

19   to the judgement of the field, which is probably why I'm

20   fuzzy on -- on the revision of the manual.

21       Q    Okay.  But the field will -- in these cases that

22   are listed here in this particular --

23       A    In these cases, if I -- in these cases the field

24   will not have to investigate the plan.

25       Q    Right.

1     A     They will not have to expend the resources, the man

2     hours, to actually go out and investigate the plan. Now, if

3     we parole the person, even if these scenarios, they will

4     then have to investigate the plan after parole has been

5     granted, or reparole.

6     Q     Okay. Would you believe it to be accurate if

7     wardens from the Department of Corrections or the actual

8     psychologist or mental health workers in the Department of

9     Corrections who actually run the sex offender treatment

10    program tell the inmates that, look, if you've been ordered

11    to take sex offender treatment and you don't take it, really

12    there's no chance that you're going to get paroled?

13          MR. BRADLEY: I'm going to object to the form of

14    that question, but if you understand it.

15          THE WITNESS: I -- I -- if you could rephrase it

16    maybe.

17    BY MR. PATTON:

18    Q     Okay. Would you think that the Department of

19    Corrections staff would be -- were wrong if they told

20    inmates in -- in the institution who had been ordered to

21    participate in sex offender treatment that if they failed to

22    participate in sex offender treatment program in all

23    likelihood they were not going to be get paroled or

24    reparoled by the Board?

25    A     I hesitate because each case -- the scenarios

1    involve each case and when the sex offender -- when the sex
2    offense occurred. I don't think that's something that they
3    should be telling offenders. It's not necessarily accurate,
4    if I understand it correctly.

5        Q    Okay. I know you had mentioned earlier roughly
6    that you see thousands of cases a year. Do you guys have
7    any statistics on roughly how many cases you guys review in
8    a particular year?

9        A    Yes. Don't ask me details on that, but we do keep
10   those statistics.

11       Q    Can you just give your best estimate of how many
12   files you would review a year for release? I mean, is it a
13   thousand or is it 5,000?

14       A    I can tell you how many I interview individually a
15   month. How many I review, I'd have to do the math. Frankly
16   I'm not concerned because some files I spend very little
17   amount of time on. Others I spend considerable amount of
18   time on. I frankly -- that's an area that I don't concern
19   myself with a whole lot. I can tell you how many I see
20   individually a month.

21       Q    How many is that?

22       A    Typically 15 a day eight or nine times a month.

23       Q    Okay. And these are where you're either going to
24   the institution or participating in the interviews through
25   video conferencing?

1      A    Correct, correct.

2      Q    So that would be roughly 120 interviews a month?

3      A    Correct, give or take.

4      Q    So just interview-wise then you're talking close to

5   1,500?

6      A    Face-to-face interviews roughly.

7      Q    And then on top of the face-to-face interviews

8   you're also then reviewing files where some other Board

9   member has actually done the actual face-to-face interview?

10     A    Correct, or a hearing examiner.

11     Q    Okay.

12     A    Or a panel of a hearing examiner and a Board member

13  has done the face-to-face.

14     Q    Okay.  In -- would it be fair to say that each file

15  that you're reviewing -- well, let me ask you this way.  Is

16  there a difference in violent cases or non-violent cases as

17  to the number of Board members that have to review the file?

18     A    Yes.

19     Q    In non-violent cases is -- how many Board members

20  are required to review files?

21     A    Non-violent cases generally two Board members or

22  two agreeing decision makers are sufficient for parole.  For

23  a violent file it's a majority of the Board to parole.

24     Q    So on a -- on a violent file in a case where you're

25  not the person who does the interview is it possible that

1    you may never see that -- the file of a violent offender

2    who's come up for parole or reparole because enough members

3    have seen it --

4        A    Um-hum.

5        Q    -- before you that a majority has been formed?

6        A    Yes.

7        Q    Okay.  Other than the two cases that you have --

8    we've discussed on where you can recall sex offender

9    treatment being requested of the inmate and the inmate not

10    participating in, can you recall any other cases that you

11    have participated in either by doing the interview or voting

12    that -- where the inmate was requested to do sex offender

13    treatment program but did not that you voted for release?

14        A    Um-hum, um-hum.  And I'm thinking of one as we're

15    speaking of an offender where sex offender treatment was

16    required.  It was not offered in the county prison.  I think

17    I recall a sex offender that had another sentence to turn

18    over to, if you understand what that means.

19        Q    Yes.

20        A    And I -- I voted to turn that over to another

21    sentence.

