IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT LEE DeFOY | ) |
| | ) |
| Petitioner | ) |
| | ) |
| v. | ) C.A. No. 00-110 Erie |
| | ) |
| JOHN M. MCCULLOUGH, et al., | ) |
| | ) |
| Respondents | ) |

**PETITIONER ROBERT LEE DeFOY'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

AND NOW, comes the Petitioner, Robert Lee DeFoy, by his attorney, Thomas W. Patton, Assistant Federal Public Defender, and files these Objections to Magistrate Judge's Report and Recommendation.

The facts in support of Mr. DeFoy's motion for summary judgment along with the exhibits to support them are laid out in detail in the motion, document 48. Mr. DeFoy will not repeat them here.

Statute of Limitations

The Magistrate Judge's Report and Recommendation ("R and R") concludes that Mr. DeFoy's challenge to the August 1997 denial of parole is barred by the statute of limitations contained in 28 U.S.C. § 2244(d). In so doing the Magistrate rejected Mr. DeFoy's argument that the Commonwealth had waived any statute of limitations defense. The Magistrate found that "[i]t was only after this case was re-opened, discovery was conducted, and the pending motion for summary judgment was filed on January 9, 2007, that the August 1997 parole denial became the focal point of Petitioner's constitutional attack." (R and R p. 5) The Magistrate's ruling on this

issue is incorrect as it ignores the plain language of Mr. DeFoy's amended habeas petition which specifically challenged, on Fifth Amendment grounds, the August 1997 denial of parole, counsel's argument at the intial hearing held by the Magistrate, and the history of discovery.

In the Amended Petition Mr. DeFoy raised his Fifth Amendment argument that requiring him to admit guilt to be paroled violated his right not to incriminate himself. Mr. DeFoy's Motion to Amend Petition for Writ of Habeas Corpus stated that "Mr. DeFoy moves to amend that petition to allege that he has been denied parole for the 1973 conviction based upon laws that were not in effect at the time of his conviction in violation of the *ex post facto* clause of the United States Constitution, his failure to incriminate himself in violation of the Fifth Amendment of the United States Constitution, and the arbitrary and capricious findings of the Pennsylvania Board of Probation and parole [sic] in violation of the Fourteenth Amendment of the United States Constitution." (Dkt. # 18 p. 1) The Motion to Amend then laid out the entire history of the Board's revocation of Mr. DeFoy's parole for his armed robbery conviction based upon his conviction of involuntary deviate sexual intercourse, corruption of minors, and statutory rape. The Motion to Amend details the three instances the Board denied Mr. DeFoy reparole on the armed robbery charge, the 1997 denial, the 1998 denial, and the 2000 denial. (Dkt # 18 p. 2-6)

In the Motion to Amend's legal discussion of the Fifth Amendment claim, it argues that the Board's requirement that Mr. DeFoy participate in a sex offender program that required him to admit his guilt to the IDSI, statutory rape, and corruption of minors charges amounted to compelled self-incrimination. To support this claim the Motion stated:

> In fact, at the time of Mr. DeFoy's first parole hearing on August 12, 1997, he had been granted a new trial by Judge Cassimatis. So, the board's first refusal to parole Mr. DeFoy was based on the fact that he refused to participate in a sex offender

2

> program that required him to admit his guilt of the IDSI, statutory rape and corruption of a minor charges, when he had been granted a new trial on the IDSI, statutory rape and corruption of a minor charges. It is hard to image [sic] a more stark example of the State coercing a person to incriminate themselves.

(Dkt # 18 p. 16) Clearly, Mr. DeFoy's Amended Petition[1] challenged the 1997 denial of parole based on the claim that the denial violated Mr. DeFoy's Fifth Amendment right to not be a witness against himself. The Commonwealth's Response to Amended Habeas Corpus Petition in no way indicates that its response is limited to the 1998 denial of reparole.