22        Q    Where he'd be required under the new sentence --

23        A    Yes.

24        Q    -- to take sex offender?

25        A    Yes, yes.

1       Q     Okay.

2       A     I can't recall any other off the top of my head.

3       Q     Okay.  So that appears to be a total of four,

4   because we had the two original and then the two more you've

5   just recalled.  And I'm not trying to limit you into saying

6   that that's the only four ever, but accurate to say that

7   that's what you can recall now?

8       A     Off the top of my head.  I'm giving this a whole

9   lot of consideration, and yes.

10      Q     So out of the -- then out of the six or seven years

11  or maybe even closer to eight that you've been on the Board

12  in reviewing, you know, at least 1,500 cases a year, and

13  those are just on the face-to-face ones, so the actual

14  number of files you've reviewed has probably been much

15  larger than that?

16      A     Um-hum.

17      Q     And then you have the fact that there's only four

18  inmates that you can recall who were requested to take sex

19  offender treatment and did not that you voted to release, is

20  --

21      A     There could have been many others that I just can't

22  remember.  The volume is -- is pretty significant.

23      Q     It would seem from those numbers though that the

24  participation or failure to participate in the sex offender

25  treatment program makes it very, very, very difficult for an

1    inmate to get released?  Would that be accurate?

2        A    I think it's a significant factor generally

3    speaking.  But, again, each case may -- has its own peculiar

4    characteristics.

5        Q    You mentioned that sometimes you sit in panels when

6    you review a case?

7        A    Yes.

8        Q    Is that sometimes more than one Board member, or

9    are those panels generally a hearing examiner and a Board

10   member?

11       A    Generally a hearing examiner and a Board member.

12       Q    Okay.  The hearing examiners, are they allowed to

13   actually have a vote, or do they make a recommendation, or

14   how do they -- what input do they get to provide?

15       A    Oh, it varies.  In the case where the offense --

16   the instant offense is a violent offense it requires five

17   Board members to parole.  If the initial two votes are to

18   refuse and one of those votes is a hearing examiner, that

19   vote would count.

20            In non-violent cases their vote would count to

21   parole or to reparole.  Then there's scenarios of

22   disagreement with the Board members and the hearing

23   examiners.  They're tie breakers.  There's a couple

24   variations.  Essentially in the case of violent offenders to

25   parole they essentially make a recommendation that requires

1    Board members to parole or reparole those cases.  But we
2    designate violent due to their instant offense.
3        Q    Okay.  And if you are sitting in a panel with a
4    hearing examiner, do you guys conduct the interview
5    together?
6        A    Generally one of us will prepare the case, and I'm
7    speaking for myself.  The general practice is we'll each
8    prepare a case before the inmate comes into the room.  We
9    have a discussion -- case discussion prior to the offender
10   coming into the room.
11       When the offender's in the room and the person that
12   prepared the case is conducting the interview and taking
13   notes the other person is -- is reviewing the file.  And
14   then that person will ask follow-up questions.  I don't know
15   if that answered your question or not.
16       Q    Yeah.  And then after the interview do you -- do
17   you and the hearing examiner then discuss the case?
18       A    Yes, generally, yes.
19       Q    And would it be fair to say most often pretty
20   quickly after the interview you make your decision or --
21       A    That's where in my practices that we usually try to
22   make a decision afterwards.  Sometimes there's significant
23   discussion.  There's not always agreement, though that's
24   again case by case.  Some we reach a decision pretty
25   quickly.  Sometimes we have to discuss it pretty

1    substantially.

2        Q    Okay.

3        A    It depends.

4        Q    Would an inmate's either participation or failure

5    to participate in the sex offender treatment program be

6    something you would discuss if you're sitting in a panel

7    with the hearing examiner?

8        A    Yes.

9        Q    Okay.  In your experience dealing with the hearing

10   examiners, if an inmate has been requested to participate in

11   sex offender treatment but has not participated in the sex

12   offender treatment, would you as a panel discussing the case

13   is the -- the usual outcome that the discussion is, along

14   with any other factors, that there's no sex offender

15   treatment programming here, and we want sex offender

16   treatment programming and no release?

17       A    I would say typically that's a significant factor.

18   I'd say typically that's a significant hurdle generally.

19       Q    If the Board has a difference with the Department

20   of Corrections over whether or not treatment's necessary or

21   not necessary, is there ever any discussion between the

22   Board and the Department of Corrections on that or -- or if

23   the Board says we want this treatment, is that pretty much

24   just the end of the way it goes?

25       A    We enter into discussions as to why there may be --

1   usually in the case of disagreement why we may recommend a

2   program and the other -- and the Department of Correction

3   may not think it's necessary.