When the Magistrate held a hearing in this case on May 5, 2003, during the discussion of the Fifth Amendment claim and how Mr. DeFoy's participation in the sex offender treatment program could result in self-incrimination, counsel for Mr. DeFoy argued, in part, "[a]nd you'll recall that at the time that he was being denied parole, he had been granted a new trial part of that time, and so if he would have participated in the program, made admissions, you know, getting a new trial wouldn't have been much use to him, because they would have been able to use those admissions against him. . . . . So that there was definitely–he could have, by participating, if he would have made admissions, he would have set himself up for incriminating himself for any new trial . . . ." (Dkt # 25 pp. 37-38) Again, Mr. DeFoy was clearly arguing that the denial of reparole in 1997 violated his Fifth Amendment rights.

The discovery conducted in the case makes the point as well. The initial exchange of discovery occurred by letter from Commonwealth counsel dated March 28, 2005. A copy of the letter is attached to Mr. DeFoy's Reply to the Commonwealth's Brief in Opposition to Mr. DeFoy's Motion for Summary Judgment as Petitioner's Exhibit FFF. The letter accompanied "various

---

[1] The Magistrate granted the Motion to Amend. (Dkt # 19)

documents related to Mr. DeFoy's most recent parole decisions involving his Robbery conviction and sentence. These documents include the Board's Parole Decision Making Guidelines Forms as well as the Department of Corrections' Review Sheets." The Parole Decision Making Guidelines Forms (Petitioner's Exhibit AAA attached to the Motion for Summary Judgment) and the Department of Corrections' Review Sheets for the 1997 denial of reparole (Petitioner's Exhibit A attached to the McCullough Deposition) were included in these documents. Attached to Mr. DeFoy's Reply to the Brief in opposition to Mr. DeFoy's Motion for Summary Judgment as Petitioner's Exhibits GGG and HHH respectively are Requests for Admissions served by Mr. DeFoy on the Commonwealth and the Commonwealth's response.[2] Requests 1A through 1E, 2E through 2G, and 2I through 2J deal exclusively with the 1997 denial of parole. The Commonwealth responded to each of these Requests for Admissions on December 20, 2005. At no time did the Commonwealth claim any surprise that Mr. DeFoy was seeking discovery regarding the 1997 denial of parole or claim that discovery on that issue was inappropriate due to Mr. DeFoy's alleged failure to challenge that denial of parole.

Contrary to the Magistrate's finding, it is not an overstatement of the case that it has been crystal clear since Mr. DeFoy filed his Motion to Amend on May 14, 2001, that he was challenging the 1997 denial of reparole. (R and R p. 5) The 1997 denial was the only denial specifically discussed in the Amended Petition, was discussed at the initial hearing, and was the focus of the discovery process. Once this fact is acknowledged, it is clear that the Commonwealth has waived any statute of limitations defense.

---

The voluminous documents attached to the original Requests were not included.

A statute of limitations defense is not jurisdictional and may be waived by failure to raise the defense in a timely manner. Day v. McDonough, 126 S.Ct. 1675, 1680 (2006). While the Supreme Court held in Day that district courts may raise a statute of limitations defense *sua sponte*, it made clear that district courts were not required to do so, and stressed that "the court must assure itself that the petitioner is not significantly prejudiced by the delayed focus on the limitation issue, and 'determine whether the interests of justice would be better served' by addressing the merits or by dismissing the petition as time barred." Id. at 1684 (quoting Granberry v. Green, 481 U.S. 129, 136, 107 S.Ct. 1671, 1676 (1987)).

The unique facts of this case demonstrate that the interests of justice would be better served by addressing the merits of Mr. DeFoy's amended petition. The amended petition which raised this issue had been pending for over five years before the Commonwealth raised the statute of limitations defense. The amended petition, and all of Mr. DeFoy's actions since the filing of the amended petition have made it clear that he was challenging all of the denials of reparole following his convictions for IDSI, statutory rape, and corruption of a minor. Furthermore, the Commonwealth has already had one chance to litigate an affirmative defense to this Court, the Third Circuit, and the United States Supreme Court. It should not be given the opportunity to litigate its potential defenses piecemeal, holding one in reserve while it litigates another. As the Third Circuit has explained:

> Affirmative defenses must be raised as early as practicable, not only to avoid prejudice, but also to promote judicial economy. If a party has a successful affirmative defense, raising that defense as early as possible, and permitting a court to rule on it, may terminate the proceedings at that point without wasting precious legal and judicial resources.