4          In fact, that's a course that we've been following

5   up on more and more recently trying to understand each

6   other's thought process on why perhaps we're recommending

7   sex offender treatment or any other type of treatment and

8   the department may not, if I understood your question

9   correctly.

10      Q    Yes.  If the Department of Corrections is

11  recommending release on a particular individual, even if the

12  individual hasn't completed the prescriptive programming

13  plan, is that something you can -- you consider in making

14  your release decision?

15      A    Yes.

16      Q    Do you ever go back to the department to get an

17  explanation of why are you recommending release if -- if he

18  hasn't done all the -- the programs that have been included

19  in the prescriptive programming plan?

20      A    There's been occasions where I individually go to

21  the sex offender treatment providers.  And we have a pretty

22  good rapport in most institutions that I go to where we may

23  have a discussion about the progress of this -- their

24  progress in treatment, why they may not have been

25  recommended when we felt that -- that they should have

1  participated.  There's occasions when we do enter into those

2  discussions.  Again, if I understood that right.

3      Q    Yeah.

4      A    Okay.

5          MR. PATTON:  I believe those are my questions.

6          THE WITNESS:  Okay.

7                    CROSS-EXAMINATION

8  BY MR. BRADLEY:

9      Q    I just have a few.  Let me start with Exhibit A.

10  And first off, with regard to 2(a)6, which for the record

11  states offender refuses to follow DOC prescriptive

12  programming or has been removed from programming for cause,

13  that scenario is not limited to sex offender treatment, is

14  it?

15      A    Oh, no, no.

16      Q    And at least in your experience you've indicated

17  that the absence of an investigative home plan would not be

18  dispositive of your parole decision?

19      A    Not in mine, no.  My practice is, and I think I

20  said it before, I tend to defer to the field for those kind

21  of judgements.

22      Q    And finally, you did indicate that persons who may

23  not have a home plan investigated, they're parole eligible

24  -- if they are parole eligible, a decision is still made?

25      A    Oh, absolutely.

1      Q    And, again, you've indicated that the decision is

2    then made on an individualized basis?

3      A    Yes.

4      Q    You've talked and interchangeably used terms like

5    significant factor or substantial hurdle with regard to

6    whether an inmate's failure to participate in prescribed sex

7    offender treatment programming would affect his ultimate

8    parole decision.  Are there other significant factors or

9    substantial hurdles that you come across?

10     A    Many, many other significant factors.  And they're

11   all -- I guess there's a laundry list under Section 19,

12   Title -- Section 19 of the Parole Act.  I can go down them

13   if you want.  We consider the victim input.  That's a

14   significant factor.  Any recommendations of the sentencing

15   judge or the District Attorney, their institutional

16   behavior, whether we perceive that there's -- that they

17   benefited from the programs they participated in.  And,

18   again, it depends on the case, which is where we tend to put

19   more emphasis.

20     Q    So in at least those situations you've identified

21   from the inmates perspective if there was negative

22   information regarding those factors, you're indicating that

23   that would also be a significant factor or substantial

24   hurdle to a favorable parole decision?

25     A    Yes.

1   Q    Would the fact of an inmate's -- and I guess this

2   would obviously be for reparole, an inmate's prior parole

3   failure, would that be a significant factor or a substantial

4   hurdle to a new favorable parole decision, reparole

5   decision?

6   A    Yes.  And the factors that related to that

7   violation.

8   Q    And, again, would that even more so if the parole

9   violation was for commission of and conviction of new

10  offenses?

11  A    Yes.

12  Q    You had talked also about -- initially it was two,

13  it was the -- the young offender with a young victim within

14  a four year age range nearing the end of his maximum

15  sentence and then the mental health situation where you

16  wanted to transition them back into the community prior to

17  the expiration of the maximum sentence.

18       You had talked interchangeably of those as -- as

19  cases and scenarios.  And I just want to be clear, are you

20  talking about there was one young offender and one mental

21  health offender in specific, or are you talking generally

22  these are scenarios where I've come across?

23  A    Those are scenarios, and there may have been more

24  than one of each of those scenarios.  There may have been

25  others.  As I said, I recall at least once.  No, at least

1   one, perhaps more, offenders confined in county institutions

2   where the program is not offered or offenders that turn over

3   to another sentence.  There's -- there's probably more, but

4   I can't think of any off the top of my head.

5        Q    Okay.  And we've talked about programming generally

6   and the impact a failure to participate may have on -- on a

7   favorable parole decision, but I don't think we've talked

8   much about why.

9        And maybe if you could spend a few moments and talk

10  about why that becomes a substantial hurdle or why it

11  becomes a significant factor when making the parole

12  decision.