Robinson v. Johnson, 313 F.3d 128, 137 (3rd Cir. 2002). From the filing of the amended petition

onward Mr. DeFoy has argued that denying him parole because he would not admit his guilt to an offense while he had been granted a new trial on that offense violated the Fifth Amendment. If the Commonwealth believed that argument was time barred it should have raised that argument five and a half years ago. See Venters v. City of Delphi, 123 F.3d 956, 967-969 (7th Cir. 1997) (defendant's failure to raise statute of limitations defense until response to plaintiff's motion for summary judgment resulted in waiver). Allowing the Commonwealth to litigate a statute of limitations defense now would give it a second bite at the apple, having previously pursued and lost its original affirmative defense.

## Mootness

The R and R's mootness analysis is fatally flawed. The Magistrate's view of mootness allows the parole board to benefit from its unconstitutional behavior and conflicts with Third Circuit precedent. The Magistrate's ruling is based on the rationale that the remedy for any constitutionally defective parole consideration would be ordering a new review by the Board so if the Board has already done subsequent parole hearings the remedy is moot. Gauche v. Lavan, 2005 WL 1324859, *11 n.2 (M.D. Pa. 2005). Or, as this Court has stated the reasoning "since the remedy available under Mickens-Thomas I, for an ex post facto violation would be a new hearing before the Board applying the appropriate standard, challenges to parole denials occurring prior to the last denial . . . are moot." Bartholomew v. Pennsylvania Board of Probation and Parole, 2006 WL 1669899, * 1 (W.D. Pa. 2006). This Court's statement of the mootness argument contains an important qualifier that is that the remedy would be a new hearing before the Board **applying the appropriate standard.** If the Board continues to employ the same constitutionally defective analysis in each hearing, a constitutional challenge has not been mooted. Repeated violations of an inmate's

constitutional rights does not moot the original constitutional violation. The Third Circuit's opinion in <u>Mickens-Thomas I</u> makes this very point. The Third Circuit's opinion discusses in detail the Board's denial of parole in 1997, 1998, and 2000 and its finding that in each of those considerations the Board violated the ex post facto clause by applying new parole standards adopted in 1996 to Mickens-Thomas' parole consideration. <u>Mickens-Thomas v. Vaughn</u>, 321 F.3d 374, 380-391 (3rd Cir. 2003). The ultimate holding in <u>Mickens-Thomas I</u> was an affirmance of the district court's order remanding the case to the Board to apply its pre-1996 parole policies to determine if Mickens-Thomas should be paroled. <u>Id</u>. at 393.

In <u>Mickens-Thomas v. Vaughn</u>, 355 F.3d 294 (3rd Cir. 2004) ("<u>Mickens-Thomas II</u>"), the Third Circuit granted unconditional habeas relief when it found that on remand the Board had refused to apply its pre-1996 parole policies and had acted vindictively in relying upon factors to deny parole that had not previously played a role in the Board's decisions. <u>Id</u>. at 309-10.

Under <u>Mickens-Thomas I</u> and <u>II</u>, the proper remedy in this case for the Board's unconstitutional conduct in denying reparole in 1997 is a remand for a hearing using the factors at issue at the time of the 1997 parole consideration and based upon the facts as they existed in 1997. To do otherwise, as recognized in <u>Mickens-Thomas II</u>, allows the Board to benefit from its prior unconstitutional practices.

Merits

A. Compulsion

The Magistrate's R and R treats the plurality opinion in <u>McKune v. Lile</u>, 536 U.S. 24, 122 S.Ct. 2017 (2002) as if it were a majority opinion. (R and R p. 9) But that is not the way lower courts are to employ plurality opinions. "When a fragmented Court decides a case and no single

rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993 (1977) (internal quotation marks omitted). As will be discussed below, Justice O'Conner's concurrence provided a narrower basis for reversing the judgment in McKune, which means her opinion constitutes the holding of the case. Ainsworth v. Stanley, 317 F.3d 1, 4 (1st Cir. 2002); Searcy v. Simmons, 299 F.3d 1220, 1225 (10th Cir. 2002); United States v. Antelope, 395 F.3d 1128, 1133 n.1 (9th Cir. 2005).