13       A    We try to, in our assessment -- or in my assessment

14  of the case I try to focus in on what factors were related

15  to the actual offense, whether there were issues relative to

16  drug and alcohol abuse, the sex offender issues, domestic

17  violence.  And there's programmings that -- programs that

18  deal with those specific factors.  And if an offender hasn't

19  participated in a program to deal with -- with those factors

20  in this life that lead him to offend, that's why it's

21  significant if they don't participate, if I understand your

22  question correctly also.

23       Q    I believe that answers the question.

24       A    Okay.

25       Q    And I guess going from there I believe from some of

your prior answers, I don't know that you said this, but it
sounds like you indicated that there may be times when an
inmate does complete the prescribed programming and will
still not get a favorable parole decision because of -- I
guess I'll stop the question there.

Are there times when an inmate will complete all
his prescribed programming and still get an unfavorable
programming decision?

A    Yes.

Q    And what would be the reasons for that?

A    Typically in scenarios where I would feel that the
offender has not benefited from those programs, has not
gained any incite into his or her pathway to reoffending,
where it doesn't appear that they've gotten anything out of
it frankly.

MR. BRADLEY:  I believe that's all the questions I
have.  He may have some follow ups.

MR. PATTON:  I don't have any follow up.

MR. BRADLEY:  Okay.

MR. PATTON:  We'll just ask that Exhibit A be
attached as an exhibit to the deposition.

MR. BRADLEY:  Just for the record, can we indicate
the source of that?  And that is -- maybe if you could just
read for the record what this document is.

THE WITNESS:  Yeah.  This comes from our manual of

1    operations, Chapter 3 -- from the Pennsylvania Board of

2    Probation and Parole's manual of operation, Chapter 3,

3    Section 3, Procedure 3.4, effective date April 30th, 2004.

4    Is that enough?

5              MR. PATTON:  That's fine.

6              MR. BRADLEY:  Yeah.

7              (Whereupon, the deposition was concluded at 3:09

8    p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COUNTY OF DAUPHIN                :
                                 :  SS
COMMONWEALTH OF PENNSYLVANIA     :

I, Donna E. Gladwin, a Notary Public, authorized to administer oaths within and for the Commonwealth of Pennsylvania, do hereby certify that the foregoing is the testimony of Benjamin Martinez.

I further certify that before the taking of said deposition, the witness was duly sworn; that the questions and answers were taken down stenographically by the said Reporter-Notary Public, and afterwards reduced to typewriting under the direction of the said Reporter.

I further certify that I am not a relative or employee or attorney or counsel to any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

I further certify that the said deposition constitutes a true record of the testimony given by the said witness.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of November, 2006.

_Donna E. Gladwin_

Donna E. Gladwin, RPR
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Donna E. Gladwin, Notary Public
Susquehanna Twp., Dauphin County
My Commission Expires July 22, 2008

Member, Pennsylvania Association of Notaries

Case 1:00-cv-00110-SJM-SPB    Document 48-13    Filed 01/09/2007    Page 47 of 47

of this chapter). An offender can also be designated as hard to place by a PBPP decision maker. Institutional staff will meet with DOC staff to ensure that coordinated release planning efforts begin as early as possible for these offenders. Information on hard to place offenders should be noted in the Parole Plan section of the Summarization report. Each District Field Office has a designated referral specialist who can assist with possible placement for these offenders.

2.  Exceptions to Providing Release Plan for Board Interview

    a.  Investigated Release Plans will not be required if an offender meets one or more of the following criteria.

        1.) Offender has indicated to parole staff that they wish to serve the maximum sentence. (See Exhibit IV-3).

        2.) Offender refuses to attend the parole interview.

        3.) Offender is incarcerated for a violent offense and refuses to attend psychological testing/evaluation.

        4.) Offender is housed in restricted housing due to disciplinary reasons.

        5.) Offender has incurred a serious Class 1 misconduct within the past six months for assault, threats to staff or drug use (this includes paroling actions that have been rescinded or suspended and the offender has been ordered to be reviewed on the next available docket).

        6.) Offender refuses to follow DOC prescriptive programming or has been removed from programming for cause.

    b.  Release plan information will still be collected from an offender that meets the above criteria. The institutional parole agent will indicate in the Summarization Report what information was received from the offender, that the release plan was not submitted for investigation, and note the reason(s) for non-submission.

3.  Time Frame For Submitting Pre-Parole Investigation Request/Report (PBPP-30).

    a.  At least two months prior to the parole consideration



EXHIBIT

A

deg 11·9·06