In McKune, the Supreme Court found that the Kansas sex offender treatment program did not violate the Fifth Amendment. Under the Kansas program, a refusal to participate in the program resulted in a transfer of the inmate to a higher security facility and a reduction in visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, and the loss of access to a personal television. McKune, 536 U.S. at 30-31, 122 S.Ct. 2023. A majority of the Court held that the loss of these privileges did not amount to unconstitutional compulsion, but a majority of the Court could not agree on a rationale to support this conclusion. A four-justice plurality employed the "atypical and significant hardship" test of Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293 (1995) to determine whether or not the penalties imposed by Kansas for failure to participate in its sex offender program amounted to unconstitutional compulsion. McKune, 536 U.S. at 41, 122 S.Ct. 2029. "A prison clinical rehabilitation program, which is acknowledged to bear a rational relation to a legitimate penological objective, does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life." Id. at 37-38, 2027. The plurality found that the denial of benefits

at issue in the Kansas program did not constitute atypical and significant hardship in relations to the ordinary incidents of prison life, and, therefore, did not amount to unconstitutional compulsion. In reaching this conclusion, however, the plurality explicitly noted that the inmate's decision not to participate in the program "did not extend his term of incarceration. Nor did his decision affect his eligibility for good-time credits or parole." Id. at 38, 2027.

Justice O'Connor provided the fifth vote for the McKune majority. Id. at 48, 2032. Justice O'Conner disavowed the plurality's use of the Sandin "atypical and significant hardship" test to determine compulsion, finding that the Fifth Amendment compulsion standard is broader than Sandin. Id. Justice O'Conner explained that the Court's "penalty cases," Uniformed Sanitation Men Ass'n, Inc v. Commissioner of Sanitation of City of New York, supra, Spevack v. Klein, supra, Lefkowitz v. Turley, supra, and Lefkowitz v. Cunningham, supra, established that the threatened loss of one's livelihood or the political influence or prestige of elected office were "grave" consequences that established unconstitutional compulsion. That having been said, Justice O'Conner made clear that threats of longer incarceration and execution "are far greater than those we have already held to constitute unconstitutional compulsion in the penalty cases." Id. at 52, 2034. In this process Justice O'Connor specifically rejected the plurality's reliance upon Ohio Adult Parole Authority v. Woodward, 523 U.S. 272, 118 S.Ct. 1244 (1998) to support its finding that there was no compulsion under the Kansas sex offender program. McKune, 536 U.S. at 52, 122 S.Ct. at 2034. Ultimately Justice O'Connor did not believe that "the consequences facing respondent in this case are serious enough to compel him to be a witness against himself." McKune, 536 U.S. at 50, 122 S.Ct. 2033-34.

I believe the proper theory should recognize that it is generally acceptable

9

>to impose the risk of punishment, however great, so long as the actual imposition of such punishment is accomplished through a fair criminal process. See, e.g., McGautha v. California, [402 U.S. 183, 213, 91 S.Ct. 1454 (1971)] ("The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." (Citation and internal quotation marks omitted.)) Forcing defendants to accept such consequences seems to me very different from imposing penalties for the refusal to incriminate oneself that go beyond the criminal process and appear, starkly, as government attempts to compel testimony; in the latter context, any penalty that is capable of compelling a person to be a witness against himself is illegitimate.

Id. at 53, 2035.

Justice Stevens wrote for the four dissenting Justices. Id. at 54, 2035. Justice Stevens had no problem concluding that the transfer of the respondent to a higher security facility and the concomitant loss in privileges punished the inmate for invoking his Fifth Amendment right not to incriminate himself. Id. at 56, 2036.

Justice O'Conner's repudiation of the plurality's use of Woodward to claim lack of compulsion shows the error of the Magistrate's R and R's reliance upon Woodward. Reliance on Minnesota v. Murphy, 465 U.S. 420, 104 S.Ct. 1136 (1984) is also misplaced.[3]

As explained by Justice Stevens in his dissent, the defendant in Murphy did not invoke his

---

[3] The R and R cites to "Murphy, supra." (R and R p. 9) The only cases previously cited by the R and R with Murhpy in the title is Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594 (1964). However, the R and R cites to footnote 6 of Murphy v. Waterfront Comm'n to establish the principle that the Fifth Amendment prevents the government from using compulsion to elicit self-incriminating statements, and that the government cannot use self-incriminating statements obtained through compulsion in a criminal trial. (R and R p. 8) The R and R's cite to "Murphy, supra" on page 9 discusses the Supreme Court's citation in McKune v. Lile, 536 U.S. 24, 122 S.Ct. 2017 (2002) of Murphy. In McKune the Supreme Court cited Minnesota v. Murphy along with Woodward in support of its holding. McKune, 536 U.S. at 42-43, 122 S.Ct. at 2029-30. It is clear then that the Magistrate is referring to Minnesota v. Murphy.

Fifth Amendment privilege when questioned by his probation officer about an offense the defendant had allegedly committed while on probation. McKune, 536 U.S. at 61 n.7, 122 S.Ct. at 2039 n.7. Because the defendant had not invoked his right to remain silent, it was waived. The defendant tried to get around his waiver by arguing that the privilege should be self-executing because he was threatened with revocation of his probation if he did not answer his probation officer's questions truthfully. Murphy, 465 U.S. at 434, 104 S.Ct. 1146. The defendant argued that this situation fit within the Court's "penalty" cases in which the Court had held that the threatened penalty foreclosed a free choice to remain silent. Id. In examining this claim the Court explained

> A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

Id. at 435, 1146

The Court found no self-executing privilege because "[n]either the trial court nor the Minnesota Supreme Court found that Murphy believed that his probation could have been revoked for leaving the meeting or that he remained in the office for this reason." Id. at 433 n.6, 1145n.6. Furthermore, the Court found that any fear the defendant might have had that his probation could be revoked if he asserted his Fifth Amendment privilege and refused to answer the probation officer's questions was unreasonable because the Court's case law made it clear that the state could not impose such a penalty on the defendant for invoking his Fifth Amendment privilege. Id. at 438,

11

1148.

Murphy does not support a finding that Mr. DeFoy was not compelled to be a witness against himself. To the contrary it supports his argument that he was compelled to incriminate himself. Just as in the hypothetical set forth in Murphy, Mr. DeFoy was threatened with the withholding of parole if he would not incriminate himself on an unrelated pending criminal prosecution. And, the Pennsylvania Board of Probation and Parole carried through on its threat, it refused to reparole Mr. DeFoy based upon the exercise of his Fifth Amendment privilege even though its own guidelines recommended reparole. This is the key feature of the case that the Magistrate failed to grasp. Mr. DeFoy was denied reparole not because he wouldn't accept responsibility for the armed robbery for which he was up for reparole but on the IDSI, statutory rape and corruption of a minor charges for which he had been granted a new trial. Reviewing Justice O'Connor's opinion for the Court in McKune it becomes clear that under these circumstances Mr. DeFoy's Fifth Amendment rights were violated.

Justice O'Connor's opinion, while not setting forth a completely comprehensive theory of the Fifth Amendment, indicates that if an inmate has been convicted of a sex offense through a fair criminal process, the inmate must accept the consequences of that conviction, even if the consequences include potentially longer sentences if the inmate will not participate in treatment. In this view, sex offender treatment is part of the criminal process, and any penalty or denied benefit due to a failure to participate in sex offender treatment is acceptable as the imposition of the original punishment imposed through a fair criminal process. The Fifth Amendment is violated, however, if an inmate is penalized not as part of the criminal process but rather as part of a government attempt to compel testimony. In this context, any penalty that is capable of compelling a person to

be a witness against himself is illegitimate. As explained by the Ninth Circuit, "[a]lthough it may be acceptable for the state to impose harsh penalties on defendants when it has legitimate reasons for doing so consistent with their conviction of their crimes of incarceration, it is a different thing to impose 'penalties for the refusal to incriminate oneself that go beyond the criminal process and appear, starkly, as government attempts to compel testimony.'" Antelope, 395 F.3d at 1137 (quoting McKune, 536 U.S. at 53, 122 S.Ct. 2017, O'Conner, J., concurring).

In this case, when the Board considered Mr. DeFoy for reparole on his armed robbery conviction in June 1997, through a fair criminal process, his convictions and sentence for the IDSI, statutory rape, and corruption of a minor had been vacated and a new trial ordered. And, at the time of his interview with Mrs. Cook, Mr. DeFoy had been granted bail on the pending charges. Refusing reparole on the armed robbery sentence at this point due to Mr. DeFoy's refusal to admit his guilt to the IDSI, statutory rape, and corruptions of a minor charges went well beyond the criminal process into a stark attempt by the Commonwealth to compel testimony. In essence, the Commonwealth demanded that Mr. DeFoy admit his guilt to a pending charge as a condition of being paroled on an unrelated charge. That is the quintessential government attempt to compel testimony. Antelope, 395 F.3d at 1137-38 (revoking supervised release because defendant convicted of possessing child pornography would not admit to committing other crimes violated Fifth Amendment).

It cannot be seriously disputed that the testimony sought from Mr. DeFoy would be incriminating. The Sex Offender Treatment program required Mr. DeFoy to admit to the official version of the offense which meant he would have had to admit to the official version of the IDSI, statutory rape, and corruption of a minor offenses which admission could have then been used

against him at his new trial rendering the new trial meaningless. That the testimony was compelled is also beyond dispute. The only basis for refusing Mr. DeFoy reparole in 1997 was his refusal to participate in Sex Offender Treatment. The Parole Decision Making Guidelines form recommended release, the Department of Corrections recommended release, and the only factors listed as countervailing the guidelines was a negative psychiatric report, which stated Mr. DeFoy had no history of mental illness or treatment but needed to participate in Sex Offender Treatment, an unexplained, unfavorable recommendation from Board staff, the refusal to participate in Sex Offender Treatment, and a negative attitude. (Petitioner's Exhibit AAA p. 3) To put it mildly, a person may have a negative attitude when he is being told he won't be paroled because he won't admit he's guilty of offenses for which he has been granted a new trial.

When a situation involves an attempt by the government to compel testimony, "any penalty that is capable of compelling a person to be a witness against himself is illegitimate." McKune, 536 U.S. at 53, 122 S.Ct. 2017. Justice O'Connor's opinion and Justice Steven's opinion make clear that increased incarceration, or the threat thereof, is a penalty that is capable of compelling a person to be a witness against himself. Incarceration is the harshest sanction our society uses to punish citizens. Indeed, all the Court need look at in this context is the manner used to compel recalcitrant witnesses to testify. When witnesses refuse to testify, they are held in contempt and incarceration is used to convince the witness to change their minds. In re Grand Jury Investigation, 600 F.2d 420 (3rd Cir. 1979).

Justice O'Connor's insistence that an inmate accept the consequences of a conviction resulting from a fair criminal process applies equally to the Commonwealth. Mr. DeFoy obtained an order vacating his convictions and granting a new trial through a fair criminal process created

14

by the Commonwealth. The Commonwealth, through the Board, was not free to ignore the results of this fair criminal process at its whim. At the time the Board considered Mr. DeFoy for reparole in July 1997, the Board knew that Mr. DeFoy had been granted a new trial on the IDSI, statutory rape, and corruption of a minor charges and yet it refused to reparole Mr. DeFoy, in contradiction to its own guidelines, because Mr. DeFoy would not admit he was guilty of the very offenses for which he had been granted a new trial. These actions went well beyond the criminal process, indeed ignored the criminal process, and appear, starkly, as a government attempt to compel Mr. DeFoy to be a witness against himself.

The Board can not punish Mr. DeFoy for legitimately invoking his Fifth Amendment privilege to not be a witness against himself. The evidence in this case makes clear that had the Board not considered Mr. DeFoy's invocation of the Fifth Amendment he would have been paroled following the June 1997 reparole consideration. The Parole Decision Making Guidelines form recommended release, the Department of Corrections recommended release, and the only reasons given to countervail the guidelines was Mr. DeFoy's failure to participate in Sex Offender Treatment. The proper remedy for the Board's violation of Mr. DeFoy's Fifth Amendment rights is to enter an order reparoling Mr. DeFoy effective August 12, 1997, the date the Board issued its ruling on Mr. DeFoy's reparole consideration. Mickens-Thomas v. Vaughn, 355 F.3d 294, 309 (3rd Cir. 2004).

The R and R's claim that there was no compulsion because Mr. DeFoy was not entitled to parole is contrary to Supreme Court case law. As Justice O'Connor explained in her concurring opinion, the Court's Fifth Amendment "penalty" cases involved the threatened loss of employment, Uniformed Sanitation Men Ass'n, Inc. V. Commissioner of Sanitation of City of New York, 392

U.S. 280, 88 S.Ct. 1917 (1968), loss of professional license, Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625 (1967), ineligibility to receive government contracts, Lefkowitz v. Turley, 414 U.S. 70, 94 S.Ct. 316 (1973), and loss of the right to participate in political associations and to hold public office, Lefkowitz v. Cunningham, 431 U.S. 801, 97 S.Ct. 2132 (1977). McKune, 536 U.S. at 49-50, 122 S.Ct. 2033. In none of these cases did the individuals threatened with the loss of their livelihood have a right to the job they had or to the professional license they held or to receive any particular government contract. But the failure to have a "right" to benefit they were threatened with losing if they invoked their Fifth Amendment privilege did not prevent the Supreme Court from finding that the privilege had been violated due to the state's threatened punishment for invoking the right.

      B.    Use in a Criminal Proceeding

The Magistrate's R and R's finding that no Fifth Amendment violation occurred because no statements were used against Mr. DeFoy at a criminal trial is breathtaking. It appears that the Magistrate has determine that the Supreme Court's Fifth Amendment "penalty" cases are no longer good law. In addition to the fact that an inferior court cannot overrule Supreme Court case law, the R and R is wrong because the Supreme Court itself has reaffirmed the viability of the "penalty" cases in Chavez v. Martinez, 538 U.S. 760, 123 S.Ct. 1994 (2003).

The R and R cites to United States v. Patane, 542 U.S. 630, 637, 124 S.Ct. 2626 (2004) for the proposition that the core protection of the Fifth Amendment is a prohibition from compelling a defendant to testify against himself at trial. (R and R p. 11) The R and R extrapolates from that proposition that no Fifth Amendment violation occurred here because no compelled statement has been used against Mr. DeFoy at a criminal trial. That is a serious misreading of Patane.

16

Patane supports its statement that the core protection of the Fifth Amendment is prohibiting a defendant from being forced to testify against himself at trial by citing to Chavez. In Chavez, a majority of the Court found that a violation of the Fifth Amendment occurs when compelled statements are introduced against a defendant at a criminal trial. Chavez, 538 U.S. at 767, 123 S.Ct. at 2001 (plurality opinion), 538 U.S. at 777, 123 S.Ct. at 2006 (concurring, creating majority). However, both the plurality opinion and Justice Souter's concurring opinion make clear that the Court was not altering its "penalty" jurisprudence concerning the penalizing of a citizen for invoking his Fifth Amendment privilege. 538 U.S. at 772 n.3, 123 S.Ct. at 2004 (plurality opinion) ("That the privilege is a prophylactic one does not alter our penalty cases jurisprudence, which allows such privilege to be asserted prior to, and outside of, criminal proceedings."); 538 U.S. at 777-78, 123 S.Ct. 2007 (Souter, J. concurring) ("extensions of the bare guarantee may be warranted if clearly shown to be desirable means to protect the basic right against the invasive pressures of contemporary society. In this light, we can make sense of a variety of Fifth Amendment holdings: . . . precluding threats or impositions of penalties that would undermine the right to immunity.") (internal citations and quotations omitted). Thus, the Supreme Court made clear in Chavez that the penalty cases are still viable and prevent government from penalizing an individual for invoking his Fifth Amendment privilege. See, Antelope, 395 F.3d at 1140-41.

WHEREFORE, petitioner, Robert Lee DeFoy, respectfully requests that this Honorable Court reject the Magistrate's R and R and issue a writ of habeas corpus ordering the Pennsylvania Department of Corrections to release Mr. DeFoy from imprisonment on his armed robbery and larceny sentence effective August 12, 1997.

Respectfully submitted,


/s/ Thomas W. Patton
Thomas W. Patton
Assistant Federal Public Defender
PA I.D. No. 88653